# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY GILL & MARCELLE LETOURNEAU, et al. <br><br> Plaintiffs, <br><br> v. <br><br> OFFICE OF PERSONNEL MANAGEMENT, et al. <br><br> Defendants. | ) <br> ) <br> ) <br> )     No. 1:09-cv-10309 JLT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

GAY & LESBIAN ADVOCATES & DEFENDERS
Gary D. Buseck
Mary L. Bonauto
Nima R. Eshghi
Janson Wu
Samuel P. Bickett
30 Winter Street, Suite 800
Boston, MA 02108
Telephone (617) 426-1350
Facsimile (617) 426-3594
*Attorneys for Plaintiffs*

FOLEY HOAG LLP
Claire Laporte
Vickie L. Henry
Matthew Miller
Amy Senier
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210
Telephone (617) 832-1000
Facsimile (617) 832-7000
*Attorneys for Plaintiffs*

JENNER & BLOCK LLP
Paul M. Smith
Luke C. Platzer
Daniel I. Weiner
Anna M. Baldwin
1099 New York Ave, NW, Suite 900
Washington, DC 20001
Telephone (202) 639-6060
Facsimile (202) 661-4948
*Attorneys for Plaintiffs*

SULLIVAN & WORCESTER LLP
David J. Nagle
Richard L. Jones
One Post Office Square
Boston, MA 02109
Telephone (617) 338-2873
Facsimile (617) 338-2880
*Attorneys for Plaintiffs Mary Ritchie, Kathleen Bush, Melba Abreu, Beatrice Hernandez, Marlin Nabors, Jonathan Knight, Mary Bowe-Shulman, and Dorene Bowe-Shulman*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

    A.    Federal Marriage-Based Laws, Programs, Rights, and Responsibilities. ............... 3

    B.    Plaintiffs Have Been Harmed Because Defendants Refuse to Acknowledge that They are Married. .................................................................. 5

    C.    The 1996 Defense of Marriage Act. ................................................................... 8

ARGUMENT ........................................................................................................... 11

I.    PLAINTIFFS' EQUAL PROTECTION CLAIMS REQUIRE HEIGHTENED REVIEW. ........................................................................................................... 12

    A.    The Court Should Closely Scrutinize DOMA's Intrusion into Family Law, an Area Traditionally Reserved to the States. ....................................................... 12

        1.    Determining Marital Status Is Exclusively a State Concern. .................... 13

        2.    Marital Eligibility Has Always Varied Across States, Often Dramatically. ........................................................................................... 14

        3.    Federal Law Has Long Relied Upon State Marital Status Determinations When Marital Status Is Relevant to Federal Law. .......... 15

        4.    DOMA's Radical Break from this Tradition Calls for Heightened Review. ................................................................................................... 18

    B.    DOMA Should Be Subjected to Heightened Scrutiny Because it Disparately Burdens the Fundamental Interest in Maintaining Existing Family Relationships. .......................................................................................... 19

    C.    DOMA Should Be Subjected to Heightened Scrutiny Because it Discriminates on the Basis of Sexual Orientation. ............................................... 22

        1.    Gays and Lesbians Have Experienced a History of Discrimination. ......... 24

        2.    Sexual Orientation Is Unrelated to the Ability to Contribute to Society. .................................................................................................. 25

        3.    Gays and Lesbians Are a Minority and Face Significant Obstacles to Achieving Protection from Discrimination Through the Political Process. ................................................................................................. 25

        4.    Sexual Orientation Is a Defining Characteristic of a Person's Identity. .................................................................................................. 25

II.    DOMA FAILS HEIGHTENED SCRUTINY. ................................................................. 26

III.    DOMA FAILS EVEN RATIONAL BASIS REVIEW. ..................................................... 26

    A.    The Interests Asserted By the Government Are Unpersuasive. ........................... 28

        1.    DOMA Does Not "Maintain the Status Quo," and Continuing the Exclusion of Married Same-Sex Couples from Marital Benefits Is Not an "Interest." .................................................................................. 29

        2.      DOMA Is Not an "Incremental" Response to Marriage by Same-Sex Couples, and Incrementalism Alone Is not an Interest in the Absence of Some Underlying Purpose. ...................................................... 30

        3.      DOMA's Discrimination Among Married Persons Cannot Be Justified as Treating All Same-Sex Couples Alike, Whether Married or Not. ........................................................................................ 32

    B.      The Interests Actually Stated by Congress, and Abandoned by the Government, Cannot Support DOMA Either. ...................................................... 34

        1.      DOMA Has Nothing to Do with Procreation and Child-Rearing............ 34

        2.      DOMA Cannot Be Justified as Preserving "Traditional" Marriage. ........ 36

        3.      DOMA Undermines Rather than Protects State Sovereignty................... 37

        4.      DOMA Does Not "Conserv[e] Scarce Resources," and Conserving Resources Is Not a Justification for Denying Rights Indiscriminately and Inequitably. ........................................................... 38

        5.      Expressing Moral Disapproval of Homosexuality Is Not a Valid Interest. ........................................................................................................ 39

IV.    IN THE ALTERNATIVE, DOMA SHOULD BE INTERPRETED SO AS NOT TO REACH THE FEHB STATUTE. ............................................................................ 41

V.     EACH PLAINTIFF HAS STANDING. ............................................................................ 43

    A.      Defendants' Partial Challenge to Gill and Letourneau's Standing is Moot.......... 43

    B.      Plaintiff Hara Has Standing to Pursue his Claim for Federal Health Insurance Benefits................................................................................................. 44

CONCLUSION AND RELIEF REQUESTED ............................................................................ 47

# TABLE OF AUTHORITIES

**CASES**

*Albathani v. INS*, 318 F.3d 365 (1st Cir. 2003) ............................................................46

*Ankenbrandt v. Richards*, 504 U.S. 689 (1992)............................................................13

*Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986) ............................20

*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993)......................................................................9

*Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001) ......27, 28, 33, 37

*Bowen v. Gilliard*, 483 U.S. 587 (1987) .......................................................................24

*Bradwell v. Illinois,* 83 U.S. 130 (1872) .......................................................................41

*Bush v. Gore*, 531 U.S. 98 (2000).................................................................................20

*Butler v. Apfel*, 144 F.3d 622 (9th Cir. 1998) ..............................................................32

*Califano v. Goldfarb*, 430 U.S. 199 (1977) ...................................................................4

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) .................22, 26, 27, 28, 37, 40

*City of New Orleans v. Dukes*, 427 U.S. 297 (1976) ....................................................26

*Clark v. Martinez*, 543 U.S. 371 (2005) .......................................................................43

*Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008), *cert. denied*, 129 S. Ct. 2763 (2009).......................23

*DeSylva v. Ballentine*, 351 U.S. 570 (1956) ...........................................................16, 17

*Diffenderfer v. Gomez-Colon*, 587 F. Supp. 2d 338 (D.P.R. 2008).................................. 26-27, 28

*Dunn v. Commissioner,* 70 T.C. 361 (1978) .................................................................16

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ................................................................28, 35

*Elk Grove United School District v. Newdow*, 542 U.S. 1 (2004)................................13

*FCC v. Beach Communication, Inc.*, 508 U.S. 307 (1993).............................................27

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)................................................46

*Flemming v. Nestor*, 363 U.S. 603 (1960) ......................................................................4

*Frontiero v. Richardson*, 411 U.S. 677 (1973) ............................................................24

*Gately v. Massachusetts*, 2 F.3d 1221 (1st Cir. 1993) ..................................................23

*Goodridge v. Dep't of Public Health*, 798 N.E.2d 941 (Mass. 2003) .....................35, 36

*Griswold v. Connecticut*, 381 U.S. 479 (1965) .............................................................35

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) .....................................................27, 37

*Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) ...............................20

*Heller v. Doe*, 509 U.S. 312 (1993) ........................................................................28, 39

*Helvering v. Janney*, 311 U.S. 189 (1940) .....................................................................4

*Hernandez-Montiel v. INS*, 225 F.3d 1084 (9th Cir. 2000), *overruled in part on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) ............................26

*Hewlett-Packard Co. v Berg*, 61 F.3d 101 (1st Cir. 1995) ...........................................42

*Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985) .......................................35

*Houston Community Hospital v. Blue Cross and Blue Shield of Texas, Inc.*, 481 F.3d 265 (5th Cir. 2007) ..........................................................................................................4

*Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649 (1st Cir. 1997) ..................27-28

*Kurzon v. United States Postal Service*, 539 F.2d 788 (1st Cir. 1976) .........................46

*Lachance v. Devall*, 178 F.3d 1246 (Fed. Cir. 1999) ....................................................47

*Lawrence v. Texas*, 539 U.S. 558 (2003) ........................................20, 23, 24, 35, 41

*Lee v. Commissioner,* 64 T.C. 552 (1975), *aff'd*, 550 F.2d 1201 (9th Cir. 1977) .......16

*Lofton v. Secretary of Dep't of Children and Family Services*, 377 F.3d 1275 (11th Cir. 2004) ...................................................................................................................28, 41

*Loving v. Virginia*, 388 U.S. 1 (1967) .....................................................................13, 41

*Lyng v. Castillo*, 477 U.S. 635 (1987) ..........................................................................24

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) ...........................................................................21

*Massachusetts Trustees of Eastern Gas & Fuel Ass'n v. United States*, 312 F.2d 214 (1st Cir. 1963) .........................................................................................................42

*Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976) ..........................24

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ..............................................................32

*Matthews v. de Castro*, 429 U.S. 181 (1976)...............................................................27

*Medeiros v. Vincent*, 431 F.3d 25 (1st Cir. 2005).................................................24, 32

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977) ...............................................20

*National Federation of Federal Employees v. Devine*, 679 F.2d 907 (D.C. Cir. 1982).................4

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) .................................................14

*Northwest Austin Municipal Utility District No. One v. Holder*, 129 S. Ct. 2504 (2009).............18

*Palmore v. Sidoti,* 466 U.S. 429 (1984).....................................................................41

*Pennoyer v. Neff*, 95 U.S. 714 (1877), *overruled on other grounds, Shaffer v. Heitner*,
    433 U.S. 186 (1977)..............................................................................................13

*Plyler v. Doe*, 457 U.S. 202 (1982)............................................21, 24, 25, 27, 37, 39

*Reynolds v. United States*, 98 U.S. 145 (1878) ..........................................................17

*Romer v. Evans*, 517 U.S. 620 (1996)............................................................... passim

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .......................................................32, 46

*Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled in part on other grounds,*
    *Edelmann v. Jordan*, 415 U.S. 651 (1974) ........................................................39

*Sosna v. Iowa*, 419 U.S. 393 (1975) ....................................................................13, 37

*Spearman v. Spearman*, 482 F.2d 1203 (5th Cir. 1973) ............................................17

*Stanley v. Illinois*, 405 U.S. 645 (1972)......................................................................20

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) .................................20

*Turner v. Safley*, 482 U.S. 78 (1987) ..........................................................................13

*United States Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973) ................26, 40, 41

*United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005) ..........................................42

*United States v. Dwinells*, 508 F.3d 63 (1st Cir. 2007) ........................................43, 44

*United States v. Lopez*, 514 U.S. 549 (1995) ..............................................................14

*United States v. Morrison*, 529 U.S. 598 (2000) ........................................................13

*United States v. Sacco*, 428 F.2d 264 (9th Cir. 1970)...................................................17

*United States v. Virginia*, 518 U.S. 515 (1996) ...............................................26, 41

*Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009)...................................................24

*Von Tersch v. Commissioner*, 47 T.C. 415 (1975)................................................16

*Zablocki v. Redhail*, 434 U.S. 374 (1978)...........................................................13

**S**TATUTES

5 U.S.C. § 3110 ...........................................................................................................3

5 U.S.C. § 7703(d) ...................................................................................................47

5 U.S.C. § 8901(5)...............................................................................................42, 43

5 U.S.C. § 8903(3) ...................................................................................................43

5 U.S.C. § 8905(a) ...................................................................................................43

5 U.S.C. § 8905(b) ...................................................................................................43

5 U.S.C. § 8905(b)(2) ...............................................................................................43

5 U.S.C. § 8905(e) ...................................................................................................43

5 U.S.C. §§ 8981-8992 .............................................................................................42

8 U.S.C. § 1101(a)(35)..............................................................................................17

8 U.S.C. § 1186b(2)(A)...............................................................................................3

8 U.S.C. § 1430 ...........................................................................................................3

28 U.S.C. § 458...........................................................................................................3

28 U.S.C. § 1738C..................................................................................................1, 38

38 U.S.C. § 101(31) ..................................................................................................16

38 U.S.C. § 103(c) ....................................................................................................16

42 U.S.C. § 416(h)(1)(A)(i) ......................................................................................16

Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996), *codified at* 1
   U.S.C. § 7.............................................................................................................. *passim*

U.S.C.A., T.1, Ch.1...................................................................................................18

5 C.F.R. § 843.102 ...................................................................................................16

5 C.F.R. § 1201.119 .................................................................................................47

20 C.F.R. § 10.415 ...................................................................................................16

20 C.F.R. § 219.30 ....................................................................................................16

20 C.F.R. § 222.11 ....................................................................................................16

20 C.F.R. § 404.345 ..................................................................................................16

29 C.F.R. § 825.122 ..................................................................................................16

29 C.F.R. § 825.800 ..................................................................................................16

38 C.F.R. § 3.1(j) ......................................................................................................16

45 C.F.R. § 237.50(b)(3) ...........................................................................................16

HAW. CONST. art. I, § 23 ............................................................................................9

## LEGISLATIVE MATERIALS

142 CONG. REC. H7275 (daily ed. July 11, 1996) ....................................................10

142 CONG. REC. H7276 (daily ed. July 11, 1996) ....................................................10

142 CONG. REC. H7444 (daily ed. July 11, 1996) ....................................................10

142 CONG. REC. H7480 (daily ed. July 12, 1996) ....................................................10

142 CONG. REC. H7486 (daily ed. July 12, 1996) ....................................................10

142 CONG. REC. H7494 (daily ed. July 12, 1996) ....................................................10

142 CONG. REC. H7495 (daily ed. July 12, 1996) ....................................................10

142 Cong. Rec. H7503-05 (daily ed. July 12 1996) ..................................................39

142 CONG. REC. S10,110 (daily ed. Sept. 10, 1996) .................................................10

H.R. Rep. No. 104-664 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905 ................. *passim*

H.R. Rep. No. 67-350 (1921) .......................................................................................5

H.R. Rep. No. 86-957 (1959) ..................................................................................4, 43

S. Rep. No. 108-393 (2004) .........................................................................................4

S. Rep. No. 86-468 (1959) ...................................................................................42, 43

S. Rep. No. 97-144 (1981) ...........................................................................................5

**ADMINISTRATIVE RULINGS**

*In re Applications of Algreg Cellular Engineering*, 12 FCC Rcd 8148 (FCC 1997) .....................3

**OTHER AUTHORITIES**

Kerry Abrams, *Immigration Law and the Regulation of Marriage*, 91 Minn. L. Rev. 1625
  (2007) ......................................................................................................................17

Homer Clark, *Family Law* (1988) ..............................................................................15

Cong. Budget Office, *The Potential Budgetary Impact of Recognizing Same-Sex
  Marriages* (Jan. 21, 2004) ....................................................................................38

Fed. R. Evid. 501 ..........................................................................................................3

Michael Grossberg, *Guarding the Altar: Physiological Restrictions and the Rise of State
  Intervention in Matrimony*, 26 Amer. J. of Legal Hist. 197 (1982)...................14, 15

Fred S. Hall & Elisabeth W. Brooke, *American Marriage Laws in Their Social Aspects*
  (1919) ......................................................................................................................15

George Elliott Howard Ph.D., *A History of Matrimonial Institutions* (1904) ...............14

Randall Kennedy, *Interracial Intimacies* (2003) ..........................................................14

Report of the U.S. General Accountability Office, Office of General Counsel, January 23,
  2004 (GAO-04-353R).............................................................................................3

Report of the U.S. General Accounting Office, Office of General Counsel, January 31,
  1997 (GAO/OGC-97-16).......................................................................................11

Edward Stein, *Past and Present Proposed Amendments to the United States Constitution
  Regarding Marriage*, 82 Wash. U. L.Q. 611 (2004) ...............................................18

# INTRODUCTION

Plaintiffs are gay men or lesbians who married a person of the same sex under the law of the Commonwealth of Massachusetts.  Once legally married, the Plaintiffs would ordinarily expect to exercise all of the rights and discharge all of the responsibilities of married people.  However, Section 3 of the Defense of Marriage Act, Pub. L. No. 104-199, 110 Stat. 2419 (1996), *codified at* 1 U.S.C. § 7 ("DOMA"), defines the terms "marriage" and "spouse" so as to exclude the lawful marriages of same-sex couples from federal recognition.[1]  As applied to Plaintiffs, DOMA takes the unitary class of couples married in Massachusetts and divides it in two: those who are "married" under federal law, and those whose marriages do not exist for any federal purpose.

This sundering of the class of married people violates the Equal Protection guarantee of the Fifth Amendment.  Under our constitutional scheme, it is the prerogative of the States to say who is "married," as Massachusetts has done here.  Because DOMA establishes a conflicting and supervening federal definition of marriage, in contravention of the States' constitutional sovereignty over marriage, it merits particularly close review.  Heightened scrutiny also is warranted because DOMA burdens Plaintiffs' fundamental interests in the integrity of their existing familial relationships and because it impermissibly targets gay men and lesbians.

Even if DOMA is examined without heightened scrutiny, it fails.  There is no legitimate or plausible federal interest that is served by the creation of a freestanding federal definition of marriage that excludes same-sex couples.  The reasons offered by Congress at the time, which the government sensibly does not even try to defend, are either nonsensical or just another way

---

[1]     The Defense of Marriage Act also contains a distinct provision, Section 2, authorizing States to disregard marriages of same-sex couples performed and recognized by other States. *See* 28 U.S.C. § 1738C.  Plaintiffs do not challenge Section 2 here; the shorthand reference to "DOMA" in this brief is intended exclusively as a reference to Section 3 of the Act and not to Section 2.

of saying that Congress wanted to denounce and harm those gay men and lesbians who form long-term relationships and seek to have those relationships recognized and respected through civil marriage. For example, it is absurd to suggest that barring federal recognition of marriages of same-sex couples will somehow promote responsible procreation. And the government itself has determined that DOMA, while excluding Plaintiffs and others like them from important federal programs designed to support couples and families, has a net cost to the federal purse rather than a net savings. As for the government's effort to conjure up new and more defensible post hoc justifications for DOMA, they are more rhetoric than real justifications. Plaintiffs should not have to bear the burden of Congress's desire to score political points by refusing to recognize Plaintiffs' marriages and treat them equally.

For these reasons, the Defendants' motion to dismiss should be denied. Indeed, as shown below, Plaintiffs are entitled to summary judgment in their favor. The material facts are not in dispute. Each Plaintiff is suffering harm traceable directly to the Defendants' refusal to recognize their State-sanctioned marriages. Each Defendant's refusal to do so is the direct and proximate result of DOMA. Each Plaintiff has brought an as-applied challenge to DOMA because these refusals deny them legal rights and protections to which they would otherwise be entitled. There are no factual issues to resolve on any of these points, only a pure question of law: whether DOMA is unconstitutional as applied to these Plaintiffs.

The answer to that question is clear. There are no legitimate or remotely plausible justifications for the federal government's continued refusal to recognize the Plaintiffs' actual marital status. Thus, in addition to denying Defendants' Motion to Dismiss, the Court should grant Plaintiffs' Motion for Summary Judgment.

**STATEMENT OF FACTS**

**A.      Federal Marriage-Based Laws, Programs, Rights, and Responsibilities.**

Federal law presently conditions over a thousand different federal rights, responsibilities, and opportunities on whether an individual involved is married.  *See* Affidavit of Gary D. Buseck, Ex. B (Report of the U.S. General Accounting Office, Office of General Counsel, January 23, 2004 (GAO-04-353R)).  Many of these rights, responsibilities and opportunities, including those at issue in this litigation, pertain to benefits under particular federal programs, as well as the treatment of persons under the Internal Revenue Code.  In these contexts, federal law often affords more favorable treatment, or greater rights, to married persons than it does to single persons.  Plaintiffs concur with, and adopt, Defendants' descriptions of each of the specific programs at issue in this case.  *See* Defendants' Motion to Dismiss ("MTD") at 5-12.[2]

Federal law often provides advantageous treatment to married individuals to further specific federal polices.  In the case of the Federal Employees Health Benefits Act ("FEHBA"), the stated purpose is twofold: to make federal employment competitive with benefits offered in

---

[2]      Plaintiffs' as-applied challenge is to their exclusion from specific federal benefits programs and tax advantages.  However, it is worth noting that federal law looks to marital status across a vast range of laws and programs, and that marriage can be advantageous or disadvantageous, and can involve pecuniary as well as nonpecuniary rights and responsibilities. For instance, married persons enjoy the right under federal law to invoke the marital confidences and spousal privileges in federal court, *see* Fed. R. Evid. 501, the right to sponsor a non-citizen spouse for naturalization, *see* 8 U.S.C. § 1430, and to obtain conditional permanent residence for that spouse, *id*. § 1186b(2)(A).  Married persons are also subject to a number of legal obligations, such as conflict-of-interest rules governing federal employment and participation in federally funded programs, *e.g.*, 5 U.S.C. § 3110, restrictions on employment with or appointment to the judiciary, *see* 28 U.S.C. § 458, and various ownership limitations and certifications related to telecommunications and broadcast licensing, *see e.g.*, *In re Applications of Algreg Cellular Engineering*, 12 FCC Rcd 8148, 8181-82 (FCC 1997), to cite but a few examples.  In the well-known case of the so-called "marriage penalty," some married persons receive less favorable treatment under the tax code than similarly situated unmarried persons.  And, as presented in the related case currently pending before the Court, federal law also affects individuals' rights as married persons under a number of State programs that implicate federal funds.  *See Commonwealth of Mass. v. U.S. Dep't of Health and Human Servs.*, No. 1:09-cv-11156-JLT.

the private sector, and to provide support and security for federal wage-earners and their families. *See* H.R. Rep. No. 86-957 at 1-2 (1959) ("FEHB H. Rep.") (goal was to "close the gap" and improve the "competitive position" of the government vis-à-vis private enterprise "in the recruitment and retention of competent civilian personnel," and recognizing "urgent need" for an employee health benefits program as "essential to protect wage-earners and their families"); *Nat'l Fed'n of Fed. Employees v. Devine*, 679 F.2d 907, 913 n.9 (D.C. Cir. 1982) (purpose of the FEHBA is to "protect federal employees against the high and unpredictable costs of medical care" along with ensuring that the federal government provides benefits sufficient to make itself competitive in employee recruitment and retention); *Houston Cmty. Hosp. v. Blue Cross and Blue Shield of Tex., Inc.*, 481 F.3d 265, 271 (5th Cir. 2007) (same). The same concerns animated the provision of supplemental vision and dental insurance ("FEDVIP"). *See* S. Rep. No. 108-393, at 1-2 (2004). In the case of the Social Security program, also at issue in this case, benefits are provided to married and widowed individuals as an economic safety net. Workers earn benefits through their paid labor and contributions to the economy so that they can later rely on that economy to care for them and their dependents in old age and during periods of disability. *See Califano v. Goldfarb*, 430 U.S. 199, 208 (1977) (purpose of Social Security is to protect beneficiaries "against the economic consequences of old age, disability, and death"); *see also Flemming v. Nestor*, 363 U.S. 603, 609 (1960).

Similarly, federal tax law has long permitted married couples to pool their income and deductions on a joint return and compute tax on their combined income as an economic unit. *See, e.g.*, *Helvering v. Janney*, 311 U.S. 189, 192, 194-95 (1940) (approving the principle expressed in an opinion of the Solicitor of Internal Revenue, Sol. Op. 90, 4 C.B. 236, 238 (1921), that a joint return "is treated as the return of a taxable unit" and acknowledging Congressional

"policy set forth in substantially the same terms for many years . . . to provide for a tax on [a married couple's] aggregate net income"); H.R. Rep. No. 67-350, at 13 (1921), *as reprinted in* 1939-1 C.B. (Pt. 2) 168, 178 (referencing a married couple's right "in all cases to make a joint return and have the tax computed on [their] combined income."). *Cf. also* S. Rep. No. 97-144, at 127 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 105, 228 ("The committee believes that [spouses] should be treated as one economic unit for purposes of estate and gift taxes, as they generally are for income tax purposes.").

**B.      Plaintiffs Have Been Harmed Because Defendants Refuse to Acknowledge that They are Married.**

Each Plaintiff is married or a surviving spouse, and each Plaintiff has been concretely harmed because DOMA requires Defendants to refuse to acknowledge that reality.  Neither the harms suffered by each Plaintiff, nor the fact that such harms have been or are being caused by Defendants' treatment of Plaintiffs as unmarried, is reasonably disputed.

Several of the Plaintiffs seek spousal protections based on their (or their spouse's) employment with the United States government.  Plaintiff Nancy Gill, a 22-year employee of the U.S. Post Office, has been unable to add her spouse, Plaintiff Marcelle Letourneau, to her health insurance coverage, vision benefit plan, or flexible spending account.   As a consequence, Plaintiff Letourneau has had to remain in the work force to have access to health insurance rather than stay at home with their two children for several years.   Their family also has suffered increased medical expenses as a result.   Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1 in Support of Plaintiffs' Motion for Summary Judgment ("SUF"), Nos. 4-11; Joint Affidavit of Nancy Gill & Marcelle Letourneau, ¶¶2, 27-28.   Plaintiff Martin Koski, a retiree from the Social Security Administration, has similarly been denied the right to add his spouse, Plaintiff James Fitzgerald, to his health insurance coverage.   SUF, Nos. 13-16.   The

couple has been forced to incur additional insurance expenses.  SUF, Nos. 17-18.  They also suffer from the fear that James may be unable to maintain even his current, inferior coverage due to his poor health, and could be left without insurance altogether.  Joint Affidavit of Martin Koski & James Fitzgerald, ¶6.  Plaintiff Dean Hara is the surviving spouse of Gerry Studds, a retired Member of the United States Congress.  SUF, Nos. 19-20.  Dean has been denied both health insurance and the survivor annuity normally available to surviving spouses, and has been forced to incur significant costs in purchasing his own insurance.  SUF, Nos. 23-25; Affidavit of Dean T. Hara, ¶¶19-20.

Other Plaintiffs have suffered adverse income tax consequences from being treated as single for purposes of the Internal Revenue Code.  Plaintiffs Melba Abreu and Beatrice Hernandez, respectively the chief financial officer of a Boston-area non-profit organization and a writer developing a business, have been forced to file any federal income tax returns as "single," notwithstanding the fact that they have been married since 2004, and have borne a higher aggregate tax burden as a result.  SUF, Nos. 32-37; Joint Affidavit of Melba Abreu & Beatrice Hernandez, ¶¶3-4.  Mary Ritchie, a longtime Massachusetts State Trooper, has been unable to contribute to a "spousal IRA" for her spouse, Kathleen Bush, who has temporarily sacrificed her career in order to be at home with their children and volunteer in their school and community activities.  The couple has incurred additional income tax burdens due to both their inability to file jointly and Mary's inability to contribute to Kathleen's IRA.  SUF, Nos. 26-31; Joint Affidavit of Mary Ritchie & Kathleen Bush, ¶¶4-5, 21.  Plaintiffs Marlin Nabors and Jonathan Knight, a college administrator and university finance associate respectively, have similarly faced higher income taxes because of their inability to file jointly.  SUF, Nos. 38-43; Joint Affidavit of Marlin Nabors and Jonathan Knight, ¶¶5-6.  Plaintiffs Mary and Dorene Bowe-

Shulman – one an attorney employed by the Commonwealth of Massachusetts and the other a cancer survivor who has recently started her own business – receive health insurance provided through Mary's employment with the Commonwealth. Joint Affidavit of Mary and Dorene Bowe-Shulman, ¶¶6-9. But the couple has been forced to pay federal income taxes on Dorene's benefits, in addition to being unable to file jointly, both of which have resulted in their paying higher taxes than a similarly situated opposite-sex family. SUF, Nos. 45-48; Joint Aff., ¶¶10-11.

Several of the Plaintiffs – although they and their spouses have paid into the Social Security system – have been denied the program's spousal protections. Several are widowers who have been denied benefits to which they would have been entitled if their deceased spouses had been wives rather than husbands. Plaintiff Randell Lewis-Kendell, a shop owner, was partnered with and then married to his now-deceased husband for 30 years. Affidavit of Randell Lewis-Kendell, ¶¶2-5, 8, 16. Plaintiff Herbert Burtis and his late husband were both musicians and music teachers who were together 60 years. Affidavit of Herbert Burtis, ¶¶3-6, 17. Plaintiff Dean Hara and Representative Studds had been together 16 years before the latter's death. Hara Aff., ¶¶2, 9-10. Each widower applied for and was denied the "One-Time Lump-Sum Death Benefit" of $255 normally available upon the death of a spouse. SUF, Nos. 21-22, 56-57, 60-61. Plaintiff Burtis, relying on the higher earnings record of his spouse, also was denied the survivor benefit normally available to a widower, totaling about $700 per month since his spouse's death in August 2008. SUF, Nos. 62-64; Burtis Aff., ¶17. Plaintiffs Jo Ann Whitehead and Bette Jo Green, together nearly 30 years, are both current Social Security recipients. As a labor and delivery nurse for many years, Bette Jo always earned more than Jo Ann, a garden educator. But Jo Ann has been denied the "spousal benefit" normally available to the lower-earning spouse. SUF, Nos. 50-53; Joint Affidavit of Bette Jo Green & Jo Ann Whitehead, ¶¶1, 3-4, 10-11. Jo

Ann is also extremely concerned about her financial circumstances if Bette Jo, a two-time cancer survivor, predeceases her and Jo Ann is unable to receive the Social Security spousal survivor benefit.  SUF, No. 54.

Apart from these concrete financial losses, many Plaintiffs have also faced additional harm from the confusion and uncertainty that arise from having their marriages not "count" for many purposes, causing anxiety in everyday situations and inviting discrimination by private parties.  For example, after his husband passed away, Plaintiff Lewis-Kendell repeatedly contacted the company holding his deceased husband's mortgage.  However, despite repeated efforts over a number of months, the company refused to talk to him and seemed incapable of understanding that he was the mortgagor's widower.  Lewis-Kendell Aff., ¶25.  He has experienced DOMA as "send[ing] a message to businesses and others that my marriage was not real" thus "add[ing] stress and confusion to everyday situations."  *Id*.  Other Plaintiffs have similarly experienced DOMA as devaluing their marriages.  Separate Statement of Non-Adjudicative Facts for Purposes of Determining the Level of Scrutiny for Plaintiffs' Equal Protection Claim ("SN-AF"), Nos. 10-22.

### C. The 1996 Defense of Marriage Act.

Normally, each Plaintiff would be entitled to the legal benefits and protections afforded to married (or widowed) persons under each of the various federal programs at issue – and would be treated the same as any other married person.  But they are denied those rights and benefits because of Section 3 of the 1996 Defense of Marriage Act, in which Congress excluded same-sex couples from any marriage-based rights or benefits arising under federal law:

CHAPTER 1--RULES OF CONSTRUCTION

§ 7. Definition of "marriage" and "spouse"

In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7.

Prior to DOMA's enactment, the Hawaii Supreme Court had indicated that same-sex couples might be entitled to marry under the State's constitution, raising the possibility that same-sex couples would begin marrying in the near future. *See Baehr v. Lewin*, 852 P.2d 44, 59-67 (Haw. 1993). The House Judiciary Committee's Report on DOMA cited *Baehr* as part of an "orchestrated legal assault being waged against traditional heterosexual marriage," and stated that this development "threatens to have very real consequences . . . on federal law." H.R. Rep. No. 104-664 at 2-3 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906-07 ("H. Rep.") (attached as Exhibit D to Affidavit of Gary D. Buseck). Specifically, the Report warned that "a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits." *Id*. at 10.[3]

The House Report acknowledged that federalism constrained Congress's power, and that "[t]he determination of who may marry in the United States is uniquely a function of state law." *Id*. at 3. Nonetheless, the Report stated that Congress was not "supportive of (or even indifferent to) the notion of same-sex 'marriage,'" *id*. at 12, and embraced DOMA as furthering Congress's interests in, *inter alia*, "defend[ing] the institution of traditional heterosexual marriage," *id*. The

---

[3]    *Baehr* never took effect in Hawaii, as the State ultimately amended its Constitution to allow the State legislature to limit marriage to opposite-sex couples. *See* HAW. CONST. art. I, § 23. However, five States now extend full marriage rights to same-sex couples (Iowa, New Hampshire, Connecticut, Vermont, and Massachusetts, where Plaintiffs reside).

Report also claimed interests in "encouraging responsible procreation and child-rearing," and conserving scarce resources. *Id*. at 13, 18.

Another purpose of the Act, as stated by the House Report, was to reflect Congress's "moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." *Id* at 16 (footnote omitted). The remarks of Rep. Henry Hyde, then-Chairman of the House Judiciary Committee, were blunt but typical: "Most people do not approve of homosexual conduct . . . and they express their disapprobation through the law. . . . It is . . . the only way possible to express this disapprobation." 142 CONG. REC. H7480 (daily ed. July 12, 1996). In the floor debate, members of Congress repeatedly voiced their disapproval of homosexuality, calling it "immoral," "depraved," "unnatural," "based on perversion" and "an attack upon God's principles."[4] They argued that marriage by gays and lesbians would "demean" and "trivialize" heterosexual marriage[5] and might indeed be "the final blow to the American family."[6]

Although DOMA amended the eligibility criteria for a vast number of different federal benefits, rights, and privileges dependent upon marital status, the relevant committees did not engage in any meaningful examination of the scope or effect of the law, much less the way in

---

[4]     142 CONG. REC. H7444 (daily ed. July 11, 1996) (statement of Rep. Coburn); 142 CONG. REC. H7486 (daily ed. July 12, 1996) (statement of Rep. Buyer); *Id*. at H7494 (statement of Rep. Smith).

[5]     *Id*. at H7494 (statement of Rep. Smith); *see also* 142 CONG. REC. S10, 110 (daily ed. Sept. 10, 1996) (statement of Sen. Helms) ("[Those opposed to DOMA] are demanding that homosexuality be considered as just another lifestyle – these are the people who seek to force their agenda upon the vast majority of Americans who reject the homosexual lifestyle . . . . Homosexuals and lesbians boast that they are close to realizing their goal – legitimizing their behavior . . . . At the heart of this debate is the moral and spiritual survival of this Nation."); 142 CONG. REC. H7275 (daily ed. July 11, 1996) (statement of Rep. Barr) (stating that marriage is "under direct assault by the homosexual extremists all across this country").

[6]     *Id*. at H7276 (statement of Rep. Largent); *see also* 142 CONG. REC. H7495 (daily ed. July 12, 1996) (statement of Rep. Lipinski) ("Allowing for gay marriages would be the final straw, it would devalue the love between a man and a woman and weaken us as a Nation.").

which federal interests in the relevant programs would be affected.  Congress did not, for instance, hear any testimony from agency heads regarding how DOMA would affect federal programs, nor from historians, economists, or specialists in child welfare.  Instead, the House Report simply observed that the terms "marriage" and "spouse" appeared hundreds of times in various federal laws and regulations, and that those terms were generally "not defined."  H. Rep. (Buseck Aff., Ex. D) at 10.  The vast reach of the Act did not become fully clear until January 1997, months after its passage, when the General Accounting Office issued a report stating that DOMA implicated 1,049 federal laws, touching on everything from entitlement programs like Social Security to employee issues to taxation.  Buseck Aff., Ex. A (Report of the U.S. General Accounting Office, Office of General Counsel, January 31, 1997 (GAO/OGC-97-16)).

## ARGUMENT

Defendants' pending Motion to Dismiss and Plaintiffs' pending Motion for Summary Judgment both turn on the same legal question: whether DOMA violates the Equal Protection guarantee of the Fifth Amendment as applied to Plaintiffs.  In the interest of judicial economy, these motions should be decided together and should be decided now.  The material facts are undisputed:  each Plaintiff has been harmed by DOMA's requirement that people married to a person of the same sex must be treated for federal purposes as though they were unmarried.

As shown below, the constitutionality of DOMA should be examined with heightened scrutiny for three independent reasons:  (1) it represents an unprecedented intrusion upon a domain traditionally reserved to the States; (2) it burdens the core liberty interest in the integrity of one's family; and (3) it unfairly discriminates against gay men and lesbians.

DOMA cannot survive such heightened review.  Nor can it survive even rational basis review.  The post-hoc rationalizations that the government advances for DOMA – that it "preserves the status quo," furthers an interest in "incremental[ism]," and preserves

"consistency" by ensuring that all gay and lesbian people are treated alike, whether they are married or not – are insubstantial and counterfactual.   And the reasons Congress actually articulated when it enacted DOMA – reasons the government (wisely) declines to defend here – are either nonsensical or reflect outright animus against gays and lesbians.   Under either the old or the new justifications, DOMA violates the equal protection guarantee of the Fifth Amendment and cannot constitutionally be applied to Plaintiffs.

I.      **PLAINTIFFS' EQUAL PROTECTION CLAIMS REQUIRE HEIGHTENED REVIEW.**

As Plaintiffs explain in Part III *infra*, the federal government's discrimination against Plaintiffs cannot be justified by reference to any legitimate or rational interest.   The standard governing review of DOMA, however, should be higher.   By upending the traditional balance between the State and federal governments, disparately burdening fundamental interests in family relationships, and drawing an invidious classification based on sexual orientation, DOMA triggers heightened scrutiny.

A.      **The Court Should Closely Scrutinize DOMA's Intrusion into Family Law, an Area Traditionally Reserved to the States.**

DOMA marks a stark, and unique, departure from the respect and recognition the federal government has long afforded to State marital status determinations.   The absence of any historical precedent for legislation that regulates the status of family relationships at the federal level demonstrates that there are no legitimate federal interests in this area.   Because it represents such a dramatic departure from federalist tradition, and implicates the core State power to govern domestic relations, DOMA should be subjected to more searching constitutional scrutiny than that applicable to conventional social or economic legislation.   *See Romer v. Evans*, 517 U.S. 620, 633 (1996) (imposition of a broad and unprecedented legal disability on one group of citizens requires closer equal protection scrutiny than conventional legislation).

1.    Determining Marital Status Is Exclusively a State Concern.

Under the basic structure of our constitutional scheme, the power to establish criteria for marriage, and to issue determinations of marital status, lies at the very core of the States' sovereign authority.[7]   The Supreme Court has made this point repeatedly and emphatically.  *See, e.g.*, *Elk Grove United Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) ("[t]he whole subject of the domestic relations . . . belongs to the laws of the States and not to the laws of the United States") (citing *In re Burrus*, 136 U.S. 586, 593-94 (1890)); *United States v. Morrison*, 529 U.S. 598, 617 (2000) (regulation of marriage touches on the police power, "which the Founders denied the National Government and reposed in the States…."); *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); *id*. at 716 (Blackmun, J., concurring) ("declarations of status, *e.g.* marriage, annulment, divorce, custody, and paternity" lie at the "core" of domestic relations law reserved to States); *Sosna v. Iowa*, 419 U.S. 393, 404  (1975) ("domestic relations" are "an area that has long been regarded as a virtually exclusive province of the States"); *Pennoyer v. Neff*, 95 U.S. 714, 734-35 (1877) (State has the "absolute right to prescribe the conditions on which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved"), *overruled on other grounds, Shaffer v. Heitner*, 433 U.S. 186 (1977).  Even when the Supreme Court has been divided on the scope of federal power vis-à-vis the States, it has unanimously reaffirmed that regulation of familial relations, including marriage, remains beyond the scope of federal power.  *See, e.g.*, *United States v. Lopez*, 514 U.S. 549, 564 (1995) (rejecting reading of Commerce Clause that could lead to federal regulation of "family law (including

---

[7]      State power over marital relations is of course itself bounded by the Constitution. *See, e.g.*, *Turner v. Safley*, 482 U.S. 78 (1987) (holding unconstitutional State marriage law limiting ability of prisoners to marry); *Zablocki v. Redhail*, 434 U.S. 374 (1978) (holding unconstitutional State marriage law limiting access to marriage based on financial status); *Loving v. Virginia*, 388 U.S. 1 (1967) (holding unconstitutional State marriage law limiting access to marriage based on race).

marriage, divorce, and child custody),” an area “where States historically have been Sovereign”); *id*. at 585 (Thomas, J., concurring); *id*. at 624 (Breyer, J., dissenting).

2.    <u>Marital Eligibility Has Always Varied Across States, Often Dramatically.</u>

The differences that exist among the States today with respect to marriage by same-sex couples (five States presently extend marital rights to same-sex couples) is far from unique in our nation’s history.[8]  In accordance with their sovereign power over family law in the federalist system, and their right to “experiment[] and exercis[e] their own judgment in an area to which States lay claim by right of history and expertise,” *United States v. Lopez*, 514 U.S. 549, 580-83 (1995) (Kennedy, J., concurring), the States have changed marital eligibility requirements in many ways over time.  *See* George Elliott Howard, Ph.D., *A History of Matrimonial Institutions* (1904) (changing and varied State policies on marital eligibility); Michael Grossberg, *Guarding the Altar: Physiological Restrictions and the Rise of State Intervention in Matrimony*, 26 Amer. J. of Legal Hist. 197, 197-200 (1982) (same); Randall Kennedy, *Interracial Intimacies* 219 (2003) (same, with respect to interracial marriages).

Historically, evolving eligibility criteria for marriage have frequently caused dramatic State-to-State differences in who could or could not marry.  Interracial marriage bans rose and fell State-by-State.  *See* Howard; *see also* Grossberg at 200.  There was a substantial split starting in the middle of the 19th century between States that followed the English common law regarding the age for marriage (12 for women and 14 for men) and those that imposed statutory minima (averaging 16 for women and 18 for men).  *See id*. at 208-09.  There was a longstanding divide between States in New England and the South that permitted first-cousin marriage while

---

[8]     The five States that currently extend marriage eligibility to same-sex couples represent a minority.  However, “it is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory . . .”  *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

banning marriages to affinal relatives (i.e. relatives related by marriage rather than by blood), and States that followed the "Western American System" banning first-cousin marriages while permitting affinal ones. *Id*. at 212-13. Over time, the "Western American System" generally prevailed as many States gradually eliminated affinal restrictions on marriage, while, on the other hand, bans on first-cousin marriages – and even second-cousin marriages – gradually spread throughout the 19th century. *Id*. at 213-16. Certain States later implemented marital restrictions based on health and mental capacity, although not uniformly or at the same time. *Id*. at 217, 221-22. And, of course, States have long had varying rules regarding common-law marriages. Although such marriages had been recognized back to colonial times, by 1919, 17 States had declared them invalid by statute or court decision. *See* Fred S. Hall & Elisabeth W. Brooke, *American Marriage Laws in Their Social Aspects* 31-32 (1919). Even in more recent times, 13 states have continued to recognize common law marriage for some or all purposes. Homer Clark, *Family Law* 47 (1988).

This history illustrates that differences among the States in their policies regarding who can marry, contentious State-by-State social and cultural debates about shifting eligibility requirements, and a fluid and changing legal landscape as different States gradually adopt different (and even conflicting) policies, are nothing new. Rather, what the government characterizes as the "evolving nature of this [marriage] issue," MTD at 18, is precisely what one would expect, and what has always happened in the past, in our system of dual sovereignty in which marriage policy is made at the State and not at the federal level.

       3.     <u>Federal Law Has Long Relied Upon State Marital Status Determinations</u>
            <u>When Marital Status Is Relevant to Federal Law.</u>

Despite the often dramatically different family law policies the States have pursued over time, federal reliance on State determinations of marital status is a longstanding tradition –

implemented in federal common law, countless federal statutes, and federal regulations. This includes programs directly affecting Plaintiffs: federal income taxation, *see, e.g.*, *Dunn v. Comm'r of Internal Revenue,* 70 T.C. 361, 366 (1978) (referencing number of decisions "recognizing that whether an individual is 'married' is, for purposes of the tax laws, to be determined by the law of the State of the marital domicile")[9]; federal employee benefits, *see* 5 C.F.R. § 843.102 (defining "spouse" by reference to State law); and Social Security survivor and death benefits, *see* 42 U.S.C. § 416(h)(1)(A)(i) ("[a]n applicant is the wife, husband, widow or widower" of an insured person "if the courts of the State" of the deceased's domicile "would find such an applicant and such insured individual were validly married").[10] Indeed, even in the absence of such express incorporation, the well-established rule has been that federal law affords recognition to familial status determinations as governed by the law of the relevant State. As the Supreme Court recognized in *DeSylva v. Ballentine*, 351 U.S. 570, 580 (1956), "[t]he scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law. . . . This is especially true when a statute deals with a familial relationship; there is no federal law of domestic relations, which is primarily a matter

---

[9]     *See also Lee v. Comm'r of Internal Revenue,* 64 T.C. 552, 556 (1975) ("existence and dissolution [of marriage] is defined by State rather than Federal law"), *aff'd*, 550 F.2d 1201 (9th Cir. 1977); *Von Tersch v. Comm'r of Internal Revenue*, 47 T.C. 415 (1975) (same for joint filing).

[10]     Examples are endless. *See, e.g.*, 20 C.F.R. § 404.345 (Social Security) ("If you and the insured were validly married under State law at the time you apply for . . . benefits, the relationship requirement will be met."); *see also, e.g.*, 38 U.S.C. § 103(c) (Veterans' benefits); 20 C.F.R. § 10.415 (Workers' Compensation); 45 C.F.R. § 237.50(b)(3) (Public Assistance); 29 C.F.R. §§ 825.122 and 825.800 (Family Medical Leave Act); 20 C.F.R. §§ 219.30 and 222.11 (Railroad Retirement Board); 38 C.F.R. § 3.1(j) (Veterans' Pension and Compensation). Indeed, the only federal statute other than DOMA of which Plaintiffs are aware that excludes legally married couples from the federal definition of "marriage" or "spouse" is another provision targeting same-sex couples, regarding burial in veterans' cemeteries, enacted in 1975 (and superfluous at the time, given that no State then extended marriage rights to same-sex couples). *See* 38 U.S.C. § 101(31); Pub. L. No. 94-169, § 101(1)(G).

of state concern." *Id.; see also, e.g.*, *Spearman v. Spearman*, 482 F.2d 1203, 1204-05 (5th Cir. 1973) (Federal Employees' Group Life Insurance Act); *United States v. Sacco*, 428 F.2d 264, 268 (9th Cir. 1970) (1855 immigration statute conferring citizenship on women "married to a citizen of the United States"). Federal law governing eligibility for marriage, on the other hand, has been limited to situations in which the federal government exercises the police power, such as administration of the territories. *See, e.g.*, *Reynolds v. United States*, 98 U.S. 145, 166 (1878).

This is not to say that the federal government must tie rights or benefits to marriage alone; many federal programs condition eligibility for particular rights on other criteria in addition to marriage, such as the length of the marriage or the economic eligibility of the participants. Critically, however, the point of such supplemental criteria is not to call into question or redefine who is or is not married, but merely to implement particular federal interests in the context of specific laws or programs. For instance, even in the area of immigration, where the federal government's power is arguably at its most extensive, immigration law "does not directly regulate who may marry." Kerry Abrams, *Immigration Law and the Regulation of Marriage*, 91 Minn. L. Rev. 1625, 1668 (2007). Rather, in situations where a citizen "desires to bring her spouse to the United States," *id.*, federal law looks both to (1) whether there is a valid marriage under State law; and (2) "whether the couple married for love or in a 'sham, phony, empty ceremony' intended only to facilitate immigration status for one of the spouses." *Id.* at 1672 (discussing *Sacco*, 428 F.2d at 270-71); *see also* 8 U.S.C. § 1101(a)(35) (unconsummated marriages performed without the presence of both parties do not qualify for immigration

purposes).  The point of these supplemental criteria is to implement distinct federal immigration interests (in policing fraud and allocating scarce visas), not to regulate marriage itself.[11]

            4.     <u>DOMA's Radical Break from this Tradition Calls for Heightened Review.</u>

DOMA uniquely breaks from this tradition by rewriting wholesale the U.S. Code, the Code of Federal Regulations, and various other rules to disadvantage married same-sex couples.[12]  Through its sheer breadth, DOMA in substance, if not in form, arrogates to the federal government a substantial portion of the power – previously exercised only by the States – to define eligibility for marriage and render decisions regarding marital status.  Moreover, it does so in a manner that repudiates the family law of certain States while vindicating the law of others, which raises additional constitutional concerns.  *Cf. Northwest Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2512 (2009) (law that "differentiates between the States" must be justified by a showing the difference is "sufficiently related to the problem it targets" given the "historic tradition that all States enjoy equal sovereignty) (internal citation omitted).

The scope of federal programs is ultimately a question of federal law.  But the historic federal practice of looking to and incorporating State law to determine marital status reflects a reality of the federal system of dual sovereignty:  States, not the federal government, have responsibility over family law, and the federal government rarely if ever has a valid interest in disregarding determinations of family status made by the States, even within the scope of federal

---

[11]      Congress has contemplated regulating the marital relationship in the past, but when it has done so, it has not been by legislation but by proposing constitutional amendments – tacitly acknowledging that regulating marriage is beyond the scope of its legislative powers.  *See* Edward Stein, *Past and Present Proposed Amendments to the United States Constitution Regarding Marriage*, 82 Wash. U. L.Q. 611 (2004).

[12]      Prior to DOMA, there had been only six other such "Rules of Construction" sweeping across the entire federal code – defining "[w]ords denoting number, gender, and so forth"; "county"; "vessel"; "vehicle"; "company"; and "products of American Fisheries" – and the section had not been amended since 1951.  U.S.C.A., T.1, Ch.1.

rights or federal programs.  DOMA may pay lip service to federalist concerns by limiting its application to federal law, but there is no mistaking the reality of what it does: leverage the vast size and reach of the federal government in order to implement an all-purpose, "national" family law.  As a practical matter, DOMA eviscerates the historic power of the States to say who is "married."  The concerns that such an exercise of federal power raises for the system of dual sovereignty, and its departure from centuries of federalist tradition, require close scrutiny of the interests advanced by Defendants to overcome an equal protection challenge.  The "absence of precedent for" a measure imposing disadvantages "is itself instructive; [d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional [equal protection] provision."  *Romer v. Evans*, 517 U.S. at 633 (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)).

> **B.**    **DOMA Should Be Subjected to Heightened Scrutiny Because it Disparately Burdens the Fundamental Interest in Maintaining Existing Family Relationships.**

The Government recognizes that Plaintiffs have a right to marry in their State and have exercised that right: "Plaintiffs *have* married in Massachusetts."  MTD at 3.  But DOMA burdens the integrity of those marriages and by extension Plaintiffs' most intimate family relationships. First, by its sweeping reclassification of the Plaintiffs as "single" for any and all federal purposes, DOMA erases their marriages under federal law.  Second, by throwing Plaintiffs' marriages into a confusing legal status in which their marriages "count" for some purposes but not others, it erases much of the meaning their marriages would otherwise have – in both public and private settings – and relegates them to second-class status.  DOMA should thus face heightened scrutiny for the additional reason that it burdens Plaintiffs' constitutionally protected interest in the integrity of their families.

The right to maintain family relationships free from undue government restrictions is a long-established and fundamental liberty interest. *See, e.g., Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977) (quoting *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639-40 (1974) (acknowledging "freedom of personal choice in matters of marriage and family life"); *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *id.* at 658 (denying non-marital father an opportunity to resume custody on mother's death results in "dismemberment of his family"); *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) (confirming that "persons in a homosexual relationship may [also] seek autonomy" for "personal decisions relating to marriage, procreation, … family relationships, child rearing, and education").[13]

Classifications that disparately burden fundamental rights demand heightened Equal Protection scrutiny regardless of whether those disadvantaged constitute a "suspect" class. *See, e.g.*, *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986) (discrimination among veterans depending on whether they entered service from New York requires strict scrutiny due to effect on right to travel); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 672 (1966) (poll tax subject to strict scrutiny due to effect on right to vote); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659-60 (1994) (law discriminating between different types of media subject to intermediate scrutiny due to impairment of First Amendment rights).  Indeed, even when interests impaired by an unequal classification are not considered "fundamental," their nature and importance informs the level of review. *See, e.g., Bush v. Gor*e, 531 U.S. 98, 104 (2000) (holding that despite the absence of fundamental right to vote for President, voters were

---

[13]      This case does not involve giving "formal recognition to any relationship that homosexual persons seek to enter," *Lawrence*, 539 U.S. at 578, and Plaintiffs are not seeking a "right to marry."  It rather concerns the different, and more burdensome, treatment of Plaintiffs vis-à-vis the class of opposite-sex married couples, notwithstanding the formal recognition of Plaintiffs' marital and family relationships by the Commonwealth of Massachusetts.

entitled to "equal dignity" and disparate recount standards violated the Equal Protection Clause); *Romer*, 517 U.S. at 631, 633 (striking down a classification interfering with ability of gay and lesbian persons to "seek specific protection from the law" and participate in "transactions and endeavors that constitute ordinary civic life in a free society"); *M.L.B. v. S.L.J.*, 519 U.S. 102, 120, 127 (1996) (holding that although there is no fundamental right to appeal State judicial determinations, barriers to appeal by an indigent appellant in parental termination proceeding violated the Equal Protection Clause); *Plyler v. Doe*, 457 U.S. 202, 219-21 (1982) (holding that although illegal aliens are not a suspect class and public education is not fundamental right, the importance of the interest in education warrants striking down measure restricting access to public school).

Plaintiffs have married and formed family relationships. Yet those family relationships are burdened by Defendants' wholesale refusal to afford their marriages any legal recognition; Plaintiffs are unable to enjoy many of the benefits of marriage that "constitute ordinary civic life in a free society" and that are taken for granted by different-sex married couples. *Romer*, 517 U.S. at 633. Defendants' assertion that heightened scrutiny is unwarranted because "there is no right to receive federal benefits on the basis of . . . marital status," MTD at 15, misses the forest for the trees. DOMA does not merely deprive Plaintiffs of discrete selected federal "benefits" (although it does), it sweeps so broadly and indiscriminately as to effect a virtual change of their legal status – from "married" to "single." In so doing, it strips Plaintiffs' closest familial relationships of much of their legal meaning, depriving them not only of the multitude of rights and benefits that accrue to marriage under federal law,[14] but also of the unique public validation, social recognition, respect, support and private and personal value that come with marriage.

---

[14]     Defendants characterize these as "benefits," but the legal effect goes well beyond federal entitlement programs. *See supra* n.2.

Section 3 even conscripts Plaintiffs into denying the existence of their own marriages through civil and criminal statutes that prohibit them from acknowledging those marriages in dealings with the federal government, such as on federal forms.

This enforced reclassification of Plaintiffs' closest and most intimate family relationships by the federal government interferes with Plaintiffs' relationships beyond the federal programs specifically at issue by signaling that their marriages lack full legal effect, thereby causing confusion among third parties and encouraging private disrespect for Plaintiffs' relationships.  In fact, several Plaintiffs have experienced adverse consequences in social and business settings as a result of their marriages' legal status being unclear or confusing.  *See* SN-AF, Nos. 15-16, 18, 20.  By stripping Plaintiffs' marriages of much of their legal meaning, DOMA also deprives them of their perceived legitimacy and the benefits that flow from it.

In short, by complicating what should be perfectly simple, imposing confusion and stigma, and undermining the legal effect of State-sanctioned marriages, DOMA substantially burdens Plaintiffs' fundamental interest in their existing familial relationships.  It is this wholesale undermining of their State-sanctioned family relationships, and not merely Plaintiffs' exclusion from discrete federal benefits, that necessitates heightened scrutiny.

## C.    DOMA Should Be Subjected to Heightened Scrutiny Because it Discriminates on the Basis of Sexual Orientation.

Finally, Section 3 also requires heightened scrutiny because it discriminates based on sexual orientation.  Courts apply heightened scrutiny to laws that single out a class of persons who have "experienced a history of purposeful unequal treatment or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985) (citations omitted).  When a law classifies persons based upon a characteristic that is "seldom relevant to the achievement of any

legitimate state interest," it is assumed to "reflect prejudice and antipathy – a view that those in the burdened class are not as worthy or deserving as others." *Id.* at 440. DOMA on its face discriminates against gay and lesbian persons and should face heightened scrutiny for this reason as well.

Plaintiffs acknowledge that the First Circuit recently applied rational basis scrutiny to the law excluding gay and lesbian persons from military service, and noted in its opinion that "homosexuals are not a suspect class." *Cook v. Gates*, 528 F.3d 42, 62 (1st Cir. 2008), *cert. denied*, 129 S. Ct. 2763 (2009). Defendants make too much of this passage. *See* MTD at 16. The *Cook* court's analysis demonstrates that the holding arose in the specific and limited context of the challenge to the military's policy, and that the panel limited itself to the question of whether the Supreme Court's decisions in *Romer v. Evans* and *Lawrence v. Texas* "mandate[d]" the application of heightened scrutiny. *Cook*, 528 F.3d at 61. The court did not consider whether sexual orientation is a suspect classification under the doctrinal factors that govern such an analysis, nor, importantly, was there any record before the court on which it even could have done so. *See id.* at 60-62. Nor did the court discuss, or appear to consider, whether classifications based on sexual orientation should be treated as "quasi-suspect" or evaluated under "intermediate" scrutiny. As "a decision dependent upon its underlying facts is not necessarily controlling precedent as to a subsequent analysis of the same question on different facts and a different record," *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993), *Cook* should not foreclose inquiry into whether sexual orientation is a suspect or quasi-suspect classification based on application of those factors. Plaintiffs seek such an inquiry now, supported by expert affidavits submitted in support of this motion. SN-AF, Nos.23-53; *see*

*generally* Affidavit of Michael Lamb, Ph.D.; Expert Affidavit of George Chauncey, Ph.D.;

Expert Affidavit of Gregory M. Herek, Ph.D.; and Affidavit of Gary M. Segura, Ph.D.

There is no rigid test for determining whether a particular classification qualifies as "suspect," but the courts consistently examine whether the group adversely affected has experienced a history of invidious discrimination. *See Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313 (1976); *Medeiros v. Vincent*, 431 F.3d 25, 29 n.2 (1st Cir. 2005) (a "suspect class" is "defin[ed] . . . as a class of persons characterized by some unpopular trait or affiliation that would reflect any special likelihood of bias against them on the part of the ruling majority") (citations omitted). Courts also look to whether the characteristic defining the group is unrelated "to the ability to perform or contribute to society." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Although these two factors are most important, *see, e.g.*, *Varnum v. Brien*, 763 N.W.2d 862, 889 (Iowa 2009), courts also have considered the group's minority status and/or relative lack of political power, *see Plyler*, 457 U.S. at 218 n.14; *Lyng v. Castillo*, 477 U.S. 635, 638 (1987) ("minority *or* politically powerless") (emphasis added), as well as whether group members have "obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987). Adverse classifications based on sexual orientation meet all four criteria.

1.    Gays and Lesbians Have Experienced a History of Discrimination.

It is beyond dispute that "for centuries there have been powerful voices to condemn homosexual conduct as immoral," *Lawrence*, 539 U.S. at 571, and that "state-sponsored condemnation" of homosexuality has led to "discrimination both in the public and in the private spheres." *Id.* at 575. Gays and lesbians have been subjected to violence and harassment, denied jobs, labeled mentally ill, and prosecuted for engaging in intimate conduct with loved ones. SN-AF, Nos. 23-25; *see generally* Chauncey Aff., ¶¶4-79. This history alone suggests that legal

classifications based on sexual orientation are especially likely to reflect bias and are unlikely to reflect the pursuit of legitimate objectives. *See Plyler*, 457 U.S. at 218 n.14.

    2.  <u>Sexual Orientation Is Unrelated to the Ability to Contribute to Society.</u>

  As evidenced by the Plaintiffs in this case, sexual orientation has no bearing on an individual's ability to contribute to society.  SN-AF, Nos. 28-32; *see* Herek Aff., ¶¶7, 13-16; Lamb Aff., ¶¶27-39.  The Plaintiffs, for example, include public servants like a State Trooper, teachers, and a government attorney.  They have made the commitment to form families providing mutual support and, for those with children, a good setting for raising them.  All have contributed to society, as have millions of their fellow gay and lesbian Americans.

    3.  <u>Gays and Lesbians Are a Minority and Face Significant Obstacles to Achieving Protection from Discrimination Through the Political Process.</u>

  Gay men and lesbians are a minority in the United States.  SN-AF, No. 39; *see* Herek Aff., ¶¶7, 16, 34-35.  Also, despite recent progress, "[t]he civil rights enjoyed by gay and lesbian Americans vary substantially from region to region and are still subject to the vicissitudes of public opinion."  NA-SF ¶26; *see* Chauncey Aff., ¶79.  While federal laws have long prohibited discrimination on the basis of race, sex, and nationality – classifications the courts have held to warrant heightened scrutiny – gays and lesbians have been unable, after years of effort, to enact similar laws to protect them.  SN-AF, Nos. 41-42, 47; *see* Segura Aff., ¶¶9, 17-67.  Numerous State marriage bans, along with DOMA itself, are emblematic of the limited political power exercised by gays and lesbians.  Segura Aff., ¶¶17, 24.

    4.  <u>Sexual Orientation Is a Defining Characteristic of a Person's Identity.</u>

  Finally, "[s]exual orientation and sexual identity . . . are so fundamental to one's identity that a person should not be required to abandon them" in order to avoid discrimination. *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000), *overruled in part on other*

*grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005).  Moreover, sexual orientation is extremely resistant to change.   SN-AF, Nos. 50-52; *see* Herek Aff., ¶¶17-20.   As with classifications such as religion and alienage, which are treated as "inherently suspect," *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), this more than satisfies the requirement of "obvious, immutable, or distinguishing characteristics that define them as a discrete group." *Bowen*, 483 U.S. at 602.

## II.    DOMA FAILS HEIGHTENED SCRUTINY.

Where heightened (strict or "intermediate") scrutiny applies, "[t]he justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."   *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis in original).  Since Defendants rely *exclusively* on justifications "hypothesized or invented *post-hoc* in response to litigation," *id*., *see* MTD 18, and the "genuine" contemporaneous justifications for DOMA are readily disposed of, *see* Part III.B *infra*, the Court need go no further.  Defendants' entire effort to defend DOMA by conjuring up new and less-offensive justifications than those actually stated by Congress is categorically misplaced if heightened scrutiny applies.

## III.    DOMA FAILS EVEN RATIONAL BASIS REVIEW.

Defendants urge application of the "rational basis" standard, but DOMA fares no better under that test.  Even rational basis scrutiny requires that classifications be "rationally related to a legitimate government interest."  *Cleburne*, 473 U.S. at 446; *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 (1973).  Courts must ensure that disadvantages are not imposed arbitrarily or for improper reasons.  *Romer*, 517 U.S. at 635 (striking down measure based on "bare desire to harm" gay and lesbian persons); *Diffenderfer v. Gomez-Colon*, 587 F. Supp. 2d 338, 347-48 (D.P.R. 2008) (striking down measure for which "cultural nationalism" was the "only logical explanation").  That is precisely what DOMA does.

Rational basis review is not "toothless." *Matthews v. de Castro*, 429 U.S. 181, 185 (1976).  First, although rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," *FCC v. Beach Communication, Inc.*, 508 U.S. 307, 312 (1993), the interest claimed must still be "legitimate," meaning that it must not only be a proper basis for government action, but also that it must be "properly cognizable" by the governmental body at issue, *Cleburne*, 473 U.S. at 448, and "relevant to interests" the classifying body "has the authority to implement." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001) (quoting *Cleburne*, 473 U.S. at 441).  This assures that the interest supposedly advanced is within the purview of those making the classification.  *See, e.g.*, *Plyler*, 457 U.S. at 225 (overturning State law discriminating against aliens and noting that although it is a "routine and normally legitimate part of the business of the federal government to classify based on the basis of alien status . . . only rarely are such matters relevant to legislation by a state") (internal citation omitted); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 114-15 (1976) (Civil Service Commission could not justify rule barring employment of aliens because asserted interests in encouraging nationalization were "not matters which are properly the business of the Commission").  As demonstrated below, this concern is particularly acute here, where the federal government has legislated in an area traditionally a matter of State, rather than federal, concern. *See* Parts I.A *supra* and III.B.2 *infra*.

Second, the classification must be "narrow enough in scope and grounded in sufficient factual context … to ascertain some relation between the classification and the purpose it serve[s]." *Romer*, 517 U.S. at 632-33; *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997).  The classification drawn "must find some footing in the realities of the subject addressed by the legislation," *Heller v. Doe*, 509 U.S. 312, 321 (1993), and the

government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 447; *Garrett*, 531 U.S. at 366 n.4 (measure will fail rational basis review where the "purported justifications . . . ma[k]e no sense in light of how the [government] treated other groups similarly situated in relevant respects."). As the Supreme Court made clear in *Romer*, rational basis review will invalidate a measure whose "sheer breadth" is "discontinuous with the reasons offered for it . . . ." 517 U.S. at 632. *See also, e.g.*, *Diffenderfer,* 587 F. Supp. 2d at 347-48 (invalidating Puerto Rican election commission's longstanding policy of providing ballots only in Spanish).

Third, although the government bears a lesser burden to show facts supporting a measure than under heightened scrutiny, the requirement of a "reasonably conceivable state of facts" still demands that the claimed factual basis for a categorization be plausible. A measure will fail rational basis review "when all the proffered reasons for a law are clearly and manifestly implausible." *Lofton v. Sec'y of Dep't of Children and Family Servs.*, 377 F.3d 1275, 1280 (11th Cir. 2004) (Birch, J., concurring); *accord Romer*, 517 U.S at 635 (rejecting justifications where "[t]he breadth of the [measure] is so far removed from these particular justifications that we find it impossible to credit them"); *Eisenstadt v. Baird*, 405 U.S. 438, 449 (1972) (law discriminating between married and unmarried persons in access to contraceptives "so riddled with exceptions" that the interest claimed by the government "cannot reasonably be regarded as its aim").

As shown below, the interests asserted on behalf of DOMA fail these tests.

## A.      The Interests Asserted By the Government Are Unpersuasive.

To their credit, Defendants acknowledge that the interests that actually motivated Congress to impose disadvantages on Plaintiffs and other married gay and lesbian couples cannot pass constitutional muster. They concede that Congress's stated interests in promoting

"responsible procreation" and "the raising of children by both of their biological parents" cannot support discrimination against same-sex couples.  *See* MTD at 19 n.10.  And they make no effort to defend the other "interests" that Congress enunciated while enacting DOMA.[15]

Instead Defendants hypothesize new reasons for denying recognition to married same-sex couples:  (1) "maintain[ing] the status quo," (2) "respond[ing] to new social phenomena one step at a time and . . . adjust[ing] national policy incrementally," and (3) avoiding a legal regime in which "[f]ederal rights would vary dramatically from State to State."  MTD at 18.  DOMA in fact accomplishes the opposite of these "hypothesize[d]" *post-hoc* interests, which are in any event far too weak to provide any rational justification.

    1.    DOMA Does Not "Maintain the Status Quo," and Continuing the Exclusion of Married Same-Sex Couples from Marital Benefits Is Not an "Interest."

Defendants first assert that Congress was "entitled to maintain the status quo pending further evolution in the states" because "same-sex marriage is a contentious social issue."  MTD at 18.  Tellingly, they cite not a single case for the proposition that "maintain[ing] the status quo" is itself a government *interest*.  It is at best a description of what the law does, not a reason for doing it.  And it is not even an accurate description, as the "status quo" prior to DOMA had been for the federal government to recognize and accept State determinations of marital status, even in the face of substantial differences among the States regarding eligibility for marriage and divorce.  *See* Part I.A.3 *supra*.  DOMA upends, rather than preserves, this longstanding federalist tradition.  *Id*.

---

[15]    Those interests were "defending and nurturing the institution of traditional, heterosexual marriage," "defending traditional notions of morality," "protecting state sovereignty and democratic self-governance," and "preserving scarce government resources." *See* H. Rep. (Buseck Aff., Ex. D) at 12-18.  Although the government does not rely on them, Plaintiffs address these interests in Parts III.B *infra*.

Defendants get no further by noting that the extension of marriage rights to same-sex couples is "contentious."  MTD at 18.  Under our Constitution, the States have the authority to define family relationships, including eligibility requirements for marriage.  *See* Part I.A.1 *supra*. The choice of some States to extend marriage to same-sex couples may not be universally supported.  But the mere existence of policy differences among States or citizens has never been a basis for establishing "national" marriage rules in the past and does not create a new federal interest in doing so now.  Nor does the fact that the extension of marriage rights to same-sex couples is relatively recent create any such interest.  *See* MTD at 3 (asserting interest in providing "benefits only to those who have historically been permitted to marry").  The mere fact that same-sex couples were excluded from marriage in the past is not a basis for continuing the exclusion at the federal level even after the exclusion has been lifted.  Defendants' rhetoric cannot hide the absence of a legitimate federal interest that is being served.

2. <u>DOMA Is Not an "Incremental" Response to Marriage by Same-Sex Couples, and Incrementalism Alone Is not an Interest in the Absence of Some Underlying Purpose.</u>

Nor is it plausible for Defendants to claim an interest in proceeding "incrementally" or "one step at a time" with respect to marriage by same-sex couples given the "evolution in the states" of marital eligibility rules.  MTD at 13, 18.  This supposed "interest" again bears no relation to the operation of the statute; there is nothing "incremental" about permanently denying married same-sex couples every marital right and benefit without qualification.  Moreover, this argument confuses constitutionally appropriate justifications for laws with the appropriate means for pursuing those justifications.  Incrementalism is a means to an end, not an end itself; and Defendants have not identified any proper end that is served by DOMA's supposed "one step at a time" approach.

To begin with, there is nothing "incremental" about DOMA.  It is a permanent ban on federal recognition of marriages of same-sex couples.  It does not sunset or provide for revision based on changing policies in the States.  Nor does it afford some partial recognition to same-sex couples.  Defendants have confused the President's stated support for DOMA's eventual repeal, *see* MTD 1, with what the law *itself* actually does.  The fact that some in Washington now support repeal does not transform DOMA into something other than a complete and permanent refusal to treat Plaintiffs and other married same-sex couples as married for any federal purpose.

Just as unpersuasive is Defendants' suggestion that DOMA is somehow incremental because it "permits autonomy and legal evolution at the state level," MTD at 19; *see also* MTD at 1 (DOMA "preserv[es] the ability of the States to grant marriage rights to same-sex couples").  States are empowered to regulate marriage eligibility because it is a core State power under the Constitution, not because DOMA graciously "permits" States to do so.  *See* Part I.A.1 *supra*.  DOMA's discrimination against Plaintiffs under federal law does not become justified (as "incremental") simply because it stops short of unconstitutionally depriving them of their rights under State law as well.

What Defendants really appear to be arguing is not that DOMA is "incremental" so much as that it could have been even more constitutionally problematic, if Congress had simply banned marriages of same-sex couples altogether.  But the imposition of severe disadvantages on a class of people does not become permissible simply because one can hypothesize (and some participants in the political process might have desired to impose) even more egregious disadvantages.  Here, barring States from marrying same-sex couples would plainly not be within the federal government's power in any event.  And giving *partial* effect to the bare desire

of some to exclude same-sex couples from marriage hardly can be considered a justification for the discriminatory harms inflicted by DOMA.  *See* Parts III.B.2 & III.B.4 *infra*.

Even if Section 3 could be described as "incremental," that is no justification in the absence of some problem being addressed or good being advanced.  Defendants cite cases affirming the unremarkable proposition that incrementalism is an appropriate *means* of pursuing an independent governmental objective.  *See Medeiros v. Vincent*, 431 F.3d 25, 31-32 (1st Cir. 2005) (upholding regulation of lobster fishing method, notwithstanding differential treatment of other fishing methods, to ameliorate problem of overfishing); *Butler v. Apfel*, 144 F.3d 622 (9th Cir. 1998) (upholding denial of Social Security benefits to incarcerated felons to conserve public fisc, notwithstanding different treatment of other institutionalized groups); *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (noting "massive problems" are not generally resolved at once but rather with "reform" moving one step at a time, addressing what seems "most acute to the legislative mind"; Congress may "whittle away at [problems] over time"); *SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (addressing need for regulatory flexibility to address "specialized problems which arise").[16]  But unlike in those cases, Defendants never identify a "problem" being ameliorated or a purpose being furthered, for there is none.

> 3.   DOMA's Discrimination Among Married Persons Cannot Be Justified as Treating All Same-Sex Couples Alike, Whether Married or Not.

Also unconvincing is the government's asserted interest in "preserving nationwide consistency in the distribution of marriage-based federal benefits" and preventing "federal rights [from] vary[ing] dramatically from State to State."  MTD at 18.

---

[16]     *Massachusetts v. EPA* undermines rather than supports Defendants' position.  There, the Supreme Court expressly *rejected* the government's argument that its regulatory inaction should be immunized from judicial review because the government was following an incrementalist approach to climate change, holding that "accepting that premise would doom most challenges to regulatory action" and preclude meaningful judicial review.  549 U.S. at 524.

First, DOMA does not "preserve[e] nationwide consistency in the distribution of marriage-based federal benefits" – it eliminates it.  In the absence of DOMA, the rule would be the same for everyone:  State law would determine marital status, as it always has.  Instead, DOMA creates dramatic disparities in federal benefits by subjecting same-sex couples to a complete bar on federal marriage-based rights and benefits, whether they are married or not, and irrespective of whether identically situated opposite-sex couples would be entitled to those same rights and benefits.  The only "consistency" this rule creates is between two groups that are not legally similarly situated:  gay and lesbian persons who are married and gay and lesbian persons who are not.  Defendants articulate no reason why these groups must be treated alike.  The entire premise of federal marriage-based rights and benefit programs is that married and unmarried persons are not identically situated.  And yet Defendants in effect claim an interest in ensuring that gay and lesbian married persons be denied those rights and benefits so that they can be equal to unmarried gay and lesbian persons.  This interest cannot withstand scrutiny.  *See Garrett*, 531 U.S. at 366 n.4 (measure will fail rational basis review where the "purported justifications . . . ma[k]e no sense in light of how the [government] treated other groups similarly situated in relevant respects").

Second, it is no answer that, in the absence of DOMA, "federal rights would vary dramatically from state to state."  MTD at 18.  In the absence of DOMA, federal rights would be the same from State to State: they would turn on State marital status, as they always have.  DOMA creates disparities not only among individuals, but also among States, as some States' marriages are recognized and others' are not.  It is true that married same-sex couples exist in some States and not others.  But that is not a problem calling out for a federal solution.  It is the natural consequence of life under a system of dual sovereignty, in which family law remains the

exclusive province of the States.  As discussed above, State laws governing who can marry have always varied greatly.  *See supra* Part I.A.2.  The absence of any historical precedent for federal legislation to "correct" disparities in State marriage laws as State marriage policies have evolved throughout the past two centuries, demonstrates that this professed "interest" in maintaining uniformity is not just concocted but entirely insubstantial.

**B.     The Interests Actually Stated by Congress, and Abandoned by the Government, Cannot Support DOMA Either.**

The government's reliance on post hoc rationales to defend DOMA is understandable given the unsupportable reasons Congress actually articulated during DOMA's passage: "encouraging responsible procreation and child-rearing," "defending and nurturing the institution of traditional heterosexual marriage," "preserv[ing] scarce government resources," and "reflect[ing] and honor[ing] a collective moral judgment about human sexuality."  *See* H. Rep. (Buseck Aff., Ex. D) at 12-18.  As Defendants expressly or impliedly acknowledge, those justifications do not withstand any level of scrutiny.  Because Defendants do not rely on them to defend the statute, they are not properly before the Court.  Plaintiffs note briefly, however, why these interests are not rationally defensible.

**1.     DOMA Has Nothing to Do with Procreation and Child-Rearing.**

Defendants expressly disavow Congress's stated purpose of "encouraging responsible procreation and child-rearing," *see* H. Rep. (Buseck Aff., Ex. D) at 13, acknowledging the consensus among the leading medical, psychological, and social welfare organizations that children raised by gay and lesbian parents are just as likely to be well adjusted as those raised by heterosexuals.  MTD at 19 n.10; s*ee also* SN-AF, Nos. 32-38; *see* Lamb Aff., ¶¶11-39.  The government also concedes that procreation is not a rational basis on which to exclude only same-sex couples from federal recognition, given that the ability to procreate is not a condition for

marital eligibility.  MTD at 19 n.10 (quoting *Lawrence*, 539 U.S. at 605 (Scalia, J., dissenting)).
These concessions are appropriate.  First, because procreative decisions are quintessential
matters of individual liberty, this Court should approach with caution any attempt to justify
exclusionary policies under the banner of promoting a particular method of procreation.  *Cf.*
*Eisenstadt*, 405 U.S. at 453 ("it is the right of the individual, married or single, to be free from
unwarranted governmental intrusion into matters so fundamentally affecting a person as the
decision whether to bear or beget a child"); *Griswold v. Connecticut*, 381 U.S. 479, 485-86
(1965) (defending marital privacy against the State of Connecticut's attempt to promote
procreation through banning contraceptives).  Moreover, in this context, such an interest makes
no sense as a justification for federal non-recognition of marriages between same-sex couples.

Massachusetts has recognized that denying marriage rights to same-sex couples cannot be
justified on the ground that it will encourage different-sex couples to marry and then procreate.
*See Goodridge v. Dep't of Public Health*, 798 N.E.2d 941, 963 (Mass. 2003).  That conclusion is
unassailable as a logical and factual matter.  It is equally nonsensical to suppose that denying
*federal recognition* to Plaintiffs' marriages will encourage heterosexuals to marry and procreate.
*Cf. Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 622 (1985) (law fails rational basis
review where it "is not written to require any connection between the [the classification] and [the
asserted government interest]").  At bottom, denying federal recognition "will not make children
of opposite-sex marriages more secure" but merely serves to "prevent children of same-sex
couples from enjoying the immeasurable advantages that flow from the assurance of a stable
family structure" accorded equal recognition under federal law.  *Goodridge*, 798 N.E. 2d at 964;
*see also* SN-AF, Nos. 9-11 (children of married couples of the same sex would benefit if their
parents' marriage were recognized by the federal government).  That is not rational.

2.      DOMA Cannot Be Justified as Preserving "Traditional" Marriage.

Equally incoherent is the argument that DOMA somehow serves the goal of "defending and nurturing the institution of traditional, heterosexual marriage." H. Rep. (Buseck Aff., Ex. D) at 12. This platitude is so vague as to be meaningless, but suggests either (1) that Congress simply wanted to maintain the existing exclusion of same-sex couples from marriage rights, or (2) that Congress was worried that marriage would become less desirable and valuable to different-sex couples unless same-sex couples were excluded. The first formulation is invalid on its face; the second bears no rational relationship to what DOMA actually does.

At the outset, simply preserving the exclusion of same-sex couples from marital benefits because they have "traditionally" been excluded in the past is not a constitutionally cognizable "interest." As the Supreme Court cautioned in *Romer*, discriminatory classifications must serve some "independent and legitimate legislative end." 517 U.S. at 633. Simply asserting a desire to maintain the status quo in 1996, when same-sex couples were excluded from marriage, does nothing but tautologically circle back to the challenged classification without justifying it.

Even if preserving "traditional" marriage could be called an "interest," it would not be a valid *federal* interest. There are a number of valid federal policies advanced through the many federal laws and programs that the federal government bases on marriage, but the desire to regulate family law in accordance with Congress's own preferences – and contrary to the laws of the States – is not among them. As demonstrated in Part I.A.1 *supra*, regulation of marriage has "long been regarded as a virtually exclusive province of the States." *Sosna v. Iowa*, 419 U.S. at 404. A desire to countermand a State family law policy with which Congress disagrees – without anything more – is neither "properly cognizable" by the federal government, nor "relevant to interests" it "has the authority to implement." *Garrett*, 531 U.S. at 366 (quoting *Cleburne*, 473 U.S. at 441). If the federal government lacks the power in our federal system to

establish marital eligibility criteria directly, then, *ipso facto*, Congress's wish to make its own family law indirectly (in the absence of some other interest properly cognizable under Article I) cannot form a "valid" or "legitimate" basis for equal protection purposes. *See id.*; *Cleburne*, 473 U.S. at 448; *Plyler*, 457 U.S. at 225; *see also Mow Sun Wong*, 426 U.S. at 114-15.

The second formulation of the "traditional marriage" justification – preserving the value and desirability of marriage to heterosexual couples – lacks any reasonable connection to what DOMA actually does. Not only is there no reason to believe that excluding same-sex couples from marital rights will have any effect on opposite-sex marriages, but DOMA is a step even further removed. It does not place *any* limitations on who can marry, it merely penalizes same-sex couples that have *already married*. There is even less reason to believe that discriminating against such couples will cause more heterosexual couples to marry or cause their marriages to be more secure. The "traditional marriage" justification is thus not "narrow enough in scope and grounded in sufficient factual context … to ascertain some relation between the classification and the purpose it serve[s]." *Romer*, 517 U.S. at 632-33.

3.      DOMA Undermines Rather than Protects State Sovereignty.

Although Congress also declared that the statute advanced the government's interest in "protecting state sovereignty," that interest is inapposite here. *See* H. Rep. (Buseck Aff., Ex. D) at 16. That purported interest applies to a separate provision of the statute, Section 2, which deals with State recognition of marriages between same-sex couples performed in other States and is not implicated in this case. *See* 28 U.S.C. § 1738C. Indeed, by breaking with the long tradition of giving federal recognition to State-recognized marriages, Section 3 undermines rather than supports State sovereignty. The Commonwealth of Massachusetts has in fact sued the government in a related case pending before this Court for, *inter alia*, usurping its Tenth Amendment authority to define marriage in Massachusetts and exceeding the scope of

37

Congress's Article I powers.  *See Commonwealth of Mass. v. U.S. Dep't of Health and Human Servs.*, No. 1:09-cv-11156-JLT, Compl. at ¶2.

>   4.   DOMA Does Not "Conserv[e] Scarce Resources," and Conserving Resources Is Not a Justification for Denying Rights Indiscriminately and Inequitably.

Nor can DOMA be supported by any interest in conserving scarce resources.  *See* H. Rep. (Buseck Aff., Ex. D) at 18 (noting that Congress had "not undertaken an exhaustive examination" of financial protections related to marriage, but nonetheless asserting that "[t]o deny federal recognition to same-sex 'marriages' will thus preserve scarce government resources, surely a legitimate government purpose.").  DOMA is utterly disconnected from any goal of resource preservation.  In fact, in 2004, the Congressional Budget Office concluded that federal recognition of marriages of same-sex couples by all fifty States, would result in a net *increase* in federal revenue.  *See* Buseck Aff., Ex. C at 1 (Cong. Budget Office, "The Potential Budgetary Impact of Recognizing Same-Sex Marriages," January 21, 2004) ("In some cases, recognizing same-sex marriages would increase outlays and revenues; in other cases, it would have the opposite effect. The Congressional Budget Office (CBO) estimates that on net, those impacts would improve the budget's bottom line to a small extent: by less than $1 billion in each of the next 10 years (CBO's usual estimating period).").  So DOMA costs money rather than saves it.

DOMA also is not rationally related to the purported interest in resource conservation.  It is "at once too narrow and too broad," *Romer*, 517 U.S. at 633, sweeping in nonpecuniary and pecuniary federal benefits alike.  *See* n.3 *supra*.  As the House rejected a proposed amendment to DOMA that would have required a budgetary analysis by the General Accounting Office, *see* 142 CONG. REC. H7503-05 (daily ed. July 12 1996), financial considerations plainly were not an actual consideration in the passage of the Act.

Even if Congress actually believed it could save money by discriminating against same-sex couples, such an interest would not be a legitimate justification. *Any denial of benefits to any group will always* save resources, so the government must do more than state a desire to cut costs; it must justify why it chose a particular group to bear the burdens of cost-cutting, and "must do more than justify its classification with a concise expression of an intent to discriminate." *Plyler*, 457 U.S. at 227; *see also id.* at 229 (cost-cutting could not justify denying free public education to children of undocumented immigrants where "in terms of educational cost and need, undocumented children are basically indistinguishable from legally resident alien children"); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) ("[a state] must do more than show that denying welfare benefits to new residents saves money"), *overruled in part on other grounds, Edelmann v. Jordan*, 415 U.S. 651 (1974). Here there is no reason to justify cutting costs on the backs of Plaintiffs, which amounts to no more than the "indiscriminate imposition of inequalities" without rational basis, *Romer*, 517 U.S. at 633 (citations omitted), and fails to "find some footing in the realities of the subject addressed by the legislation," *Heller*, 509 U.S. at 321.

### 5.    Expressing Moral Disapproval of Homosexuality Is Not a Valid Interest.

DOMA makes sense only as an attempt to express disapproval of same-sex couples. In fact, Congress said as much, namely that DOMA was to "reflect and honor a collective moral judgment about human sexuality" that "entails both moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports with traditional (especially Judeo-Christian) morality." H. Rep. (Buseck Aff., Ex. D) at 15-16. This "interest" can be readily discarded as inconsistent with equal protection law.

Discrimination for its own sake, based on bare disapproval for a particular group of citizens, is not a legitimate purpose on which a classification can be based: "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very

least mean that a bare [governmental] desire to harm a politically unpopular group cannot constitute a legitimate interest." *Moreno*, 413 U.S. at 534. "Mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . , are not permissible bases" for governmental discrimination. *Cleburne*, 473 U.S. at 448.

The Supreme Court has already applied these principles to invalidate other laws predicated on moral disapproval of homosexuality. *Lawrence v. Texas* explicitly repudiated the notion that the government may uniquely disadvantage gays and lesbians because of moral disapproval for same-sex intimate conduct. *See* 539 U.S. at 577. The majority quoted and adopted Justice Stevens' dissent from *Bowers v. Hardwick* as the controlling analysis: "'[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting that practice.'" *Id.* (citation omitted). Justice O'Connor elaborated in her concurrence: "Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection clause because legal classifications 'must not be drawn for the purpose of disadvantaging the group burdened by the law.'" *Id.* at 583 (O'Connor, J., concurring) (quoting *Romer*, 517 U.S. at 633).

In short, there is no "morality" exception to the equal protection of the laws, whether applicable to gays and lesbians or to anyone else. Otherwise invidious classifications do not become constitutional simply because they further some notion of morality.[17] Such claims

---

[17] Classifications motivated by animus are typically formulated as expressions of moral disapproval. For example, laws against interracial relationships and women working outside the home were both defended on religious and moral grounds. *See Loving,* 388 U.S. at 3 (trial judge, who sentenced couple to 25 years for interracial marriage, based decision on God's separation of the races); *Bradwell v. Illinois,* 83 U.S. 130, 141 (1872) (Bradley, J., joined by Field and Swayne, JJ., concurring) (upholding refusal to admit women to practice law on basis of "divine ordinance"). The "moral" basis for such restrictions has since been recognized as illegitimate. *See United States v. Virginia,* 518 U.S. at 550; *Palmore v. Sidoti,* 466 U.S. 429, 431-32 (1984). This is not to say that moral views are *per se* impermissible as a basis for legislation but rather

amount to saying that the animus that motivated a law also serves as its justification.  That does not work as a constitutional matter.  Here, the sovereign empowered to decide family law matters involving Plaintiffs, Massachusetts, has already determined that Plaintiffs are eligible to enter into lawful marriages.  Congress's desire to express its moral disapproval of Massachusetts's policy cannot justify imposing legal disadvantages on Plaintiffs and burdens on their family relationships.  *See Lofton*, 377 F.3d at 1279-1282 (Birch, J., specially concurring in denial of rehearing en banc) ("when all the proffered rationales for a law are clearly and manifestly implausible, a reviewing court may infer that animus is the only explicable basis.  And animus alone cannot constitute a legitimate government interest.").

## IV.  IN THE ALTERNATIVE, DOMA SHOULD BE INTERPRETED SO AS NOT TO REACH THE FEHB STATUTE.

DOMA is unconstitutional as applied to Plaintiffs for the reasons articulated.  However, DOMA should not be read to reach some of the Plaintiffs in the first place.  OPM denied Plaintiffs Nancy Gill, Marcelle Letourneau, Martin Koski, James Fitzgerald and Dean Hara (the "FEHB Plaintiffs") enrollment in the federal health insurance program citing DOMA.[18]  *See* Amended Complaint, ¶¶419, 431, 454.  Defendants contend that the FEHB Plaintiffs are not "spouse[s]" due to DOMA, and therefore cannot be "member[s] of the family" pursuant to 5 U.S.C. § 8901(5).  MTD at 20-21.  This reading of the statute is mistaken.

Although the definition of "member of family" in the FEHB statute contains an enumeration of covered individuals, both the House and Senate Reports specifically note that the phrase is defined "to include" the enumerated individuals.  FEHB H. Rep. at 6, 1959

that moral disapproval, standing alone, cannot function as a justification for imposing disadvantages on a class of persons.  *See Moreno,* 413 U.S. at 534-35; *Romer* 517 U.S. at 634.

[18]     Nancy Gill and Marcelle Letourneau also challenge OPM's denial of enrollment for vision insurance under FEDVIP, 5 U.S.C. §§8981-8992.  The analysis in the text applies equally to the FEDVIP statute.

U.S.C.C.A.N. at 2919; S. Report 86-468 (July 2, 1959) ("FEHB Sen. Rep.") at 20.  Defendants'

resort to the statutory interpretation maxim of "expressio unius est exclusio alterius" to exclude

married same-sex spouses, MTD at 20-21, implicitly acknowledges that the scope of coverage

under the FEHB statute is ambiguous.  *See, e.g., United States v. Councilman*, 418 F.3d 67, 73-

74 (1st Cir. 2005) (en banc) (reliance on the canon "confirms that the text of the statute is

ambiguous . . .").   Given this concession, it is appropriate to consider other indicators of

legislative intent.  *Id.* at 74 (maxim is "only an aid in the ascertainment of the meaning of the

law, and must yield whenever a contrary intention on the part of the lawmaker is apparent");

*Hewlett-Packard Co. v Berg*, 61 F.3d 101, 106 (1st Cir. 1995) (canon is "an aid to construction

and not an inflexible rule"); *Mass. Trustees of Eastern Gas & Fuel Assoc. v. U.S.*, 312 F.2d 214,

220 (1st Cir. 1963) (canon is "a guide to construction, not a positive command").

The FEHB "statute as a whole" and the legislative "circumstances as a whole," *id.* at 220,

demonstrate a clear congressional intent to: (1) provide insurance coverage "essential to protect

wage-earners and their families"; and (2) "close the gap" and improve the "competitive position"

of the government vis-à-vis private enterprise "in the recruitment and retention of competent

civilian personnel."   FEHB H. Rep. at 1-2; 1959 U.S.C.C.A.N. at 2914-2915.  *See also* FEHB

S. Rep. at 3 ("guiding principles" include "embrac[ing] as many Federal employees as feasible,"

"provid[ing] coverage for members of an employee's immediate family," and "attracting and

retaining the services of competent personnel").   Beyond these broad legislative goals, the FEHB

statute itself repeatedly focuses on the extension of coverage to family members.  *See, e.g.*, 5

U.S.C. § 8903(3); § 8905(a); § 8905(b)(2); § 8905(e); § 8907(b).  And, as mentioned *supra*, both

the House and Senate Reports specifically note that the phrase is defined "to include" the

enumerated individuals.   FEHB H. Rep. at 6; FEHB S. Rep. at 20.[19]   These indicators of legislative intent are consistent with the extension of FEHB eligibility to family members beyond those specifically enumerated in 5 U.S.C. § 8901(5).

The doctrine of constitutional avoidance counsels that "between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative." *United States v. Dwinells*, 508 F.3d 63, 70 (1st Cir. 2007); *see also, e.g. Clark v. Martinez*, 543 U.S. 371, 381-382, 385 (2005) (canon is a means of choosing between two possible constructions of a statute).   For the reasons detailed *supra*, reading the FEHB statute to exclude married same-sex spouses raises a "substantial constitutional question." *Id*. at 70-71.   The Court therefore should hold that DOMA does not preclude the FEHB Plaintiffs' eligibility under the FEHB statute.

## V.   EACH PLAINTIFF HAS STANDING.

Defendants do not dispute that each Plaintiff has standing.   However, they contend that one Plaintiff couple and one Plaintiff widower partially lack standing with respect to particular claims.   The contention as to the Plaintiff couple is moot; in the case of the Plaintiff widower it is wrong.

### A.   Defendants' Partial Challenge to Gill and Letourneau's Standing is Moot.

Defendants' objections to the standing of Plaintiffs Gill and Letourneau are moot. Defendants complain that Gill and Letourneau do not satisfy the causation requirement with

---

[19]   The Defendants seek to bolster their position by pointing to a 1984 Act of Congress that principally addressed the status of former spouses vis-à-vis federal employee annuities and, secondarily, added provisions to the FEHB statute to allow former spouses to enroll.   *See* MTD at 21.   However, there is a fundamental difference between spouses and surviving spouses, like the Plaintiffs here, and former spouses.   While the legislative history suggests a clear intent to extend coverage to employees and their immediate families (which includes the Plaintiffs), it is not at all clear that former spouses continue within the meaning of an employee's immediate family.

respect to their claim against the Office of Personnel Management ("OPM") regarding Gill's flexible spending account.   *See* MTD at 25-26.   Gill and Letourneau, however, voluntarily dismissed OPM as a Defendant with respect to this claim while preserving it as to the Postal Service and Postmaster General.   *See* October 14, 2009 Notice of Dismissal, in Part, by Plaintiffs Nancy Gill and Marcelle Letourneau, Docket No. 24.   Defendants have since agreed that with the claim against OPM withdrawn, Gill and Letourneau have standing to plead, and have pleaded, a claim regarding Gill's flexible spending account against the Post Office and Postmaster General. *See* Buseck Aff., Ex. E.

> **B.    Plaintiff Hara Has Standing to Pursue his Claim for Federal Health Insurance Benefits.**

Finally, Plaintiff Dean Hara has standing to challenge OPM's refusal to enroll him in the federal health insurance program as the surviving spouse of a federal employee.[20]   Defendants argue as follows:  A surviving spouse can enroll in the federal health insurance program only if he or she is eligible to receive a survivor annuity under federal retirement laws, and eligibility for a survivor annuity is a matter determined by OPM and then subject to exclusive judicial review in the U.S. Court of Appeals for the Federal Circuit.   *See* MTD at 22.   As for Hara, he has an action pending, but stayed, in the Federal Circuit concerning his entitlement to a survivor annuity.   Therefore, Defendants argue, "[u]ntil that court determines that Mr. Hara is an 'annuitant,' he cannot be eligible for enrollment in the FEHB."  MTD at 25.  Plaintiff Hara has no dispute with the Defendants' first two premises but submits that their conclusion is wrong as a matter of law for two reasons.

First, and most important, the government has abandoned any argument that the fact that Hara is not currently an annuitant is a basis for denying him federal health insurance benefits.  In

---

[20]    Defendants do not contest Hara's standing to sue regarding the denial of the Social Security lump-sum death benefit.

its final decision denying Hara enrollment in a federal health benefit plan, OPM relied *solely* on a different ground, i.e., "*because Mr. Studds was not enrolled in a FEHBP family plan at the time of his death*, you are not eligible to enroll for health benefits coverage under his health benefit plan as a survivor annuitant."  Hara Aff., ¶21 Ex. B (June 18, 2009 letter from OPM to Dean Hara) (emphasis added).  In its original denial letter of April 6, 2009, OPM had included a second reason for denial, i.e., "you must have been eligible to receive a survivor annuity."  But after a request for reconsideration, OPM's final denial letter deleted this rationale for denying enrollment.

It follows that the government may not now argue that Hara has to succeed in obtaining an annuity before he can obtain health insurance benefits.  It has been well settled for at least 60 years that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency."  *Chenery*, 332 U.S. at 196; *see Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 246 (1972) ("The difficulty with the Commission's position is that we must look to its opinion, not to the arguments of its counsel, for the underpinnings of its order"); *Kurzon v. U.S. Postal Serv.*, 539 F.2d 788, 792-93 (1st Cir. 1976) (applying *Chenery* and *Sperry & Hutchinson*); *see also Albathani v. INS*, 318 F.3d 365, 378 (1st Cir. 2003) ("In functional terms, if the BIA does not independently state a correct ground for affirmance in a case in which the reasoning proffered by the IJ is faulty, the BIA risks reversal on appeal").  OPM's decision to deny health insurance enrollment to Hara thus must stand or fall solely on whether the denial was proper because Congressman Studds was not enrolled in a family plan at the time of his death.  That is a question strictly under the FEHB statute and

squarely within this Court's jurisdiction.[21]  For this reason alone, Plaintiff Hara has standing to assert his health insurance claim in this Court.

Second, even if OPM had not abandoned annuitant status as a basis for denying health insurance benefits, that would not affect Hara's standing to pursue this health insurance claim. The Merit Systems Protection Board ("MSPB") has already ruled that Hara would meet all the statutory and regulatory requirements for a CSRS annuity, but for DOMA, and the Government never appealed from that MSPB ruling, which is now final.[22]  The only appeal pending in the Federal Circuit is Hara's, in which the sole question presented is the constitutionality of DOMA.

Specifically, the MSPB ruling established that: (1) Congressman Studds intended for Hara to have the benefit of a spousal annuity if that were legally possible; (2) Hara was not legally eligible for a survivor annuity because, by virtue of DOMA, 1 U.S.C. § 7, Hara and Studds did not have a "marriage" under federal law; (3) as Hara and Studds were not "married" and not "spouses" under federal law, there was no election requirement that Studds failed to satisfy; (4) even if an election was required, that election would be deemed to have been timely made by Studds and OPM was estopped to rely on any asserted failure to elect; and (5) it was beyond the purview of the MSPB to determine the constitutionality of 1 U.S.C. § 7.  Hara Aff. ¶20 Ex. A (Judge William Boulden, Initial Decision, December 18, 2008, at 5, 10-14, 15-16, 17-

---

[21]    This preliminary enrollment question, moreover, has already been resolved in Hara's favor by the Initial Decision in his case at the MSPB.  Specifically, OPM asserted that Congressman Studds had failed to elect Hara as a survivor annuitant.  *See* Hara Aff. ¶19. However, the MSPB decision determined that: (1) Congressman Studds intended for Hara to have access to a survivor annuity (and health insurance); and (2) since Studds and Hara were not "married" and not "spouses" under federal law, there was no election requirement Studds could have satisfied prior to his death.  *Id*. ¶20, Ex. A (Judge William Boulden, Initial Decision, December 18, 2008) at 10-11, 16, 18-19.  OPM should thus be barred from enforcing the same election requirement against Hara under the FEHB statute.  *Id*. at pp. 18-19.

[22]    OPM's Director also did not seek reconsideration of the decision at the MSPB, a prerequisite to OPM's ability to appeal to the Federal Circuit.  *See* 5 U.S.C. § 7703(d); 5 C.F.R. § 1201.119; *Lachance v. Devall*, 178 F.3d 1246, 1249 n.2 (Fed. Cir. 1999).

19).   In sum, the MSPB has conclusively determined that Hara is statutorily eligible for a survivor annuity; and he is being denied an annuity solely because of DOMA.

It follows that even if the government had not abandoned the annuity issue as a basis for denying health insurance benefits, it would make no sense to bar Hara from litigating his claim for insurance benefits here.   At this point, Hara's annuity claim in the Federal Circuit (which has been stayed while this action is pending) and his health insurance claim in this Court both turn on the same question – the constitutionality of DOMA.   If that question is finally resolved in his favor, he will be entitled to an annuity and to federal health insurance benefits.   There is no basis for claiming that this constitutional issue, for this single Plaintiff, has to be addressed in the first instance in the Federal Circuit.

For these reasons, Plaintiff Hara has standing to assert his claim relating to enrollment in the federal health insurance program as a surviving spouse.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully ask that Defendants' Motion to Dismiss be denied, and that Plaintiffs' Motion for Summary Judgment be granted.   There is no genuine dispute of fact.   Section 3 of DOMA, as applied to Plaintiffs, plainly fails to pass constitutional muster under any level of equal protection scrutiny.

Respectfully submitted,

/s/  Gary D. Buseck

GAY & LESBIAN ADVOCATES & DEFENDERS
Gary D. Buseck, BBO # 067540
gbuseck@glad.org
Mary L. Bonauto, BBO #549967
mbonauto@glad.org
Nima R. Eshghi, BBO # 633716
neshshi@glad.org
Janson Wu, BBO #609949
jwu@glad.org
Samuel P. Bickett (BBO# pending)
sbickett@glad.org
30 Winter Street, Suite 800
Boston, MA 02108
Telephone (617) 426-1350
Facsimile (617) 426-3594
*Attorneys for Plaintiffs*

FOLEY HOAG LLP
Claire Laporte, BBO #554979
claporte@foleyhoag.com
Vickie L. Henry, BBO #632367
vhenry@foleyhoag.com
Matthew Miller, BBO #655544
mmiller@foleyhoag.com
Amy Senier, BBO # 672912
asenier@foleyhoag.com
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210
Telephone (617) 832-1000
Facsimile (617) 832-7000
*Attorneys for Plaintiffs*

JENNER & BLOCK LLP
Paul M. Smith (pro hac vice)
psmith@jenner.com
Luke C. Platzer (of counsel)
lplatzer@jenner.com
Daniel I. Weiner (of counsel)
dweiner@jenner.com
Anna M. Baldwin (of counsel)
abaldwin@jenner.com
1099 New York Ave, NW, Suite 900
Washington, DC 20001
Telephone (202) 639-6060
Facsimile (202) 661-4948
*Attorneys for Plaintiffs*

SULLIVAN & WORCESTER LLP
David J. Nagle, BBO # 638385
dnagle@sandw.com
Richard L. Jones, BBO # 631273
rjones@sandw.com
One Post Office Square
Boston, MA 02109
Telephone (617) 338-2800
Facsimile (617) 338-2880
*Attorneys for Plaintiffs Mary Ritchie, Kathleen Bush, Melba Abreu, Beatrice Hernandez, Marlin Nabors, Jonathan Knight, Mary Bowe-Shulman, and Dorene Bowe-Shulman*

Dated: November 17th, 2009

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 17, 2009.

/s/  Gary D. Buseck                      .
Gary D. Buseck