# EXHIBIT A

2008 WL 5552727 (PERSONNET)

Merit Systems Protection Board - Initial Decisions

HARA, DEAN T
VS
OPM

No. PH-0831-08-0099-I-2

December 17, 2008

Before: BOULDEN, WILLIAM L., ALJ

```
+--------------------------------------------+
|              CAUTION!                      |
| MSPB INITIAL DECISIONS ARE NOT PRECEDENTIAL |
| AND CANNOT BE CITED AS SUCH IN SUBMISSIONS  |
| TO THE BOARD OR THE FEDERAL COURTS.        |
+--------------------------------------------+
```

UNITED STATES OF AMERICA
   MERIT SYSTEMS PROTECTION BOARD
    NORTHEASTERN REGIONAL OFFICE

_____
      )
      )
DEAN T. HARA,    )  DOCKET NUMBER
  APPELLANT,   )  PH-0831-08-0099-I-2
      )
 V.     )
      )
OFFICE OF PERSONNEL MANAGEMENT, ) DATE: DECEMBER 17, 2008
  AGENCY.   )
  (CSF3067396)  )
      )
_____)

Cathy A. Harris, Esquire, Kator, Parks & Weiser, P.L.L.C., Washington, D.C., for the appellant.

Michele Granda, Esquire, Gary Buseck, Esquire, Gay & Lesbian Advocates and Defenders, Boston, Massachusetts, for the appellant.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

<u>Michael Shipley</u>, Washington, D.C., for the agency.

**BEFORE**

William L. Boulden
Chief Administrative Judge

**INITIAL DECISION**

INTRODUCTION

Appellant timely refiled this appeal following the issuance by the Office of Personnel Management (OPM) of a June 24, 2008 reconsideration decision in which it found that he was not entitled to a spousal survivor annuity based upon the federal service of the late Gerry E. Studds, a retired Member of Congress. The Merit Systems Protection Board (Board) has jurisdiction over final OPM decisions affecting an individual's Civil Service Retirement System (CSRS) rights or interests, pursuant to 5 U.S.C. § 8347(d)(1) and 5 C.F.R. § 831.110. Several of Congressman Studds' federal tax returns, as well as trust and will documents are in the file, and therefore, the record is SEALED as to those documents. A hearing was held on October 6, 2008, which included in-person testimony, and testimony taken by videoconferencing and telephone. For the following reasons, OPM's reconsideration decision is AFFIRMED because appellant's claim is barred by the Defense of Marriage Act (DOMA), 1 U.S.C. § 7, Pub. L. No. 104-199, § 3(a), 110 Stat. 2419 (1996) (enacted on September 21, 1996), but not because Congressman Studds did not make a spousal survivor annuity election for appellant.

**ANALYSIS AND FINDINGS**

Procedural background

Appellant first filed an appeal regarding this matter on November 27, 2007, based upon an earlier, October 24, 2007 reconsideration decision, in which OPM found that appellant was not entitled to a spousal survivor annuity based on the service of Congressman Studds solely because, it asserted, he failed to elect such an annuity for appellant within two years of their post-retirement same-sex marriage, performed under Massachusetts law.1 Initial Appeal File (IAF), Tab 1.

During the pendency of that appeal, OPM rescinded its decision in order to reevaluate it and to issue a new one. IAF, Tab 12. Thus, the appeal was dismissed without prejudice on April 2, 2008. *Hara v. Office of Personnel Management,* MSPB Docket No. PH-0831-08-0099-I-1, slip op. (Initial Decision, Apr. 2, 2008). IAF, Tab 15.

This timely refiled appeal followed OPM's issuance of a new reconsideration decision, dated June 24, 2008, in which it added a second basis for its denial: DOMA. Refiled Appeal File (RAF), Tab 1.

Background facts

On May 17, 1993, Congressman Studds designated appellant as the beneficiary of any 'lump-sum benefit' payable upon his death under 5 U.S.C. § 8342, and filed that designation with OPM. IAF, Tab 5 (subtab 6, page 8).2

On a September 18, 1996 immediate retirement application, Congressman Studds indicated that he was unmar-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ried and he elected an unreduced annuity based on some 27 years of total federal service (24 years of which were as a Member of Congress from Massachusetts). IAF, Tab 5 (subtab 6, pages 12-16).

In Benefits Administration Letter (BAL) Number 96-111, dated November 15, 1996, and signed by John E. Landers, Chief, Retirement Policy Division, OPM informed agencies that, among other things, pursuant to DOMA, 'same-sex marriages cannot be recognized for benefit entitlement purposes under FERS [Federal Employees' Retirement System], CSRS [Civil Service Retirement System], FEHB [Federal Employees Health Benefits], and FEGLI [Federal Employees Group Life Insurance].'3 RAF, Tab 23 (exhibit M).

Congressman Studds retired on January 2, 1997, just a few months after the enactment of DOMA. He began receiving CSRS retirement annuity benefits thereafter. IAF, Tab 5 (subtab 6, pages 9, 17).

In Retirement and Insurance Letter (RIL) 97-02, dated January 23, 1997, and signed by Sidney M. Conley, Assistant Director for Retirement Programs, OPM informed benefit specialists, contact representatives, and annuitant services representatives that pursuant to DOMA, 'same-sex marriages cannot be recognized for benefit entitlement purposes under any statute administered by Retirement and Insurance Programs.' RAF, Tabs 15 (attachment 1), 22 (exhibit K, page 1).

Appellant and Congressman Studds were ceremonially married in Massachusetts on May 24, 2004; seven days after the *Goodridge v. Department of Public Health* decision (*see* footnote 1) became effective. *See* IAF, Tab 5 (subtab 5, page 6) (Massachusetts certificate of marriage dated May 24, 2004, filed with the Boston City Registrar on June 2, 2004).

The file contains a February 14, 2006 affidavit from Cyrus S. Benson, who swore that he administers the contract for printing and distribution of forms and notices for OPM's Retirement and Insurance Service. He further swore that general notices about survivor and other benefits were sent to all annuitants in December of various years and, as relevant in the instant matter, in December 2004 and 2005 (the two Decembers after Congressman Studds and appellant were married and before the former died). The mailings were based on OPM's 'computer master annuity roll created and maintained by the Center for Information Services and Chief Information Officer, Benefits Systems Group.' IAF, Tab 5 (subtab 6, pages 1-2). I note that these notices are issued to all annuitants without regard to marital status. *See Hairston v. Office of Personnel Management*, 318 F.3d 1127, 1130 (Fed. Cir. 2003).

The December 2004 and 2005 notices informed annuitants about, among other things, post-retirement marriage spousal survivor annuity election requirements and deadlines, but they did not define 'marriage' or 'spouse' or discuss same-sex marriage or DOMA in any way. IAF, Tab 5 (subtab 6, page 4 (para. 2), page 6 (para. 2)).

In BAL Number 06-602, dated October 6, 2006, and signed by Robert F. Danbeck, Associate Director for Human Resources Products and Services, OPM informed agencies that pursuant to DOMA, 'same-sex spouses ... are not eligible family members' under the newly-created Federal Employees Dental and Vision Insurance Program (FEDVIP). RAF, Tabs 15 (attachment 2, page 6), 22 (exhibit K, pages 2, 6).

Congressman Studds died on October 14, 2006. The Massachusetts death certificate lists appellant as the decedent's spouse. IAF, Tab 5 (subtab 5, page 8).

Appellant applied to OPM for death benefits based upon Congressman Studds' service on March 1, 2007, using the May 2000 version of Standard Form (SF) 2800, entitled Application for Death Benefits. Although the form

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

uses the terms 'marriage' and 'spouse' in several places, those terms are not defined on the form, nor is DOMA or same-sex marriage discussed. IAF, Tab 5 (subtab 5, pages 2-5).4

OPM issued a check to appellant in the amount of the lump-sum benefit remaining in Congressman Studds' retirement account (*see* IAF, Tab 5 (subtab 5, page 1)), pursuant to 5 U.S.C. § 8342(c). By letter of May 14, 2007, appellant acknowledged receipt of the lump-sum benefit payment. IAF, Tab 5 (subtab 5, page 1).

By letter of May 30, 2007 OPM denied appellant's request for spousal survivor annuity benefits because Congressman Studds did not elect such an annuity within two years of their marriage. IAF, Tab 5 (subtab 4).

In his June 28, 2007 request for reconsideration, appellant notified OPM, among other things, that he and Congressman Studds had entered into a same-sex marriage in Massachusetts but that DOMA precluded Congressman Studds from making a survivor annuity election. IAF, Tab 5 (subtab 3, pages 1-2). The two reconsideration decisions referred to above followed.

On September 24, 2008, The Honorable Howard C. Weizmann, OPM's Deputy Director, testified before the U.S. Senate's Committee on Homeland Security and Governmental Affairs concerning Senate Bill 2521, the Domestic Partnership Benefits and Obligations Act of 2007, which would provide benefits to domestic partners of federal employees. Deputy Director Weizmann reiterated that under DOMA, '[s]ame-sex marriages are not recognized for benefit entitlement purposes under any of the Federal benefit programs.' RAF, Tab 22 (exhibit L, page 2). *See* 2008 WL 4337699 (F.D.C.H.).

General legal standard

The Civil Service Reform Act (CSRA), codified, in part, at 5 U.S.C. §§8331 *et seq.*, provides for:

payment of annuities to retired federal employees and their surviving spouses. Congress has entrusted the administration of this system to ... [OPM]. *Id.* § 8347(a). The CSRA provides that OPM 'shall adjudicate all claims' for retirement benefits, *id.* § 8347(b), and sets forth a detailed regime for reviewing those decisions [through the Board and the courts].

*Fornaro v. James*, 416 F.3d 63, 64 (D.C. Cir. 2005).5

The burden of proving entitlement to a survivor annuity is on the applicant for benefits, who must establish entitlement by preponderant evidence.6 5 C.F.R. § 1201.56(a)(2). *See Cheeseman v. Office of Personnel Management*, 791 F.2d 138, 140-41 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1037 (1987).

Irrespective of the equities of a particular case, OPM cannot ordinarily be estopped from denying benefits not otherwise permitted by law even if an appellant was denied monetary benefits because of his reliance on the mistaken advice of a government official. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 416, 434 (1990) (*Richmond*).

However, an express statutory waiver provision, an agency's failure to provide notice of election rights and of a filing deadline as required by statute or regulation, or affirmative misconduct (such as proving misleading information in the context of a required notice provision) may warrant a waiver of the filing deadline. *Nixon v. Office of Personnel Management*, 452 F.3d 1361, 1367 (Fed. Cir. 2006); *Blaha v. Office of Personnel Management*, 106 M.S.P.R. 265, 269-70 (2007); *Wutke v. Office of Personnel Management*, 67 M.S.P.R. 523, 528 (1995). *See also Speker v. Office of Personnel Management*, 45 M.S.P.R. 380, 385 (1990), *aff'd*, 928 F.2d 410 (Fed. Cir.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

1991) (Table) *and modified on other grounds, Fox v. Office of Personnel Management*, 50 M.S.P.R. 602 (1991).

Issues

OPM asserted that appellant is not entitled to the annuity he seeks because: (1) DOMA bars him; and (2) Congressman Studds failed to make an election for him to receive such benefits under 5 U.S.C. § 8339(k)(2)(A), despite OPM's annual notice to annuitants of various election rights.

Appellant first asserted that DOMA is unconstitutional. Appellant also moved that OPM be sanctioned for its failure to file a prehearing submission and its failure to timely and completely respond to discovery requests and orders. Appellant also asserted that Congressman Studds desired to elect a spousal survivor annuity for him, and would have done so, but for DOMA. He argued that because DOMA barred Congressman Studds from making the section 8339(k)(2)(A) election and because OPM never advised him to the contrary, OPM may not base its denial on Congressman Studds' failure to make that election. He also argued that if Congressman Studds actually could have made the election, his failure to do so was due to reliance on misinformation about this from his former employing agency (Congress) and OPM. The appellant further asserted that attempting to make the election would have been 'futile' and 'impossible' due to DOMA, and thus, Congressman Studds should be excused from not having made the election.7

The Board may not reach the constitutional issue

It is well-settled, and both sides agree,8 that while the Board, an administrative agency, has the authority to adjudicate a constitutional challenge to an agency's application of a statute,9 it has no power to determine the constitutionality of a federal statute. *Bayly v. Office of Personnel Management,* 42 M.S.P.R. 524, 525-26 (1990); *May v. Office of Personnel Management,* 38 M.S.P.R. 534-538 (1988). Therefore, this issue is not further addressed.

Appellant's motions for sanctions against OPM are DENIED in part and GRANTED in part

Appellant moved for sanctions during our September 24, 2008 prehearing teleconference, based on OPM's failure to file a prehearing submission and its untimely and incomplete response to my order compelling discovery (in part). *See* IAF, Tab 11; RAF, Tabs 5, 6, 8, 10.

An administrative judge may impose sanctions against a party for failure to follow the Board's regulations or failure to respond to the administrative judge's orders. Sanctions should be imposed when a party has failed to exercise due diligence in complying with any order, or when a party has exhibited negligence or bad faith in its efforts to so comply. However, an administrative judge should not resort to the use of sanctions unless necessary to serve the ends of justice. *Williams v. Office of Personnel Management,* 71 M.S.P.R. 597, 603 (1996), *aff'd,* (Table).

The authority to impose sanctions includes, but is not limited to, the circumstances set forth below:

(a) Failure to comply with an order. When a party fails to comply with an order, the judge may:

(1) Draw an inference in favor of the requesting party with regard to the information sought;

(2) Prohibit the party failing to comply with the order from introducing evidence concerning the information sought, or from otherwise relying upon testimony related to that information;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(3) Permit the requesting party to introduce secondary evidence concerning the information sought; and

(4) Eliminate from consideration any appropriate part of the pleadings or other submissions of the party that fails to comply with the order.

(b) Failure to prosecute or defend appeal. If a party fails to prosecute or defend an appeal, the judge may dismiss the appeal with prejudice or rule in favor of the appellant.

(c) Failure to make timely filing. The judge may refuse to consider any motion or other pleading that is not filed in a timely fashion in compliance with this subpart.

5 C.F.R. § 1201.43.

OPM failed to file a prehearing submission as ordered

On August 12, 2008, I issued an Order and Notice of Hearing and Prehearing Conference (Hearing Order). RAF, Tab 7. This was a standard Hearing Order for OPM cases which invited OPM to participate in a prehearing tele-conference (*see* last paragraph directing OPM to contact the administrative judge to confirm whether or not it will participate). The Hearing Order indicated that if OPM chose not to participate, the administrative judge would deem this to be a waiver of the prohibition against *ex parte* communications and would proceed without OPM. *Id.* OPM chose to participate.

The Hearing Order also ordered both sides to file a 'prehearing submission' to include: (1) a statement of facts and issues; (2) any agreed-upon material facts; (3) a list of witnesses and their expected testimony; and (4) a copy of exhibits. The Hearing Order also indicated that documents previously submitted by either party were already part of the record and were not to be offered as exhibits. The Hearing Order further noted that in presenting evidence at the hearing, the parties would generally be limited to their listed witnesses and exhibits. The Hearing Order also indicated that at the scheduled prehearing teleconference, witness requests and hearing exhibits would be reviewed and the 'facts and issues of the appeal' would be discussed. *Id.*

Appellant filed a September 18, 2008 'prehearing statement' that included a statement of facts and issues, request for sanctions based on discovery issues, a proposed witness list, and proposed exhibits. RAF, Tab 12. OPM did not file a prehearing submission.

During our September 23, 2008 prehearing teleconference, appellant moved for sanctions based, in part, on OPM's failure to file a prehearing submission. Appellant asserted that he was entitled to know OPM's position in the case (and OPM's failure deprived him of this knowledge). RAF, Tab 17. OPM's representative stated that during ten years as such a representative, he could not recall submitting a prehearing submission in any appeals before the Board that did not involve disability retirement. I indicated that I did not recall that this was the routine practice for this or other OPM representatives. RAF, Tabs 17, 18, 20. I also indicated that OPM would not be allowed to call witnesses or introduce new evidence at the hearing. Finally, I indicated that I would entertain other argument about possible sanctions. RAF, Tab 17.

At the beginning of the hearing, appellant orally renewed his motion for sanctions. He argued that there is no exception in law under which OPM may be allowed to not file a prehearing submission, and that the Board should not countenance a 'double-standard.' He further argued that he was prejudiced by not knowing OPM's position in the case. He moved that, as sanctions, the Board not consider OPM's 'agency file' (see IAF, Tab 5), that the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Board strike OPM's assertion that appellant was not entitled to a spousal survivor annuity because Congressman Studds did not elect one for him, that OPM not be allowed to cross-examine appellant's witnesses, and that OPM not be allowed to make a written closing argument. OPM opposed the motion asserting simply that sanctions were not appropriate. I denied the latter two requested sanctions at the hearing, but agreed to further consider the first two. HT 1 (side A).10 I ruled that OPM's closing argument was important for the completeness of the record (HT 1 (side A)), and I do not find appellant was prejudiced by its consideration, particularly because I granted appellant's motion to file a written response thereto. Thus, appellant made an oral closing argument at the conclusion of the hearing, and a written closing argument in response to OPM's written closing argument. HT 2 (side B); RAF, Tabs 24, 25.

In responding to the sanctions motion in its closing argument, OPM asserted that it 'is not required to participate in the proceedings.' RAF, Tab 24 (page 7) (emphasis supplied). It supports this assertion by noting that the Board may not sanction OPM through a 'default judgment' because this could grant benefits to an appellant who has not met his or her burden of proving entitlement to those benefits. *Id.* (pages 7-8).

In his oral and written closing arguments, appellant renewed his motions for sanctions, but agreed that the Board cannot grant him benefits as a sanction against OPM. He also argued that OPM's 'election defense' should not be considered and that the Board should draw all inferences on the election issue in appellant's favor. HT 2 (side B); RAF, Tab 25.

The Board has long held, and the parties agree, that even in the face of 'OPM's failure to defend and submit the evidence upon which it denied [an] appellant's application [for benefits], and its failure to respond to the Board's orders,' sanctions may not be imposed which grant benefits where there has not been an entitlement determination. *Mittendorf v. Office of Personnel Management,* 9 M.S.P.R. 484, 485-86 (1982). *Cf. Richmond,* 496 U.S. 414 (the government may not be equitably estopped from denying benefits not authorized by law). However, the fact that reversal by the Board is not an available sanction in an OPM case is not analogous to the proposition that OPM is not required to participate in Board proceedings.

As previously explained, an individual such as appellant, whose CSRS rights or interests are affected by an OPM final decision, has the right to appeal to the Board pursuant to 5 U.S.C. § 8347(d)(1) and 5 C.F.R. § 831.110. Once such an appeal is filed, OPM becomes a party and is ordered, like all agencies, to file a response with the Board (the 'agency file') in the form prescribed by 5 C.F.R. § 1201.25. OPM did submit its agency file in this case, on December 20, 2007. IAF, Tab 5.

Appellant was not prejudiced by OPM's failure to file a prehearing submission

In its agency file, OPM supplied its initial and reconsideration decisions, appellant's request for reconsideration, numerous background documents concerning Congressman Studds' government service, and a cover memorandum in which OPM expounded upon its initial position in the case (regarding the failure-of-election issue). IAF, Tab 5. Appellant also received OPM's second reconsideration decision in which it asserted DOMA as a second ground for denying appellant's application for benefits. RAF, Tab 1.

Thus, OPM participated fully throughout the proceedings with the exception of filing a prehearing submission as was ordered. OPM had no witnesses or new evidence to present at the hearing, but appellant did not, in fact, have the benefit of a 'statement of facts and issues' from OPM, as required by the Hearing Order. Although there is no exception in the law that allows OPM to not file a prehearing submission, OPM, in essence, 'rested' on its agency file and second reconsideration decision. These materials do contain its view of the facts and is-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sues, but OPM did not make its intent to so 'rest' known until the prehearing teleconference took place. Although I can envision a situation in which this practice would prejudice an appellant's case, and I am mindful of appellant's 'double-standard' assertion, I do not find prejudice here.11 Appellant was, in fact, apprised of OPM's position in the case, and OPM's failure to file an additional statement of facts and issues in a prehearing submission did not hinder his ability to present his case and, as discussed later, to prevail on the 'failure-of-election issue.' Therefore, I do not find any of appellant's requested sanctions necessary to serve the ends of justice regarding OPM's failure to file a prehearing submission.

OPM failed to timely and completely respond to appellant's discovery requests and my order granting, in part, appellant's motion to compel the agency's responses to discovery (motion to compel)

Appellant served a first discovery request on December 21, 2007, to which OPM responded on January 24, 2007. Appellant was not satisfied with those responses and, after attempts to informally resolve the discovery issues were unsuccessful, appellant filed a motion to compel, pursuant to 5 C.F.R. § 1201.74, on February 19, 2008. IAF, Tab 11. The motion was not resolved at that point because, as explained above, the case was dismissed without prejudice on April 2, 2008, after OPM rescinded its first reconsideration decision.

After the appeal was refiled, I held a status teleconference on August 12, 2008, during which I indicated that my discovery order would be forthcoming. Appellant indicated that he soon would be filing a second discovery request. OPM's representative indicated that he would need some extra time to respond to that motion because he was going to be out of town for a few days. RAF, Tab 8. He filed a motion two days later, requesting a 10-day extension of time in which to reply to the second discovery request, because he would be out of town from August 15 through 25, 2008. RAF, Tab 9.

By order of August 18, 2008, after considering OPM's opposition to the motion to compel and appellant's response thereto, I granted in part, and denied in part, the motion. RAF, Tabs 5, 6, 10. Pursuant to 5 C.F.R. § 1201.73(d)(2), OPM's response to my order was due no later than 20 days after my August 18th order, which was served electronically on OPM on that date.

Appellant served a second discovery request on OPM on August 19, 2008. *See* RAF, Tab 14. Not having received further discovery as ordered by the time of his September 18, 2008 prehearing submission, appellant included in that submission a motion for sanctions in which he requested that numerous adverse inferences be drawn. RAF, Tab 12 (pages 8-11). When OPM did not respond to the second discovery request, and after attempts to informally resolve the discovery issues were unsuccessful, appellant filed a second motion to compel on September 22, 2008. RAF, Tab 14.

OPM filed its response to my order on the first motion to compel at 11:44 a.m.; one hour and fifteen minutes before our scheduled 1:00 p.m. September 23rd prehearing teleconference. RAF Tabs 15, 17. OPM's representative agreed to complete a search for other responsive documents no later than September 26, 2008, and to notify the other side of the result on that date. RAF, Tab 17 (page 3).

OPM filed its response to the appellant's second discovery request at 1:02 p.m. on September 23rd, just as our prehearing teleconference began. RAF, Tabs 16, 17. Therefore, appellant's second motion to compel was moot. Although appellant had no time to review OPM's new discovery responses before our prehearing teleconference, he preferred to proceed to hearing as scheduled, and to preserve his sanctions motion based on OPM's failure to timely respond to discovery requests and orders. I indicated that I would entertain appellant's further arguments about possible sanctions. RAF, Tab 17.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

At the beginning of the hearing, appellant orally renewed his motion for sanctions based on appellant's untimely discovery responses, and their incompleteness. HT 1 (side A). The latter part of this motion was based on the fact that appellant had discovered, on his own, two responsive documents not produced by OPM: (1) the September 24, 2008 testimony of The Honorable Howard Weizmann before the Senate; and (2) BAL Number 96-111, dated November 15, 1996, regarding same-sex marriage vis-?-vis federal benefits. RAF, Tabs 22 (exhibit L), 23 (exhibit M). I, note, however, that the August 12, 2008 Hearing Order provided that all discovery efforts would ordinarily terminate on the date of the prehearing teleconference (September 23, 2008). RAF, Tab 7. Therefore, I do not find OPM was obligated to produce a copy of the September 24th testimony.

However, the BAL was responsive to appellant's first discovery request (document request 4), and I ordered OPM to respond to that document request in my order on appellant's first motion to compel. RAF, Tab 10 (page 3). 'Document request 4' asked OPM to produce all its 'guidelines, notices to annuitants, policy statements or other documents which govern or provide guidance regarding any federal non-recognition of spouses of the same-sex, including but not limited to ... [DOMA].' IAF, 11 (attachment 1, page 13).

Because of these discovery problems, appellant urged at the beginning of the hearing that an inference be drawn that the failure-of-election issue is not dispositive in this case. OPM's representative stated that he had been unaware of BAL Number 96-111. HT 1 (side A). In OPM's closing argument, it did not address the discovery sanctions issue. RAF, Tab 24. In his written closing argument, appellant argued that as sanctions, OPM's 'election defense' should not be considered and that the Board should draw all inferences on the election issue in appellant's favor. RAF, Tab 25.

Appellant was not prejudiced by the untimeliness of OPM's discovery responses

As explained above, OPM's delays in responding to appellant's requests and/or Board orders regarding discovery were not lengthy, and OPM's representative documented his unavailability for part of the relevant response period. Moreover, appellant had sufficient time to review the submissions prior to the hearing. Therefore, I do not find that he was prejudiced by the delays.

I am mindful that in the Board's early cases, it found that OPM's failure to exercise the due diligence expected of an agency in complying with the discovery order of an administrative judge or showing of good cause why it could not comply with the order, warranted striking OPM's agency file as well as all of OPM's submissions. *See Julson v. Office of Personnel Management,* 8 M.S.P.R. 178, 183 (1981); *Stone v. Office of Personnel Management,* 5 M.S.P.R. 68, 71 (1981). However, in both cases, OPM did not respond at all to Board orders that it answer interrogatories. This is not the situation here. And in *Julson,* the Board held that a short delay in responding to a Board order to produce its agency file was not a basis for sanctions absent a showing of prejudice caused by the delay. *Id.*, 8 M.S.P.R. at 180. Therefore, I do not find any of appellant's requested sanctions regarding late discovery responses are necessary to serve the ends of justice.

Appellant was prejudiced by the incomplete discovery responses from OPM

With regard to discovery response failures, the Board has reiterated, in *dicta*, that sanctions are appropriate only if appellant demonstrates that he was prejudiced by OPM's failure to respond to his discovery requests in that the information sought would change the outcome of the appeal. *See Szejner v. Office of Personnel Management,* 99 M.S.P.R. 275, 278-79 (2005), *aff'd*., 167 Fed.App'x 217 (Fed. Cir. 2006).

I am mindful that the information sought in the instant matter would not change the ultimate outcome of this

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Board appeal, in that benefits are barred by DOMA. But, the information sought was crucial to the validity of OPM's failure-of-election argument; its alternate basis for denying appellant's application for benefits. Challenging this alternate basis was the crux of appellant's Board appeal. *See* RAF, Tab 1, 12; HT 2 (side B) (closing argument). Therefore, I find appellant was prejudiced by OPM's incomplete discovery response and that sanctions are necessary to serve the ends of justice.

As explained above, OPM did not produce through discovery all of its 'guidelines, notices to annuitants, policy statements or other documents which govern or provide guidance regarding any federal non-recognition of spouses of the same-sex, including but not limited to ... [DOMA],' and OPM did not show good cause why it did not completely respond. Thus, I find OPM failed to exercise due diligence or was negligent in its efforts to comply with my order granting, in part, appellant's motion to compel. Therefore, one is left with a firm doubt that OPM has to date produced all requested materials. Therefore, I draw an adverse inference pursuant to 5 C.F.R. § 1201.43(a)(1), that had OPM fully responded to 'document request 4,' as ordered, none of the produced material would support OPM's view that it put Congressman Studds on notice that he was required to make a spousal survivor annuity election for appellant under 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R. § 831.631(b)(1), that OPM had established a policy of requiring annuitants in same-sex marriages to make an attempted election under those provisions of law despite the fact that they did not have federally recognized marriages, or that OPM notified annuitants in same-sex marriages that it had a filing deadline policy outside of statute or regulation.

Evidence and testimony shows that Congressman Studds wanted appellant to have federal spousal survivor annuity benefits - Two public statements by Congressman Studds show he believed DOMA precluded those benefits, despite his wishes to the contrary

Congressman Studds' first statement was made on July 11, 1996, on the floor of the U.S. House of Representatives during debate over passage of DOMA. He stated, 'Mr. Speaker ...'

We are then left with a bill that simply denies Federal benefits to any State which choose[s] to sanction a certain kind of marriage. Mr. Speaker, I have served in this House for 24 years. I have been elected 12 times, the last 6 times as an openly gay man. For the last 6 years, as many Members of this House know, I have been in a relationship as loving, as caring, as committed, as nurturing and celebrated and sustained by our extended families as that of any Member of this House. My partner, Dean [Hara], whom a great many of you know and I think a great many of you love, is in a situation which no spouse of any Member of this House is in. The same is true of my other two openly gay colleagues. This is something which I do not think most people realize. The spouse of every Member of this House is entitled to that Member's health insurance, even after that Member dies, if he or she should predecease his or her spouse. That is not true of my partner. The spouse of every Member of this House knows that, if he or she predeceases, is predeceased by their spouse, a Member, that for the rest of their lives they may have a pension, long after if they live longer, the death of the Member of Congress. I have paid every single penny as much as every Member of this House has for that pension, but my partner, should he survive me, is not entitled to one penny. I do not think that is fair, Mr. Speaker. I do not believe most Americans think that is fair. And that is real. Yet that is what the second section of this bill is about, to make sure that we continue that unfairness.

....

142 Cong. Rec. H7270-04, 7277-78 (1996) (Statement of Rep. Studds) (emphasis supplied). *See* IAF, Tab 5 (subtab 3, pages 14-16).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The second statement was made on May 17, 2005, during an interview with Congressman Studds and appellant on the WGBH television program 'Greater Boston with Emily Rooney.' The interview was conducted on the one-year anniversary of the effective date of the Massachusetts Supreme Court's holding in *Goodridge v. Department of Public Health* (*see* footnote 1) which allowed recognition of same-sex marriages in that State. This also was one week short of the one-year anniversary of Congressman Studds' and appellant's marriage.

During the interview, Congressman Studds stated that '[a]s far as the federal government is concerned we don't exist as a married couple, unfortunately.' He discussed the fact that, accordingly, despite his Massachusetts marriage to appellant, he had filed his federal income tax return as 'single' vice 'married,' on the advice of his accountant. Congressman Studds stated that this made him uncomfortable because it required him to attest to something that he knew was not true (that is, his non-marital status). RAF, Tab 12 (exhibit A, compact disc (CD)).

During the interview, appellant stated that there still were benefits of marriage that they did not enjoy as compared with heterosexual couples. In particular, he noted that Congressman Studds could not provide him with his 'pension benefits,' and Congressman Studds added: '... or health insurance.' *Id.*

Unrebutted hearing testimony demonstrates that Congressman Studds wished for appellant to have federal spousal survivor annuity benefits[12]

David H. Simpson testified that he and Congressman Studds had been close friends since July 1983.[13] He is married to Thomas Green (see Green affidavit, IAF, Tab 5 (subtab 3, pages 20-21), who officiated at Congressman Studds' and appellant's wedding. Simpson testified that he is a writer, playwright, and poet, and lives in Provincetown, Massachusetts. He testified that Studds was his Congressman and they shared the same attorney. He testified that Studds had been an 'openly gay' Congressman and he was 'loved by his constituency.'

Simpson testified that he became Congressman Studds' link to Provincetown and he did things for him such as checking on his house. He testified they spent every holiday together and were best friends, sharing many interests such as the sea and lobsters, poetry and philosophy.

Simpson testified that he met appellant at a dinner party, and Congressman Studds had never seemed happier, as he had long wanted a partner. He (Simpson) became part of both of their lives after they were together. He also testified that he observed Congressman Studds and appellant interacting with Congressman Studds' biological family, who seemed very happy about their relationship.

Simpson also testified that Congressman Studds believed it was unfair that federal policy would not recognize gay marriages and thus would not grant benefits to gay partners. He testified that the crux of the matter after DOMA was enacted was that Congressman Studds believed appellant 'deserved his pension,' and he was angry that appellant would not get those benefits. He was also concerned because he wanted appellant to feel secure about the future, and the survivor annuity money would have helped with this concern. He observed Congressman Studds at a few dinner parties become 'ruffled' and 'turn red' when discussing benefits issues. Simpson testified that he had no doubt that Congressman Studds wanted to provide benefits to appellant, but knew that he could not. He testified on cross-examination that he did not know if Congressman Studds had ever tried to obtain survivor benefits for appellant.

Gaynor Studds Stewart testified that Congressman Studds was her brother.[14] She was three years younger than Congressman Studds and four years older than their brother, Colin Studds. She testified that she stayed close

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

with her older brother over the years and they saw each other every summer and at Christmas time.

Stewart testified that she first met appellant in 1992 when she visited them. Congressman Studds introduced appellant as his partner and she observed them to have a 'loving and close relationship.' She testified that she saw them together every summer thereafter and spoke with them by telephone 'all the time.' She also testified that she knew they wanted to be married before such marriages were recognized, and she was very supportive of their marriage in 2004.

Stewart testified that Congressman Studds had many conversations with her over the years about the fact that same-sex couples did not have the same benefits as others did. She remembered in particular a 2003 conversation in which he expressed his view that appellant's ineligibility for survivor benefits was an 'equal rights issue.' She also specifically remembered a conversation in the Spring of 2005, after their marriage, in which Congressman Studds was 'angry and upset' because appellant could not be awarded survivor benefits. He had not been well, and so he had become particularly concerned about what would happen if he died first.

Stewart testified that she had no doubt her brother would have provided survivor benefits for appellant, if he could have done so. She also had no doubt that he knew federal law prohibited this. She testified on cross-examination that she did not know if Congressman Studds had ever tried to obtain survivor benefits for appellant.

Congressman Anthony C. Beilenson, a retired Member of Congress, who represented the 24th District of California, testified that his 20 years of service overlapped entirely with Congressman Studds' service.15 He testified that he and Congressman Studds became close friends during his (Congressman Beilenson's first term (beginning in 1976)) and they remained close after they both retired.

Congressman Beilenson testified that he and his wife, Delores, often socialized with Congressman Studds and appellant, as a couple, both during and after their Congressional careers.

He testified that his wife was on an orientation committee for new Congressional spouses and that she provided this orientation for appellant. When same-sex marriage became lawful in Massachusetts, his wife urged Congressman Studds and appellant to marry.

Congressman Beilenson testified that when he retired, he elected a reduced annuity in order to provide a survivor annuity for his wife. He was aware of Congressman Studds' views on DOMA from his speeches on the floor of the House of Representatives, and from personal discussions. He was aware that Congressman Studds wanted to provide the same benefits for appellant as he had for his wife, and it 'preyed on his mind' that he could not do so because of DOMA.

He testified that it was clear to both himself and his wife that Congressman Studds was trying to find some way to take care of appellant financially should appellant outlive him. He also testified that he did not know if Congressman Studds filed a survivor annuity election form with OPM, but there would have been no point in his doing so. Congressman Beilenson testified that although Congressman Studds would take whatever steps were necessary to accomplish something, it was not his style to do futile things.

Congresswoman Elizabeth Furse, a former Member of Congress, who represented the 1st District of Oregon for three terms (1993-1999), testified that two of her terms overlapped with Congressman Studds' last terms.16 She testified that he was the Chair of the Merchant Marine and Fisheries Committee, on which she served and that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

they became friends and were very close. Congresswoman Furse testified that she and her husband socialized with Congressman Studds and appellant, as two couples. She testified that they remained close, and she visited them in Washington, D.C., and in Boston.

Congresswoman Furse testified that DOMA passed just before Congressman Studds retired. She testified that she and Congressman Studds had much in common because they each had a younger spouse and thus worried about pension issues. She testified that Congressman Studds 'wanted his beloved partner [appellant] to be protected.' She recalled in particular one conversation with Congressman Studds in the House dinning room in which he expressed concern about DOMA. She testified that he would become very angry when speaking about DOMA.

Congresswoman Furse testified that she had been excited when Congressman Studds and appellant could be married, which seemed to her to be a 'logical step.' She testified that Congressman Studds did not think he would have lived to see the day when he could be married. However, she knew that he realized that because of DOMA his marriage did not allow federal benefits for appellant.

Congresswoman Furse testified that the last time she visited with Congressman Studds and appellant was about one month before Congressman Studds died. He spoke during that visit about the need to protect loved ones. She testified that Congressman Studds cared about many things, but above all, about appellant.

Congresswoman Furse testified that she had no doubt that Congressman Studds wanted appellant to have the benefit of his pension. She also testified that she did not know if Congressman Studds made a survivor annuity election for the appellant, but she did not believe he was 'one to waste time.' She also did not believe that he undertook futile acts, which was demonstrated to her by his not having filed his federal tax return as married.

Appellant testified that he and Congressman Studds were married at Simpson's and Green's home on May 24, 2004; one week after it became lawful to do so in Massachusetts.17 He testified that they met in January 1991, and soon began going out to dinner and quickly became close. Congressman Studds was about 53 at this time and appellant was about 33. Appellant testified that Congressman Studds invited him to Congressional functions and a White House picnic. He testified that in the past, Congressman Studds had not attended many social events because he had not wanted to go alone.

Appellant testified that during Labor Day weekend of 1991, Congressman Studds proposed to him, wanting a lifetime commitment. Neither marriage nor civil unions were a possibility in Massachusetts at that time. Appellant testified that he said he needed time to think about this. Two weeks later, Congressman Studds asked again and presented him with a ring, and appellant said 'yes.' Appellant gave him a ring the following Christmas.

Appellant testified that after this, they went to the Sergeant-at-Arms Office and appellant was issued a U.S. House of Representatives Spouse Identification Card. RAF, Tab 12 (exhibit J). Appellant further testified that Congressman Studds was the first openly gay Member of Congress, and thus, in addition to his committee work, he often was contacted by the gay community from across the country. He testified that Congressman Studds chose to not seek reelection in 1996 and he retired after 24 years in the House.

Appellant testified that Congressman Studds had been angry about DOMA which he believed was 'a mean-spirited' reaction to the possibility that Hawaii might recognize same-sex marriages in the near future. He testified that Congressman Studds asked appellant to be present in Congress the day that he spoke on the floor in opposition to DOMA because many Members knew him personally. He believed this would create 'cognitive dis-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

sonance' for Members as he spoke about the benefits appellant could not receive because of DOMA.

Appellant also testified that in 1993, they went to a specialist in same-sex wills, and on December 2, 1993, they executed their first wills. Appellant is the sole beneficiary of Congressman Studds' Last Will and Testament of that date. RAF, Tab 12 (exhibit H).

He further testified that after Congressman Studds retired and they moved to Massachusetts, they executed new wills. Appellant is the sole beneficiary of Congressman Studds' May 21, 1998 Last Will and Testament. RAF, Tab 12 (exhibit I). Appellant further testified that on September 4, 1998, Congressman Studds executed an irrevocable insurance trust and named appellant as trustee. RAF, Tab 12 (exhibit D).

Appellant testified that on March 22, 2002, because Congressman Studds had some questions about these documents, he executed a new will and an amendment to the trust, which again named appellant as sole beneficiary and trustee, respectively. RAF, Tab 12 (exhibits B, C). He also testified that on May 19, 2002, Congressman Studds executed a First Codicil to the March 22nd will, in anticipation of their marriage in May of that year. The codicil provided that their marriage would not invalidate the will. RAF, Tab 12 (exhibit B, page 8).

Appellant testified that Congressman Studds was content with his retirement from public life in Boston, but that he (appellant) had to become used to living in Boston after so many years in Washington, D.C. He testified that he ultimately became a fulltime financial planner, but that Congressman Studds' income was greater than his.

Appellant also testified that when Congressman Studds filed federal income tax returns for tax years 2004 and 2005, he listed his filing status as 'single.' RAF, Tab 12 (exhibits E, F). His final return for the year he died, 2006, also indicates he was single. RAF, Tab 12 (exhibit G).

Appellant testified that Congressman Studds was 'livid' that he had paid into the retirement system for many years but that he (appellant) was denied survivor benefits.

Both sides agree that DOMA, which defines the terms 'spouse' and 'marriage' in all federal statutes and regulations, and administrative rulings and interpretations, precludes federal recognition of appellant's marriage to Congressman Studds

More than 100 years ago, the U.S. Supreme Court held that '[t]he whole subject of the domestic relations of husband and wife ... belongs to the states, and not to the laws of the United States.' *Ex parte Burrus,* 136 U.S. 586, 593-94 (1890). *See also Ankenbrandt v. Richards,* 504 U.S. 689, 703 (1992); . In fact, the Supreme Court declared in 'there is no federal law of domestic relations, which is primarily a matter of state concern.'

For these reasons, the Board long-recognized the rule that decisions regarding family status, such as the validity of a marriage, are left to state authorities. *See Beatty v. Office of Personnel Management,* 46 M.S.P.R. 623, 629 (1991). OPM has also long-defined marriage in its regulations by looking principally to state law:

'Marriage' means a marriage recognized in law or equity under the whole of the jurisdiction with the most significant interest in the marital status of the employee, Member or retiree unless the law of that jurisdiction is contrary to the public policy of the United States. If a jurisdiction would recognize more than one marriage in law or equity, the Office of Personnel Management (OPM) will recognize only one marriage, but will defer to the local court to determine which marriage should be recognized.

5 C.F.R. § 831.603.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 3(a) of DOMA changed this deference to state law, in part, because it provides that:

In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word 'marriage' means only a legal union between one man and one woman as husband and wife, and the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7 (emphasis supplied).

The legislative history shows that DOMA had two main purposes:

The first ... [was] to defend the institution of traditional heterosexual marriage. The second ... [was] to protect the right of the states to formulate their own public policy regarding the legal recognition of same sex unions. To achieve these purposes, ... [DOMA] has two operative provisions. Section 2 entitled 'Powers reserved to the States' and Section 3 [which] defines the term 'marriage' and 'spouse' for the purposes of federal law only, to re-affirm that they refer exclusively to relationships between persons of the opposite sex.

, *as reprinted in* 1996 U.S.C.C.A.N. 2905, 2906. Thus, 'the entire thrust (and legislative history) of 1 U.S.C. § 7' ensures that, for federal purposes, 'spouses shall be of the opposite sex....' *Taing v. Chertoff,* 526 F. Supp. 2d 177, 184 (D. Mass. 2007).18

But, the legislative history also makes clear that DOMA does not affect a state's ability to recognize same-sex marriages, and except for the 'narrow federal requirement' that 'spouse' and 'marriage' be defined as required by DOMA, 'the federal government will continue to determine marital status in the same manner as it ... [did, pre-DOMA].' 30, *as reprinted in* 1996 U.S.C.C.A.N. 2906, 2935.

Thus, as noted by one commentator before any state had recognized same-sex marriages,19 DOMA denies same-sex married couples 'legal entitlements that flow from marriage under federal law, while leaving those rights intact under state law.' For example, they may 'file as married on their state income tax returns, but would have to file as single on their federal returns.' And, '[s]ince state and federal regulations often intertwine, ... [these couples] exist as married and not married simultaneously.' Charles J. Butler, *The Defense of Marriage Act: Congress's use of Narrative in the Debate over Same-Sex Marriages*, 73 N.Y.L. Rev. 841, 842-43 (1998).

Therefore, while appellant was lawfully married under Massachusetts law, he was not married for federal purposes, as both sides recognize, because the terms 'marriage' and 'spouse' must be defined pursuant to DOMA. *See, e.g., In re Kandu,* 315 B.R. 123, 1130-31 (Bankr. W.D. Wash. 2004).20 Accordingly, wherever the terms 'spouse' or 'marriage' are used in 5 U.S.C. Chapter 83 - Retirement, or in OPM's implementing regulations at 5 C.F.R. Part 831 - Retirement, they must be read in consonance with DOMA's definitions.

Both sides agree that DOMA bars appellant's receipt of spousal survivor annuity benefits

As set forth below, under 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R.§ 831.631(b)(1), an annuitant who was unmarried at the time of retiring and who later marries may elect a survivor annuity for his or her spouse, and unless the annuitant makes this election, the surviving spouse may not receive such an annuity. However, as explained above, although appellant's same-sex marriage to Congressman Studds was recognized by Massachusetts, they were neither 'married' nor 'spouses' for federal purposes, pursuant to DOMA. Therefore, I find that appellant and Congressman Studds did not have a section 8339(k)(2)(A) 'marriage' nor were they 'spouses' under that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

subsection.

Moreover, under 5 U.S.C. § 8341(a), a surviving widow or widower must have been 'married' for at least nine months prior to an annuitant's death to be eligible for a survivor annuity. Under 5 U.S.C. § 8341(b)(2), the widow or widower of an annuitant who made a 5 U.S.C. § 8339(k)(2) election for him or her is entitled to an annuity as if they were 'married' to the deceased annuitant when he or she retired. And, under 5 U.S.C. § 8341(b)(2), a 'spouse' acquired after retirement is entitled to a survivor annuity only if he or she elects to receive it. As explained above, however, although appellant's same-sex marriage to Congressman Studds was recognized by Massachusetts, for federal purposes, pursuant to DOMA, they were not 'married' for any period of time, nor were they 'spouses.' Therefore, I find that appellant and Congressman Studds did not have a section 8341(a) or 8341(b)(2) 'marriage,' nor was appellant a section 8341(b)(2) 'spouse.' Therefore, appellant is not eligible for a federal spousal survivor annuity.21

5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R. § 831.631(b)(1) generally apply in post-retirement marriage spousal survivor annuity cases

In the case of a retiree who retired on or after May 7, 1985, or who married on or after February 27, 1986, the law allows for a post-retirement survivor annuity election, as follows:

An employee ... who is unmarried at the time of retiring under a provision of law which permits election of a reduced annuity with a survivor annuity payable to such employee['s] ... spouse and who later marries, may irrevocably elect, in a signed writing received in the Office within two years after such employee ... marries ... [such] a reduction in the retired employee['s] ... current annuity [and thereby provide a survivor's annuity for the spouse].

5 U.S.C. § 8339(k)(2)(A). *See* 5 C.F.R. § 831.631(b)(1).

This 'unequivocal requirement of filing [an election] within two years of marriage' does not provide any express basis for waiver, and failure to timely file an election is generally a statutory bar. *Shoemakers v. Office of Personnel Management,* 180 F.3d 1377, 1382 (Fed. Cir. 1999). *See Brush v. Office of Personnel Management,* 982 F.2d 1554 (1992); *Robinson v. Office of Personnel Management,* 106 M.S.P.R. 255 (2007).

Therefore, generally, an annuitant's intentions to provide survivor spousal annuity benefits are insufficient to make an effective survivor annuity election in the absence of a signed writing received by OPM within two years of a post-retirement marriage that manifests an unmistakable intent to provide such benefits. *Robinson,* 106 M.S.P.R. at 260. Similarly, even an annuitant's mental impairment does not permit waiver of the timely filed election requirement. *Shoemakers,* 180 F.3d at 1382.

However, OPM has a statutory obligation to notify each annuitant annually of, among other things, the requirements under (2)(A) for electing a survivor annuity benefit based on a post-retirement marriage. *See* , 92 Stat. 382 (1978) *as amended by* Reorganization Plan No. 2 of 1978, § 102, 92 Stat. 3783 (1978) (*codified at* 5 U.S.C. § 8339 note) ('The Director of the Office of Personnel Management shall, on an annual basis, inform each annuitant of such annuitant's rights of election under and ....').

Accordingly, OPM's regulations require that:

At least once every 12 consecutive months, OPM will send a notice to all retirees to inform them about the sur-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

vivor annuity elections available to them, under sections 8339(j), 8339(k)(2), and 8339(o) of title 5, United States Code.

5 C.F.R. § 831.681.

Where OPM fails to show that it has complied with the notice requirement and the annuitant's conduct is consistent with his wanting to make the election at issue, the Board has either ordered OPM to allow the annuitant to make the election or the Board has ordered OPM to grant the survivor benefits as if the deceased had made a timely election. *Brush,* 982 F.2d at 1560.22

To show that it has fulfilled this mandatory notice obligation, OPM must do two things: it must prove that it actually sent the required notice and it must prove that the content of the notice was adequate to inform the annuitant of the specific election requirements under . The fact that OPM proves that it sent annuitants a notice does not satisfy its notice obligation. (rejecting OPM's argument that its affidavit alone was enough to fulfill the notice requirement because 'there is no indication in the affidavit or anywhere else in the record that a notice was sent that informed Mr. Simpson that he needed to make a reelection').

As the Court explained in 'OPM's evidence 'must be more than a bare allegation that notice was sent,' and must show 'the contents of the annual notice.'' (finding that OPM met its notice requirement because it submitted both an affidavit, attesting that a notice was sent, and a copy of the actual notice). If OPM does not provide the annuitant with a sufficient notice, OPM cannot deny a survivor annuity based on the annuitant's failure to timely make an election under if the annuitant adequately manifested the intent to provide the survivor annuity in question. *See* . *See also* (OPM's failure to provide the statutorily mandated notice, under note, 'excused the retiree's noncompliance with the election requirement').

There is no requirement, however, that OPM's proof relate to any specific notices sent to the particular annuitant. Rather, the question simply is whether OPM has 'establish[ed] through credible evidence that it is more probable than not that the annual notice was sent' and the annuitant in question was among those to whom the notice was sent. *Brush,* 982 F.2d at 1561. If OPM establishes this, the burden shifts to the appellant to establish that the annuitant 'did not receive the annual notice.' *Id. See Schoemakers*, 180 F.3d at 1381.

Importantly, OPM is required to provide accurate information not only in its annual notice of annuitants' rights to elect survivor annuity benefits, but in all its communications to employees and annuitants 'so that the statutorily required notice is not diluted or contradicted.' *Nixon*, 452 F.3d at 1367. When OPM has provided inaccurate information, and when this action caused the annuitant to fail to elect a survivor annuity, the election should be considered to have been made (even when the annuitant has already died). *Nixon,* at 1368-69.

Congressman Studds did not 'elect' a spousal survivor annuity for appellant, but there was no statutory or regulatory requirement that he do so because they were neither 'married' nor 'spouses' under federal law

Based on all of the above, it is clear, and I find in the absence of any indication to the contrary, that OPM sent notices to all annuitants, including Congressman Studds in December 2004 and 2005, concerning, among other things, spousal survivor annuity elections based on a post-retirement marriage and the two-year filing deadline. It is also clear, and I find, that Congressman Studds did not file an election with OPM for appellant to receive spousal survivor annuity benefits within two years of their post-retirement marriage or at any time thereafter. OPM argues that, therefore, Congressman Studds did not comply with a statutorily-required election requirement. I do not agree.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

As previously explained, pursuant to DOMA, appellant was not 'married' to Congressman Studds and they were not 'spouses' for purposes of the federal statutes and regulations discussed above. Therefore, the election filing requirements set forth in those provisions of law and regulation simply do not apply to a same-sex marriage recognized only by state law. Congressman Studds could not make a 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R.§ 831.631(b)(1) post-retirement spousal survivor annuity election because he did not have a 'marriage' or a 'spouse' under those provisions. Therefore, there was no statutory or regulatory two-year election filing deadline applicable in this case.23

Even if there was a statutory or regulatory deadline, OPM is estopped from enforcing it

I find that the December 2004 and 2005 notices regarding post-retirement marriage that are described above, were not adequate to inform annuitants who were in same-sex marriages that the general notice applied to them. An annuitant who was in a same-sex marriage and who was aware of DOMA, as Congressman Studds undoubtedly was, knew that his state marriage was not a marriage for federal purposes. Congressman Studds made his understanding of this distinction and its effect clear in the public statements described above and, as demonstrated through the testimony summarized above, in conversations with appellant and their friends and family members over the years. He also made it clear by filing his federal tax returns as 'single' despite his state marriage. There is no evidence that OPM or Congressman Studds' former employer provided any clarifying information to him about the affect of DOMA on his same-sex marriage, vis-?-vis 'election' rights under 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R.§ 831.631(b)(1).24 It, therefore, would be inequitable to enforce such a deadline in this case.

It is also unmistakenly clear from the testimony and Congressman Studds' statements and actions that he intended for appellant to have the benefit of a spousal survivor annuity if this was legally possible. Congressman Studds was in a financial position where he could afford a reduced annuity to provide a survivor annuity, he was angry that DOMA precluded such an annuity, and he executed wills and trust documents in order to provide financially for appellant, who was twenty years younger than he.

As previously explained, OPM is required to provide accurate information not only in its annual notice of annuitants' rights to elect survivor annuity benefits, but in all its communications to employees and annuitants 'so that the statutorily required notice is not diluted or contradicted.' *Nixon,* 452 F.3d at 1367. Moreover, as an exception to *Richmond,* 496 U.S. 414, when OPM has provided inaccurate information, and when this action caused the annuitant to fail to elect a survivor annuity, the election should be considered to have been made (even when the annuitant has already died). *Nixon,* 452 F.3d at 1368-69; *Brush,* 982 F.2d at 1563-64. *Cf. Blaha*, 106 M.S.P.R. at 268-271 (same result where annuitant has not died). Therefore, if an election is required by statute or regulation, I consider Congressman Studds to have timely made such an election.

I am mindful it could be argued that OPM did not violate its statutory and regulatory notice duty to Congressman Studds because, as explained above, that duty extended only to notice of 'elections rights' that are 'available,'25 and, as also explained above, none are available to same-sex married annuitants. This argument goes too far, however, because it underscores the fact that Congressman Studds did not have a federally-recognized marriage, thus, the election provisions do not apply to him.

OPM seeks to enforce, by policy, an 'election' filing deadline in this case that is not mandated by statute or regulation, and without prior notice to Congressman Studds

Even though I find that there is no statutory or regulatory 'election' deadline for post-retirement same-sex mar-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

riages, OPM nevertheless seeks to enforce such a deadline in this case by policy. In other words, although same-sex married couples may not 'elect' a survivor annuity under the law, OPM seeks to require an 'attempted election' within a two-year window. Had Congressman Studds attempted to make such an election, there can be no doubt that OPM would have denied that attempt, pursuant to DOMA.

OPM has produced no evidence to show that it established such a deadline policy, and, as explained above, relevant notices and forms to this date do not reflect such a policy. Nevertheless, even if OPM had established such a deadline policy, it is clear, and I find, that it did not provide notice of the policy to annuitants such as Congressman Studds.26 I further find, for the same reasons explained above, that it would be inequitable to enforce a deadline policy in this case,27 and that estoppel does not violate the dictates of *Richmond.*

Conclusion

For all the reasons explained above, I may not reach the question of DOMA's constitutionality. I also decline appellant's request to 'invite' him to refile his appeal in the event that DOMA is declared unconstitutional in the future. I impose limited sanctions based on OPM's failure to fully respond to my order compelling discovery, which includes drawing adverse inferences against OPM regarding the failure-of-election issue.

I find that DOMA precludes federal recognition of appellant's same-sex marriage, which was lawfully performed and recorded under Massachusetts law. Therefore, he is barred from receiving the spousal survivor annuity benefits he seeks based on the federal service of the late Congressman Studds.

I also find that because DOMA defines the terms 'marriage' and 'spouse' for all federal purposes, they did not have a 'marriage' under 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R. § 831.631(b)(1), and, therefore, appellant was not Congressman Studds' 'spouse' for whom a spousal survivor annuity election was possible under those provisions. I also find that even if those provisions of law and regulation do apply, OPM is estopped from enforcing the two-year election filing deadline because of the government's failure to provide clear notice to Congressman Studds of their applicability to his same-sex marriage to appellant. I find, therefore, that based on unrebutted evidence of his intent, Congressman Studds is deemed to have timely made the election, if required. Lastly, I find that because 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R. § 831.631(b)(1) do not apply here, OPM has, in essence, imposed a two-year filing deadline by policy, which it also is estopped from enforcing based on its failure to provide clear notice of the policy to Congressman Studds.

## DECISION

OPM's reconsideration decision is AFFIRMED.

FOR THE BOARD        _____

       William L. Boulden
       Chief Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on January 21, 2009, unless a petition for review is filed by that date or the Board reopens the case on its own motion. This is an important date because it is usually the last day on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. You must establish the date on which you received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals for the Federal Circuit. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review. Your petition, with supporting evidence and argument, must be filed with:

> The Clerk of the Board
> Merit Systems Protection Board
> 1615 M Street, NW.,
> Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition for review submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website ().

If you file a petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. Your petition must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you more than 5 days after the date of issuance, 30 days after the date you actually receive the initial decision. If you claim that you received this decision more than 5 days after its issuance, you have the burden to prove to the Board the date of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j).

## JUDICIAL REVIEW

If you are dissatisfied with the Board's final decision, you may file a petition with:

> The United States Court of Appeals
> for the Federal Circuit
> 717 Madison Place, NW.
> Washington, DC 20439

You may not file your petition with the court before this decision becomes final. To be timely, your petition must be received by the court no later than 60 calendar days after the date this initial decision becomes final.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703). You may read this law, as well as review the Board's regulations and other related material, at our website,   Additional information is available at the court's website, .  Of particular relevance is the court's 'Guide for Pro Se Petitioners and Appellants,' which is contained within the court's , and Forms , , and .

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## FOOTNOTES

FN1. Same-sex marriage became recognized in Massachusetts on November 18, 2003, based upon that State's Supreme Court's holding in Goodridge v. Department of Public Health, 798 N.E.2d 941 (Mass. 2003). The Court stayed its decision for 180 days; thus, same-sex marriages lawfully could be performed in Massachusetts beginning on May 17, 2004. Id. at 969-970.

FN2. The 'lump-sum benefit' constitutes the unrefunded retirement deductions remaining upon an annuitant's death. 5 U.S.C. § 8331(8). Payment is made in the prescribed order of precedence; first in precedence being the designee listed on a duly filed designation form, irrespective of marital status. 5 U.S.C. § 8342(c).

FN3. I have taken official notice under 5 C.F.R. § 1201.64, that OPM issues BAL's to 'provide guidance to agencies on various aspects of Federal benefits administration' as part of OPM's '[g]overnment wide responsibility and oversight for [f]ederal benefits administration.' See http:// www.opm.gov/retire/pubs/bals/index.asp.

FN4. The instructions for the May 2000 version of SF-2800 are not in the file. However, I have taken official notice under 5 C.F.R. § 1201.64, that the current version of SF-2800 found on OPM's website is a June 2006 version. That version and its related instruction sheet use the terms 'spouse' and 'marriage' in several places, but they do not define those terms, nor do they refer to DOMA or same-sex marriage. See http://www.opm.gov/forms/pdfimage/sf2800.pdf. The same is true of the informational pamphlet referenced in that instruction, entitled Applying for Death Benefits under the Civil Service Retirement System (CSRS), SF-2800-1. See http://www.opm.gov/forms/pdfimage/sf2800-1.pdf.

FN5. OPM has duties to administer federal retirement activities and the Civil Service Retirement and Disability Fund pursuant to 5 U.S.C. §§ 1103(a)(5)(B) and 8348.

FN6. Preponderant evidence is the 'degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.' 5 C.F.R. § 1201.56(c)(2).

FN7. Appellant also urged the Board to 'invite' him to reopen the appeal in the event DOMA is declared unconstitutional in the future. I am mindful that there have been court challenges to DOMA's constitutionality, and a Bill entitled the 'State Regulation of Marriage is Appropriate Act' was introduced and referred to Committee this year in May and July, respectively. H.R. 6115, 110th Cong. (2d Sess. 2008). Whatever the result of these or similar efforts might be, the appellant, like any party, may request the full Board to reopen a final decision, in its

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

discretion, under 5 C.F.R. § 1201.113(a). However, I am not aware of any authority for an initial decision to include the requested 'invitation.' See 5 C.F.R. § 1201.111(b)(6).

FN8. While appellant agrees, he preserved his constitutional challenge to DOMA throughout the proceedings. See RAF, Tabs 1, 17; Hearing Tape (HT) 2 (side B).

FN9. Even if appellant's constitutional challenge was viewed as an 'application' issue, the Board has held that a claim of discrimination on the basis of sexual orientation is not cognizable discrimination under Title VII of the Civil Rights Act of 1964, § 701 et seq., 42 U.S.C. § 2000e et seq., as incorporated into the CSRA at 5 U.S.C. § 2302(b)(1). Mahaffey v. Department of Agriculture, 105 M.S.P.R. 347, 360 n.10 (2007); Morales v. Department of Justice, 77 M.S.P.R. 482, 484 (1998). Nor has the Board held that such a claim may be heard as any other form of prohibited personnel practice under 5 U.S.C. § 2302(b). See Mahaffey, 105 M.S.P.R. at 360-61.

FN10. OPM's cross-examination was minimal, usually limited to one question about whether the witness knew if Congressman Studds had filed a survivor annuity election with OPM. HT's 1 (side B), 2 (side B).

FN11. Had I found prejudice, however, the argument that OPM had not filed prehearing submissions in past cases would be unavailing. See Miller v. Office of Personnel Management, 7 M.S.P.R. 469, 473 n.5 (1981).

FN12. There are three affidavits in the file from witnesses who did not testify at the hearing. Their affidavits are consistent with the testimony and affidavits of those who did testify. See IAF, Tab 5 (subtab 3, pages 17-18, 20-21, 22-24, 26-27).

FN13. Simpson's testimony was consistent with his June 28, 2007 affidavit. IAF, Tab 5 (subtab 3, page 25).

FN14. Stewart's testimony was consistent with her June 27, 2007 affidavit. IAF, Tab 5 (subtab 3, pages 28-29).

FN15. Congressman Beilenson's testimony was consistent with his June 27, 2007 affidavit. IAF, Tab 5 (subtab 3, pages 11-12).

FN16. Congresswoman Furse's testimony was consistent with her June 26, 2007 affidavit. IAF, Tab 5 (subtab 3, page 19).

FN17. Appellant's testimony was consistent with his June 27, 2007 affidavit. IAF, Tab 5 (subtab 3, pages 7-10).

FN18. In an unpublished, non-precedential decision regarding the meaning of 'spouse' in a federal income tax context, DOMA was described as having 'presumptively denie[d] federal recognition of same-sex marriages should any state choose to recognize such unions.' Mueller v. Commissioner of Internal Revenue, 39 Fed.App'x 437, 438 (7th Cir. 2002).

FN19. Since the enactment of DOMA, in addition to Massachusetts, California recognized same-sex marriages on May 15, 2008 (In re Marriage Cases, 183 P.3d 384 (Cal. 2008)) - but on November 4, 2008 voters approved 'Proposition 8' which bans such marriages (http://www.latimes.com/news/local/la-me-gaymarriage5-2008nov05,0,1545381.story), and Connecticut recognized same-sex marriages on October 28, 2008 (Kerrigan v. Commissioner of Public Health, 957 A.2d 407 (Conn. 2008)).

FN20. In an unpublished, non-precedential decision regarding the meaning of 'spouse' in an immigration con-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

text, DOMA was described as having 'introduced a complete and exclusive definition that controls the interpretation of 'any Act of Congress.'' Matthews v. Gonzales, 171 Fed.App'x 120, 122 (9th Cir. 2006).

FN21. The only Board decision to date which construed DOMA was issued before any state had recognized same-sex marriages. In an unpublished, non-precedential initial decision, an administrative judge found that 'regardless of whether ... [the parties' domestic partnership] constitutes a valid marriage under state law, they cannot be 'married' to each other for purposes of 5 U.S.C. [Chapter 83 - Retirement].' Johnson v. Office of Personnel Management, MSPB Docket No. SF-0831-02-0089-I-1, slip op., 2002 WL 580152, at *3 (Initial Decision, Mar. 6, 2002). In the decision, OPM was found to have issued an October 10, 2001 reconsideration decision which concluded that DOMA barred it 'from considering ... [the domestic partnership] a 'marriage' for survivor annuity purposes, because the appellant and ... [his partner] are of the same sex.' Id. at *2.

FN22. This post-death recognition of an annuitant's intent is an exception to the usual rule that annuity elections are personal to the annuitant and thus may not filed on a decedent's behalf. See, e.g., Chia-Chiag Teng v. Office of Personnel Management, 85 M.S.P.R. 176, 179 (2002).

FN23. I am mindful that there are certain marriage questions, such as those involving purported 'common law' marriages or ones in which there are conflicts between states, which require an election filing to allow OPM to determine whether individuals are married for federal benefits purposes. However, this is not such a case. There was and is no doubt whatever that Congressman Studds' marriage to appellant is not a marriage under federal law, pursuant to DOMA.

FN24. Additionally, as previously explained in detail, because of OPM's incomplete discovery response, I have drawn an adverse inference pursuant to 5 C.F.R. § 1201.43(a)(1), that if OPM had produced, as ordered, all of its guidelines, notices to annuitants, policy statements or other documents which govern or provide guidance regarding any federal non-recognition of spouses of the same sex, including but not limited to DOMA, none of that material would support OPM's view that it put Congressman Studds on notice that he was required to make a spousal survivor annuity election for appellant under 5 U.S.C. § 8339(k)(2)(A) and 5 C.F.R.§ 831.631(b)(1).

FN25. OPM must inform each annuitant of 'such annuitant's rights of election' (5 U.S.C. § 8339 note), and about the 'survivor annuity elections available to them' (5 C.F.R. § 831.681) (emphasis supplied).

FN26. Additionally, as previously explained in detail, because of OPM's incomplete discovery response, I have drawn an adverse inference pursuant to 5 C.F.R. § 1201.43(a)(1), that if OPM had produced, as ordered, all of its guidelines, notices to annuitants, policy statements or other documents which govern or provide guidance regarding any federal non-recognition of spouses of the same sex, including but not limited to DOMA, none of that material would support the view that OPM had established such a policy or notified annuitants in same-sex marriages, such as Congressman Studds, of the deadline filing policy.

FN27. Whether such a policy is wise or not, is of course for OPM to decide. It may well be wise to require all annuitants in same-sex marriages to document for the record their spousal survivor annuity wishes in the event DOMA someday is repealed or declared unconstitutional. On the other hand, it might be unwise to require annuitants to declare they are married for federal purposes when, pursuant to DOMA they are not married, as there may be criminal consequences for making false marital claims. See, e.g., United States v. Dedman, 527 F.3d 577 (6th Cir. 2008). But, in any event, because a same-sex marriage 'election' is not possible under statute and regulation, and would be futile in light of DOMA, clear notice to annuitants in same-sex marriages of a two-year filing deadline policy is all the more imperative.

2008 WL 5552727 (PERSONNET)
END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.