# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| NANCY GILL & MARCELLE LETOURNEAU, et al. | ) ) ) | |
| Plaintiffs, | ) | No. 1:09-cv-10309 JLT |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICE OF PERSONNEL MANAGEMENT, et al. | ) ) ) | |
| Defendants. | ) ) | |

---

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

GAY & LESBIAN ADVOCATES & DEFENDERS
Gary D. Buseck
Mary L. Bonauto
Nima R. Eshghi
Janson Wu
Samuel P. Bickett
30 Winter Street, Suite 800
Boston, MA 02108
Telephone (617) 426-1350
Facsimile (617) 426-3594
*Attorneys for Plaintiffs*

JENNER & BLOCK LLP
Paul M. Smith
Luke C. Platzer
Daniel I. Weiner
Anna M. Baldwin
1099 New York Ave, NW, Suite 900
Washington, DC 20001
Telephone (202) 639-6060
Facsimile (202) 661-4948
*Attorneys for Plaintiffs*

FOLEY HOAG LLP
Claire Laporte
Vickie L. Henry
Matthew Miller
Amy Senier
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210
Telephone (617) 832-1000
Facsimile (617) 832-7000
*Attorneys for Plaintiffs*

SULLIVAN & WORCESTER LLP
David J. Nagle
Richard L. Jones
One Post Office Square
Boston, MA 02109
Telephone (617) 338-2873
Facsimile (617) 338-2880
*Attorneys for Plaintiffs Mary Ritchie, Kathleen Bush, Melba Abreu, Beatrice Hernandez, Marlin Nabors, Jonathan Knight, Mary Bowe-Shulman, and Dorene Bowe-Shulman*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................2

I.     PLAINTIFFS' EQUAL PROTECTION CLAIMS REQUIRE HEIGHTENED
       SCRUTINY...............................................................................................................2

       A.     DOMA's Departure from Principles of Federalism Merits Close Review. ............2

       B.     DOMA Disparately Burdens the Fundamental Interest in Maintaining
              Existing Family Relationships. ...............................................................................6

       C.     Discrimination Based on Sexual Orientation Merits Heightened Scrutiny. ............9

II.    DOMA LACKS A RATIONAL RELATIONSHIP TO ANY LEGITIMATE
       FEDERAL INTEREST...........................................................................................11

       A.     There Is No Interest in Preserving the Status Quo for the Sake of
              Preserving the Status Quo. ....................................................................................12

       B.     DOMA's Discrimination Among Married Couples Cannot Be Justified
              Based on "National Consistency."........................................................................14

       C.     State-by-State Debates Regarding Marriage for Same-Sex Couples Are
              Irrelevant to Federal Treatment of Married Same-Sex Couples. ...........................17

       D.     DOMA Lacks Any Legitimate Purpose.................................................................18

CONCLUSION..................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilar v. United States Immigration & Customs Enforcement Div. of the Dep't of Homeland Sec.*,
510 F.3d 1 (1st Cir. 2007) ................................................................................................7

*Allied Stores of Ohio, Inc. v. Bowers*,
358 U.S. 522 (1959) .........................................................................................................5

*Andrew S. ex rel. Margaret S. v. School Comm. Of Town of Greenfield*,
59 F. Supp. 2d 237 (D. Mass. 1999) ..............................................................................10

*Ankenbrandt v. Richards*,
504 U.S. 689 (1992) .........................................................................................................3

*Attorney General of New York v. Soto-Lopez*,
476 U.S. 898 (1986) .........................................................................................................6

*Bd. of Trs. of the Univ. of Ala. v. Garrett*,
531 U.S. 356  (2001) ...........................................................................................5, 16, 17

*Beauchamp v. Murphy*,
37 F.3d 700 (1st Cir. 1994) ............................................................................................10

*Bowen v. Gilliard*,
483 U.S. 587 (1987) .........................................................................................................8

*Califano v. Jobst*,
434 U.S. 47 (1977) ...........................................................................................................8

*City of Cleburne v. Cleburne Living Center*,
473 U.S. 432 (1985) ...........................................................................................5, 12, 15

*Cook v. Gates*,
528 F.3d 42 (1st Cir. 2008) ...........................................................................2, 6, 9, 10, 11

*Egelhoff v. Egelhoff*,
532 U.S. 141 (2001) .........................................................................................................4

*Frontiero v. Richardson*,
411 U.S. 677 (1973) .........................................................................................................9

*Gately v. Massachusetts*,
  2 F.3d 1221 (1st Cir. 1996).........................................................................10

*Harper v. Virginia State Bd. of Elections*,
  383 U.S. 663 (1966)....................................................................................6

*Heller v. Doe*,
  509 U.S. 312 (1993)...................................................................................17

*Metropolitan Life Insurance Co. v. Ward*,
  470 U.S. 869 (1985)....................................................................................5

*Kerrigan v. Comm'r of Public Health*,
  957 A.2d 407 (Conn. 2008) .........................................................................9

*Lawrence v. Texas*,
  539 U.S. 558 (2003).....................................................................................9

*Louisville Gas & Elec. Co. v. Coleman*,
  277 U.S. 32 (1928)......................................................................................6

*Marin TV Servs. Partners, Ltd. v. FCC*,
  936 F.2d 1304 (D.C. Cir. 1991) ................................................................19

*Meister v. Moore*,
  96 U.S. 76 (1877)......................................................................................15

*Moore v. City of East Cleveland*,
  431 U.S. 494 (1977).....................................................................................7

*Morley Const. Co. v. Maryland Cas. Co.*,
  300 U.S. 185 (1937)...................................................................................19

*National Parks Conserv. Ass'n. v. Norton*,
  324 F.3d 1229 (11th Cir. 2003) .................................................................13

*New York v. United States*,
  505 U.S. 144 (1992).....................................................................................5

*Northwest Austin Mun. Util. Dist. No. One v. Holder*,
  129 S. Ct. 2504 (2009)................................................................................4

*Osaka Shosen Kaisha Line v. United States*,
  300 U.S. 98 (1937)....................................................................................10

*Piacentini v. Levangie*,
  998 F. Supp. 86 (D. Mass. 1998) ..............................................................10

*Plyler v. Doe*,
    457 U.S. 202 (1982).................................................................................................5

*Restucci v. Clarke*,
    No. 09-10584-WGY, --- F. Supp. 2d ---, 2009 WL 3818599 (D. Mass. Nov. 16, 2009)........10

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984).................................................................................................6

*Roche v. Town of Wareham*,
    24 F. Supp. 2d 146 (D. Mass. 1998)........................................................................10

*Rodriguez v. Secretary of Health, Educ. & Welfare*,
    644 F.2d 918 (1st Cir. 1981)...................................................................................10

*Romer v. Evans*,
    517 U.S. 620 (1996)......................................................................................... passim

*Rossiter v. Potter*,
    357 F.3d 26 (1st Cir. 2004)....................................................................................11

*Sherrer v. Sherrer*,
    334 U.S. 343 (1948).................................................................................................15

*Stanley v. Illinois*,
    405 U.S. 645 (1972).................................................................................................6

*Teigen v. Renfrow*,
    511 F.3d 1072 (10th Cir. 2007) .............................................................................13

*Todd v. Merit Sys. Prot. Bd.*,
    55 F.3d 1574 (Fed. Cir. 1995)................................................................................19

*Turner Broad. Sys. Inc. v. FCC*,
    512 U.S. 622 (1994).................................................................................................6

*U.S. Dep't of Agriculture v. Moreno*,
    413 U.S. 528 (1973).................................................................................................12

*United States v. Jones*,
    231 F.3d 508 (9th Cir. 2000) .................................................................................4

*United States v. Klinzing*,
    315 F.3d 803 (7th Cir. 2003) .................................................................................4

*United States v. Lewko*,
    269 F.3d 64 (1st Cir. 2001).....................................................................................4

*United States v. Meade*,
  175 F.3d 215 (1st Cir. 1999) ...................................................................................................4

*Waste Mgmt. Inc. v. U.S. EPA*,
  669 F. Supp. 536 (D.D.C. 1987) ...........................................................................................13

*Woodson v. AMF Leisureland Centers, Inc.*,
  842 F.2d 699 (3d Cir. 1988) .................................................................................................19

STATUTES

29 U.S.C. § 2612 (a)(1)(A)-(D) ..................................................................................................8

Defense of Marriage Act, Pub. L. No. 104-199 § 3, 110 Stat. 2419, *codified at*
  1 U.S.C. § 7 ("DOMA") .................................................................................................. passim

OTHER AUTHORITIES

FED. R. EVID. 501 ........................................................................................................................8

Michael Grossberg, *Governing the Hearth, Law and the Family in Nineteenth Century
  America* (1985) ....................................................................................................................15

Nancy Cott, *Public Vows* (2000) ..............................................................................................15

Edward Stein, *Past and Proposed Amendments to the United States Constitution
  Regarding Marriage*, 82 Wash. U. L.Q. 611 (2004) ...........................................................15

## INTRODUCTION

Defendants' Opposition to Summary Judgment begins with the admirable concession that Section 3 of the Defense of Marriage Act, 1 U.S.C. § 7 ("DOMA"), is "discriminatory and should be repealed."   Defendants' Reply in Support of Defendants' Motion to Dismiss and Opposition to Plaintiffs' Motion for Summary Judgment at 1 ("SJ Opp.")  (Doc. 55).  Defendants then go on to try to defend that discrimination as serving legitimate federal interests.  Those arguments, unsurprisingly, are utterly unpersuasive.

Defendants' newly minted rationales for DOMA simply cannot justify the inequality the law imposes.  Indeed, the Court need not even reach them.  Heightened scrutiny requires consideration of the actual reasons for a law, not post hoc rationalizations advanced by counsel.  And Plaintiffs' equal protection claims require heightened scrutiny.  First, DOMA ruptured a two-hundred year understanding that marital status determinations are the sole province of the States.  While Defendants complain that applying heightened equal protection scrutiny due to federalism concerns would be "removed from existing constitutional jurisprudence," SJ Opp. at 9, the unique and historically anomalous nature of the statute raises concerns about whether it serves any legitimate *federal* purpose, and thus warrants heightened scrutiny.  Second, by erasing Plaintiffs' marriages for all federal purposes, DOMA disparately burdens Plaintiffs' fundamental liberty interest in the integrity of their marriages and families.  While Defendants characterize this burden as merely "indirect," they miss the forest for the trees, focusing on individual benefits programs from which Plaintiffs are excluded while disregarding the significance and cumulative effect of legally erasing Plaintiffs' family relationships from all federal recognition.  And third, DOMA flatly discriminates against gay and lesbian people as a class.   The uncontested record amply demonstrates that gays and lesbians, as a class, meet all the criteria for heightened scrutiny:  they have experienced a history of purposeful discrimination and have

1

suffered unique disabilities unrelated to their actual character or abilities.  Defendants' attempt to cut off this inquiry, based on one brief statement from the First Circuit's decision in *Cook v. Gates*, 528 F.3d 42 (1st Cir. 2008), where the issue was not even before the court of appeals, should be rejected.

Even if the Court were to apply rational basis scrutiny, and thus entertain the government's post hoc rationales, DOMA would still be an unconstitutional denial of equal protection of the laws.  Attempting to conjure up legitimate federal interests that are served by DOMA, Defendants describe only what Congress was doing – continuing the exclusion of same-sex couples from federal marriage-based rights and benefits while States debated and changed their laws on the subject – but never articulate why there was any valid federal interest in preserving this exclusion once States began permitting gay and lesbian couples to marry.  Instead, they simply repeat platitudes such as "preserving the status quo" and "consistency" that are devoid of substantive content, are counter-factual, and do not in any event represent real or legitimate governmental interests.  Although rational basis review is more permissive than heightened forms of scrutiny, it requires the government to do more than merely describe a law's effects without explaining what purpose it serves.

For all of these reasons, and based on the undisputed record before the Court, Plaintiffs' Motion for Summary Judgment should be granted.

## ARGUMENT

## I.    PLAINTIFFS' EQUAL PROTECTION CLAIMS REQUIRE HEIGHTENED SCRUTINY.

### A.    DOMA's Departure from Principles of Federalism Merits Close Review.

DOMA should be closely scrutinized because its creation of a federal family law marks an unprecedented departure from the federal-state balance that had previously governed domestic

relations issues.  *See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiffs' Motion for Summary Judgment at 12 ("MSJ") (Doc. No. 28).  Defendants respond that applying heightened review based on federalism concerns would be "removed from existing constitutional jurisprudence," SJ Opp. at 9, and that DOMA in any event does not raise federalism concerns because its effects are confined to federal programs.  *Id.* at 10.  Defendants understate the extent to which Congress, through DOMA, leveraged the reach of the federal government to make its own family law at the expense of States' traditional authority over domestic relations, and further misunderstand why this requires close review.

Defendants do not dispute that it is within the States' "core" power to issue "declarations of status" such as "marriage, annulment, divorce, custody and paternity," *Ankenbrandt v. Richards*, 504 U.S. 689, 716 (1992) (Blackmun, J., concurring), and concede that prior to DOMA, "the marital status of individuals under federal law . . .  generally depended on marital status under state law."  SJ Opp. at 12.  Yet they protest that DOMA did not formally "displace state law with respect to who may marry" because it ostensibly applies only to federal programs.  *Id.*  That argument misses the mark.  DOMA strikes at the heart of State prerogatives by advancing a competing definition of marriage, promulgated nationally, that supplants the States in establishing the meaning and contours of marriage.  DOMA thereby deprives Plaintiffs of a key element of marriage – the ability to hold themselves out to the world as married – by nullifying, overriding, and disregarding the Plaintiffs' marriages for all federal purposes.  Federalizing a "definition" of "marriage" for all purposes necessarily involves the federal

government in the business of marital status determinations, and disrespects the State sovereign's historical exclusivity and core power to make that determination.[1]

The absence of any recognized federal interest in regulating marital status must inform the level of review.[2] Defendants attempt to justify DOMA by arguing that it falls within the scope of Congress's enumerated powers because its effects are nominally confined to federal laws and programs. *See* SJ Opp. at 9-10. But that is irrelevant. Plaintiffs' challenge is under the Fifth Amendment, not the Tenth.[3] The issue is not whether Congress had the authority over

---

[1]     The cases relied upon by Defendants are not to the contrary. SJ Opp. at 11. *United States v. Meade*, 175 F.3d 215, 225 (1st Cir. 1999), upheld a federal gun possession law applicable to persons subject to state anti-harassment orders or convicted of a crime of domestic violence against a Tenth Amendment challenge. The federal action relied on state law predicates, and "[n]othing in the state court proceeding changes on account of, or is affected in any way by, the operation of the federal law." *Id*; s*ee also United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000) (rejecting Tenth Amendment challenge where federal law "simply accept[s] the validity of the . . . restraining orders that have been issued under state law"). Both *United States v. Lewko*, 269 F.3d 64 (1st Cir. 2001), and *United States v. Klinzing*, 315 F.3d 803 (7th Cir. 2003), upheld federal interstate enforcement of child support obligations, the latter without discussion of federalism. *Klinzing*, 315 F.3d at 808, 809. *Lewko* rejected federalism concerns because the federal law had "[n]either the purpose or effect of establishing a national, uniform 'family law,'" but instead merely "protect[ed] the integrity of state court judgments." *Lewko*, 269 F.3d at 69. "Establishing a national, uniform family law," of course, is exactly the purpose and effect of DOMA, as Defendants themselves admit. *See* SJ Opp. at 15 (arguing that purpose of DOMA is that it "preserve[s] consistency regarding marital status for purposes of federal law.").

[2]     The presumption against federal preemption of state domestic relations law also speaks to judicial skepticism of federal interests in this area. *See Egelhoff v. Egelhoff*, 532 U.S. 141, 151 (2001). In addition to the domestic relations area, the Court also closely scrutinizes federal laws that touch upon other areas of traditional state authority, such as election procedures. *See Northwest Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2511 (2009) (federal measures intruding into such areas must be "sufficiently related" to problem being addressed); *see also id.* at 2520 (Thomas, J., concurring in part and dissenting in part) (such measures must be "closely examined to ensure that its encroachment on state authority in this area is limited").

[3]     If Congress had exceeded the scope of its enumerated Article I powers, the result would not be heightened review – it would simply be that the law was unconstitutional altogether. This is in fact the position of the Commonwealth of Massachusetts in a separate case. *See Commonwealth of Massachusetts v. United States Department of Health and Human Services et al.*, No. 1:09-cv-11156-JLT.

4

the federal programs and laws affected by DOMA, but whether it had a legitimate federal interest in discriminating against gay and lesbian married couples.  The equal protection guarantee requires the government's justification for disadvantaging a class of people be "properly cognizable" by the governmental body at issue, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 448 (1985), and "relevant to interests" the classifying body "has the authority to implement."  *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366 (2001) (quoting *Cleburne*, 473 U.S. at 441); *see also Plyler v. Doe*, 457 U.S. 202, 225 (1982).  That is why the historically anomalous nature of DOMA – and its radical departure from the history of the federal-state balance regarding the determination of marital status – matter so much.  The fact that DOMA created a federal marital status for the first time, and that it had to run roughshod over two centuries of federalist practice in order to do so, should raise serious questions whether a legitimately *federal* purpose truly animates the legislation.  At the very least, it should temper the usual presumption of constitutionality.

The "maintenance of the principles of federalism is a foremost consideration in interpreting *any* of the pertinent constitutional provisions under which this Court examines state action," and "the 'Equal Protection Clause, among its other roles, operates to maintain this principle of federalism . . . . [and] as an instrument of federalism.'"  *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 532 (1959) (Brennan, J., concurring) (emphasis added), *cited with approval for related point of law in Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869, 878 (1985).[4]   And at a minimum, as the Supreme Court made clear in *Romer*, the "absence of precedent for" a measure "is itself instructive; [d]iscriminations of an unusual character

---

[4]      *See generally New York v. United States*, 505 U.S. 144, 181 (1992) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals. . . . [F]ederalism secures to citizens the liberties that derive from the diffusion of sovereign power.")

especially suggest careful consideration to determine whether they are obnoxious to the constitutional [equal protection] provision." *Romer v. Evans*, 517 U.S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)). Such consideration is required here.

> **B.      DOMA Disparately Burdens the Fundamental Interest in Maintaining Existing Family Relationships.**

DOMA is also subject to heightened scrutiny because it disparately burdens the right to family integrity. Defendants acknowledge there is a fundamental "right to family integrity." SJ. Opp. at 10. And they do not contest that when a classification subjects one group of people to a disparately high burden in exercising a fundamental right, the classification triggers heightened equal protection scrutiny irrespective of whether the persons disadvantaged constitute a suspect class. *See* SJ Opp. at 6-7; *see also, e.g.*, *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898, 902 (1986); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 672, (1966); *Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 659-60 (1994); *see also Cook v. Gates*, 528 F.3d at 56 (explaining that heightened scrutiny applies when individual's protected liberty interests are infringed by the government). Nonetheless, Defendants argue that DOMA does not sufficiently burden the right to family integrity because it does not physically cast married couples of the same sex asunder. SJ Opp. at 10 (stating DOMA does not prevent married couples of the same sex from "'remain[ing] together,' enjoy[ing] 'familial privacy,' or rais[ing] children"). This cramped understanding of the right to family integrity is unwarranted.

Family relationships enjoy constitutional protection because they permit "the ability independently to define one's identity that is central to any concept of liberty." *Roberts v. United States Jaycees*, 468 U.S. 609, 619 (1984). Laws that disparately burden the right to stake out and define such family relationships are subject to heightened scrutiny. *See, e.g., Stanley v.*

*Illinois*, 405 U.S. 645, 658 (1972) (statute declaring unwed fathers presumptively unfit to raise their own children violated equal protection clause, where married parents, divorced parents, and unmarried mothers were treated more favorably); *Moore v. City of East Cleveland*, 431 U.S. 494, 506 (1977) (zoning ordinance held unconstitutional where it required family members "to live in certain narrowly defined family patterns").

Heightened scrutiny is more than appropriate because DOMA, with its unprecedented sweep, erases Plaintiffs' marital status wholesale, treating lawfully married same-sex couples as single persons for purposes of federal law.  By promulgating an unprecedented federal marriage standard, DOMA renders one class of marriages into non-marriages, requires Plaintiffs to disavow their own marriages in every interaction with the federal government, "slicing deeply into the family itself," *Moore*, 431 U.S. at 498, and thus stigmatizes Plaintiffs by calling into question the legitimacy, worth, and meaning of their marriages and their families.  *See* Plaintiffs' Separate Statement of Non-Adjudicative Facts, Nos. 15-16, 18, 20 (SN-AF) (Doc. No. 27).  As a result, Plaintiffs are prevented from enjoying many of the benefits of marriage that "constitute ordinary civic life in a free society" and which lawfully married different-sex couples receive as a matter of course.  *Romer*, 517 U.S. at 631.  Heightened scrutiny is therefore proper because the disparate burden that DOMA imposes on Plaintiffs' right to maintain their existing family relationships is not "transitory in nature" but is instead a permanent disability imposed purposefully and only on same-sex couples.  *See Aguilar v. United States Immigration & Customs Enforcement Div. of the Dep't of Homeland Sec.*, 510 F.3d 1, 23 (1st Cir. 2007).

Given the breadth and severity of DOMA's burdens, Defendants' citation of cases where heightened scrutiny was not applied because the challenged provision had only "some indirect effect" on a fundamental interest is completely inapposite.  SJ Opp. at 8.  There is nothing

7

"indirect" about DOMA's intentional erasure of Plaintiffs' State-sanctioned marriages for all purposes under federal law.  Congress's explicit purpose in passing DOMA was to burden and express opposition to Plaintiffs' State-sanctioned marriages.  *See* MSJ at 9-19 (discussing Congress's stated purposes for DOMA's passage, including the goal of expressing "moral disapproval of homosexuality").  On the undisputed factual record before this Court, there is no question that the denial of federal recognition has concretely burdened the Plaintiffs' relationships – it has denied Plaintiffs access to a multitude of federal benefits, rights, and responsibilities, imposed additional financial costs, prevented spouses from staying home with children or retiring, and relegated Plaintiffs to second-class status by denying them much of the public and private validation, social recognition, respect, and support that accompany civil marriage.  MSJ at 21.[5]  Heightened scrutiny is therefore required because DOMA has done exactly what it was intended to do – it has disparately and substantially burdened Plaintiffs' fundamental interest in their existing family relationships.  *See Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (holding that "heightened scrutiny" would be appropriate where government action has the "design and direct effect" of "intrud[ing] on choices concerning family living arrangements"); *cf. Califano v. Jobst*, 434 U.S. 47, 54 n.11 (1977).

---

[5]      For example, DOMA burdens Plaintiffs' ability to care for their children as they see fit. Because same-sex spouses are denied coverage under the Federal Employees Health Benefits Program as a result of DOMA, Plaintiff Letourneau has had to remain in the workforce in order to maintain her own insurance coverage, rather than stay home with their children as she and her spouse, Plaintiff Gill, had originally planned.  *See* SN-AF No. 11; *see also* 29 U.S.C. § 2612 (a)(1)(A)-(D) (the unavailability of leave under Family Medical Leave Act could present Plaintiff couples with an untenable choice between working and caring for a seriously ill or injured spouse). And DOMA also affects other federal rights and benefits relevant to family integrity, such as marital privacy.  *See, e.g.*, FED. R. EVID. 501 (marital confidence and spousal privileges, in federal court, which same-sex married couples are denied by DOMA).  The fact that nonpecuniary rights such as FMLA rights and the spousal privilege are not implicated in this case is beside the point.  The security provided by such rights protects marital relationships *before* the occasion arises to invoke them.

### C.      Discrimination Based on Sexual Orientation Merits Heightened Scrutiny.

It is uncontested for purposes of this motion that (1) gays and lesbians have experienced a history of discrimination; (2) sexual orientation is unrelated to the ability to contribute to society; (3) gays and lesbians are a minority and face significant obstacles to achieving protection from discrimination through the political process; and (4) sexual orientation is a defining characteristic of a person's identity.  *See* MSJ at 24-26.  Under traditional equal protection analysis, these four factors should require discrimination against gay and lesbian persons to be justified under a heightened scrutiny standard.

Instead, Defendants claim that one brief statement from the First Circuit's decision in *Cook v. Gates* forecloses heightened scrutiny for classifications based on sexual orientation.  *See* SJ Opp. at 2-6 (citing 528 F.3d at 62 ("homosexuals are not a suspect class.")).  But the excerpt Defendants cite cannot bear the weight they ascribe to it.  As an initial matter, Defendants ignore the *Cook* court's framing of the question it was answering.  The Court held that the Supreme Court's rulings in *Romer v. Evans*, 517 U.S. 620 (1996), and *Lawrence v. Texas*, 539 U.S. 558 (2003), did not "mandate" a finding that classifications based on sexual orientation necessitate other than rational basis review.  528 F.3d at 61.  The fact that the First Circuit made this observation does not demonstrate that the Court intended to bar such an inquiry going forward, particularly on a different (and undisputed) record.  Whether a classification merits heightened scrutiny is a fact-intensive inquiry necessitating an in-depth examination of the relevant group's history and objective attributes.  *See, e.g., Frontiero v. Richardson*, 411 U.S. 677, 684-88 (1973) (heightened scrutiny warranted for classifications based on sex); *Kerrigan v. Comm'r of Public Health*, 957 A.2d 407, 431-61 (Conn. 2008) (heightened scrutiny warranted for classifications based on sexual orientation).  Defendants, recognizing that the First Circuit engaged in no such inquiry, maintain that other courts have considered and rejected arguments for heightened

scrutiny without alluding to the traditional factors.  SJ Opp. at 5 n.4.  But in no case cited by Defendants for support did the court actually resolve a claim for heightened scrutiny in this manner.[6]  There is, accordingly, scant basis to think that the First Circuit intended to conclusively resolve such an important issue in the perfunctory manner that Defendants suggest.

In fact, whether sexual orientation is a suspect or quasi-suspect classification was not even before the Court in *Cook*, as Defendants themselves tacitly admit.  *See* SJ Opp. at 3, 5.  Rather, the *Cook* court was called upon to consider only whether the district court should have applied the type of "robust and realistic rational basis review" that the *Cook* plaintiffs argued the Supreme Court applied in *Romer*.  *See* Br. of Plaintiffs-Appellants, *Cook v. Rumsfeld*, Nos. 06-2313, 2381 (Nov. 14, 2006), at 31-35.  Thus, the issue that Defendants claim *Cook* resolved was not even litigated.  Where the parties fail to litigate an issue, a court's discussion of the issue in passing "does not constitute a precedent to be followed" in a different case to be decided on a different record.  *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1996); *cf. also Osaka Shosen Kaisha Line v. United States,* 300 U.S. 98, 103 (1937) ("[G]eneral expressions [in a

---

[6]      *See Beauchamp v. Murphy*, 37 F.3d 700, 706 (1st Cir. 1994) (plaintiff alleged "*irrational* classification" between prison escapees and pretrial detainees or parole violators) (emphasis added); *Rodriguez v. Sec. of Health, Educ. & Welfare*, 644 F.2d 918, 920 n.2 (1st Cir. 1981) (plaintiff relied on cases holding that suspect class issue need not be reached because "the classification is justified by no legitimate state interest, compelling or otherwise.") (citation omitted); *cf. also Roche v. Town of Wareham*, 24 F. Supp. 2d 146, 153 n.8 (D. Mass. 1998) (plaintiff invoked already-established "protected federal constitutional class of those discriminated upon based on their ancestry"); *Restucci v. Clarke*, No. 09-10584-WGY, --- F. Supp. 2d ---, 2009 WL 3818599 at *5 (D. Mass. Nov. 16, 2009) (dismissing prisoner claim due to lack of allegation that others similarly situated were treated differently; no indication prisoner argued for suspect classification); *Piacentini v. Levangie*, 998 F. Supp. 86, 91 (D. Mass. 1998) (rejecting argument that arrest due to plaintiff's parolee status was proof of animus sufficient to support a conspiracy claim under 42 U.S.C. § 1985(3) with no indication plaintiff argued for suspect classification for equal protection purposes); *Andrew S. ex rel. Margaret S. v. Sch. Comm. of Town of Greenfield*, 59 F. Supp. 2d 237, 244-45 (D. Mass. 1999) (in assessing whether IDEA violation could form basis for section 1983 claim, observed that "disabled persons have not been classified as a suspect class" for purposes of resolving a section 1983 action; suspect class issue not before the court).

judicial opinion] are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").[7]

In any event, the brief discussion in *Cook* on which Defendants rely is *dicta* not "essential to the result reached in the case." *Rossiter v. Potter*, 357 F.3d 26, 31 (1st Cir. 2004). Defendants' insistence to the contrary ignores *Cook*'s basic holding, which was that the Court would not overrule "Don't Ask, Don't Tell" notwithstanding the fact that the policy ***was*** subject to heightened scrutiny for some purposes. *See* 528 F.3d at 60. Thus, a finding that the classification in *Cook* was subject to heightened scrutiny on equal protection grounds for any reason would not have changed the ultimate result.

In sum, the Court can and should determine whether classifications based on sexual orientation are suspect or quasi-suspect based on the record before it. That record, which Defendants do not contest, plainly warrants heightened scrutiny.

## II.  DOMA LACKS A RATIONAL RELATIONSHIP TO ANY LEGITIMATE FEDERAL INTEREST.

Although DOMA's discrimination between same-sex and different-sex married couples merits heightened scrutiny for the reasons stated, the question affects only the analysis, not the outcome:  DOMA fails the "rational basis" standard just as much as it fails heightened scrutiny.

Congress clearly stated contemporaneous reasons for enacting DOMA. Every one of those reasons is impermissible under today's equal protection jurisprudence, and the government has abandoned any defense of them here. *See* MSJ at 34-41; SJ Opp. at 12, 17 (Defendants

---

[7]    One of the original *Cook* plaintiffs, James Pietrangelo, proceeded pro se in the First Circuit and called sexual orientation a suspect class twice in his brief.  However, he did not actually develop an argument for any particular equal protection standard of review although he did consistently and repeatedly assert that the government's actions were variously irrational, arbitrary, an endorsement of "blatant bigotry," and an expression of "raw animus."

"have expressly disavowed reliance on the purported interests set forth in DOMA's legislative history").  The openness and clarity with which impermissible purposes were flaunted at the time of DOMA's enactment (up to and including outright hostility to gay and lesbian persons, *see* MSJ at 8-10 & nn.4-6) should, at the very least, raise the possibility that the post hoc rationales that government's counsel now advances for purposes of defending this litigation are a less-than-complete description of the law's purposes.   And as demonstrated below, none of the government's litigation-driven positions hold water.  The government's position boils down to nothing more than an assertion that, even though these were not the motivations of the *actual* Congress, a hypothetical Congress could have legitimately wanted to (1) prevent change for the sake of preventing change, (2) treat all gay and lesbian couples in the country "consistently," irrespective of whether they were married or not, and (3) wait until the States finished debating marriage rights for same-sex couples before adopting a federal position.  *See* SJ Opp. at 11-17. Rational basis review may be lenient, but it is not *that* lenient.  Courts do not hesitate to strike down disadvantageous classifications, even when they target groups that do not receive heightened protection, that are drawn for irrational, arbitrary, or impermissible reasons.  *See, e.g., Romer,* 517 U.S. at 635; *City of Cleburne*, 473 U.S. at 446-47; *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973).   Each of the post hoc justifications advanced by the government is insubstantial, illegitimate, and/or disconnected from what DOMA actually does. Under those circumstances, DOMA fails even the "rational basis" test and cannot justify the discrimination imposed against Plaintiffs.

### A.    There Is No Interest in Preserving the Status Quo for the Sake of Preserving the Status Quo.

Defendants rely chiefly on their contention that DOMA preserved the status quo as of 1996, when gay and lesbian couples could not marry and therefore were denied access to the

federal rights and benefits associated with marriage.  SJ Opp. at 15.  That argument goes nowhere.

To begin with, preserving the status quo can be a legitimate *means* of serving some independent, legitimate government interest, but simply preventing change is not *itself* an independent government interest.  Although Defendants cite a string of cases to support their contention that preserving the status quo is a legitimate government interest for equal protection purposes, they all rest on specific explanations of why preserving the status quo for a limited time served some independent, valid purpose.[8]

Here, the Defendants fail to show that the status quo DOMA preserved was one they had any interest in preserving.  The only reason same-sex couples were denied federal marriage-based rights or benefits in 1996 was that they were not married.  When States began marrying same-sex couples, that rationale ceased to exist.  As Defendants frame it, Congress (anticipating this development) could preserve either the status quo of honoring State marriages for federal purposes or the "status quo" of gays and lesbians not receiving federal rights and benefits, and chose the latter.  *See* SJ Opp. at 12.  But that framing is fallacious.  Congress in 1996 could not have chosen to "*continue* to define marriage" to exclude same-sex couples, SJ Opp. at 12,

---

[8]     *See Nat'l Parks Conserv. Ass'n. v. Norton*, 324 F.3d 1229, 1245 (11th Cir. 2003) (preserving status quo by agreeing to defined extension of time to allow leaseholders of "stilted structures" on national park land to continue to live in the structures served legitimate government interest in seeing that the structures were maintained pending the development of a planning process for the land); *Teigen v. Renfrow*, 511 F.3d 1072, 1084-85 (10th Cir. 2007) ("a government employer may wish to maintain the status quo [by not promoting employees involved in active litigation against the government employer] during the pendency of the administrative proceedings to avoid undermining its litigation strategy or inserting complexities into the administrative process"); *cf. Waste Mgmt. Inc. v. U.S. EPA*, 669 F. Supp. 536, 541 (D.D.C. 1987) (no APA violation where agency's decision to suspend "ocean incineration" permits while rulemaking was pending served legitimate interest of allowing the agency to engage in "reasoned decision making" to consider "reasonable alternatives" and to develop new regulations to ensure environmental safety).

because there was no federal definition of marriage before DOMA.  All Congress did was create a *new* exclusion of same-sex couples from federal rights and benefits after the reason they had *previously* been unable to receive such rights and benefits (i.e. that they were not married) had vanished.  Defendants offer no reason why Congress had an interest in creating this new exclusion.[9]  Nor do Defendants attempt to explain this action in light of the purposes of particular federal programs that are designed to protect and preserve the families formed by married couples.  As articulated in Plaintiffs' opening brief – and as reflected in Defendants' abandonment of  Congress's stated rationale of preserving traditional heterosexual marriage – a mere desire to express disapproval of the extension of marriage rights to same-sex couples cannot justify this discriminatory law.

###### B.    DOMA's Discrimination Among Married Couples Cannot Be Justified Based on "National Consistency."

Defendants also suggest that DOMA's exclusion of married same-sex couples from federal rights and benefits can be justified by a purported governmental interest in "preserving nationwide consistency in the distribution of [marriage-based federal] benefits," SJ Opp. at 14 – *i.e.*, in preventing a situation in which "the terms 'marriage' and 'spouse' under federal statutes would have changed with each change in the status of same-sex marriage in each state, and the application of those federal statutes would have varied from state to state," SJ Opp. at 12.  It cannot.

First, as to "benefits," the sheer breadth of DOMA reaches so far beyond the provision of federal "benefits" to render this asserted interest implausible at best.  DOMA impacts countless nonpecuniary rights and obligations under federal law, s*ee supra* at 8, making clear that its aim

---

[9]    *See* SJ Opp. at 12 (claiming that Congress "had to choose between two interests: continuing in all respects the 'tradition' of accepting any marriage valid under state law, or continuing to define marriage, at the federal level, as only opposite-sex marriage").

and function is to serve as an all-purpose federal definition of marriage. *See Romer*, 517 U.S. at

635 (rejecting purported governmental interests where "[t]he breadth of the [measure] is so far

removed from these particular justifications that we find it impossible to credit them"); *City of*

*Cleburne* 473 U.S. at 446 (government "may not rely on a classification whose relationship to an

asserted goal is so attenuated as to render the distinction arbitrary or irrational").

Moreover, with respect to federal marriage-based law generally, DOMA does not create

or even further anything resembling "nationwide consistency." Eligibility requirements for

*heterosexual* marriage differ from State to State, and federal law embraces those inconsistencies

by treating opposite-sex couples as married so long as they are married under the laws of their

State of residence.[10]   And DOMA does not create "nationwide consistency" among married

couples. In fact, consistency is what would have existed *without* DOMA, and is what DOMA

---

[10]   Indeed, these state-to-state differences in heterosexual marriage requirements have
existed throughout our nation's history without spawning federal legislation to make marriage
"consistent." Defendants suggest that the marital eligibility of same-sex couples is different
from other inconsistencies in State marriage laws because no other State variations in marriage
eligibility "had become a topic of great debate in numerous States with such fluidity – as whether
two men or two women may marry." SJ Opp. at 14. The government's unsupported assertion is
ahistorical and simply inaccurate. For instance, the topic of interracial marriage was a "topic of
great debate" for decades, at times "explosive." Nancy Cott, *Public Vows* (2000), at
163. Variations in divorce law and whether states had to recognize divorces from "divorce mill"
States such as Nevada were equally controversial. *See, e.g., Sherrer v. Sherrer,* 334 U.S. 343,
356-57, 369-70 (1948) (Frankfurter, dissenting). Seventy seven of the 133 federal constitutional
amendments relating to marriage proposed between 1871 and 2001 addressed federal jurisdiction
for uniform national marriage and divorce legislation, a symptom of widespread distress over
varying state laws. *See* Edward Stein, *Past and Proposed Amendments to the United States*
*Constitution Regarding Marriage*, 82 Wash. U. L.Q. 611, 614-15 & App'x (2004). Thirty such
amendments were in the 22-year period between 1884 and 1906. *Id*. at 637. Conflicts about
moral laxity led to curbs on the general practice of common law marriage, *Meister v. Moore*, 96
U.S. 76, 78 (1877) (acknowledging common law tradition); Michael Grossberg, *Governing the*
*Hearth, Law and the Family in Nineteenth Century America* (1985) at 83-100 (discussing
conflict over state regulation). The eugenics movement of the early 20th century led states to
impose extensive bans on consanguineous marriages, "despite a continuing debate over the
actual physiological effects of such marriages," Grossberg, *supra* at 145. Today, only a minority
of States recognize common law marriages for some or all purposes, or permit first cousins to
marry.

*eliminated* by denying same-sex married couples the eligibility for federal rights and benefits that identically situated different-sex couples enjoy.  The only "nationwide consistency" DOMA creates is that gay and lesbian couples are consistently denied marriage rights and benefits irrespective of their marital or legal status.  There is no reason to subject gay and lesbian persons to this type of "consistency" when identically situated married heterosexual couples are treated differently.  *See Garrett*, 531 U.S. at 366 n.4 (measure will fail rational basis review where "purported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects").

Even if there were some interest in having a consistent national definition of marriage and DOMA could be framed as creating some limited form of consistency, Defendants have not justified choosing this *particular* national definition whose sole effect is to discriminate against gay and lesbian couples.  As with Defendants' invocation of the "status quo," the claimed interest in "consistency" is simply another way of saying that Congress wanted to preserve the state of affairs in 1996 – when gay and lesbian persons did not enjoy federal rights and benefits because they were unmarried – even after the rationale supporting that state of affairs had vanished.  As already stated (and conceded), Congress's mere desire to make marital status determinations, or to preserve "traditional" marriage, is not a legitimate interest.  *See supra* at 5.

The only justification Defendants provide is the unsupported assertion that treating all gay and lesbian people the same is administratively easier than sorting out which ones are married and which ones are not.  *See* SJ Opp. at 16 ("Congress could reasonably have concluded that federal agencies should not have to deal immediately with a changing patchwork of state approaches to same-sex marriage.").  With all due respect, that is nonsense.  Either a couple is married under State law or it is not.  Federal agencies already carry out federal law pertaining to

the marital status of individuals for heterosexual couples, and do so notwithstanding variations in the marriage eligibility requirements among the States, including common-law marriages. *See* SJ Opp. at 12. Defendants do not explain why treating married gay men and lesbians as married would create any additional burden on federal agencies already applying the varying State marriage eligibility requirements to different-sex couples, and the fact that identically situated heterosexual couples are treated differently shows this purported interest to be a ruse. *See Garrett*, 531 U.S. at 366 n.4. If anything, by creating for the first time a class of people who are married for State but not federal purposes, DOMA creates regulatory and legal confusion in an area that would have otherwise been exceedingly simple. Defendants' proffered justification has no "footing in the realities of the subject addressed by the legislation," and should therefore be rejected by the Court. *Heller v. Doe*, 509 U.S. 312, 321 (1993).

### C. State-by-State Debates Regarding Marriage for Same-Sex Couples Are Irrelevant to Federal Treatment of Married Same-Sex Couples.

Defendants also attempt to tie DOMA's "preserving the status quo at the federal level" to "waiting to see how a national debate is to be resolved." SJ Opp. at 15. Even disregarding the incorrect suggestion that DOMA "preserved the status quo," which it did not, marriage is a quintessentially State rather than federal concern. *See* MSJ at 13-14. It begs the question to claim that Congress had to wait for the debates within the various States to reach some sort of uniform national "outcome" before deciding on a uniform national policy toward same-sex married couples, *see* SJ Opp. at 16-17 (contending that "Congress could not have foreseen the outcome of the debate regarding same-sex marriages, nor its timing"), because it assumes a federal interest in a uniform, national approach to family law. As articulated *supra*, no such independent interest exists. If Defendants want to justify DOMA as creating a uniform national approach for purposes of the countless laws, rights, benefits, and programs the federal

government administers, they need to justify why such a uniform national approach discriminating against gay and lesbian married couples furthers the federal interests in the sweeping range of laws and regulations that DOMA amended. No such justification exists.

### D.      DOMA Lacks Any Legitimate Purpose.

Defendants concede, as they must, that DOMA "is discriminatory." SJ Opp. at 1. Defendants understandably want to disavow and avoid discussion of the statute's legislative history, consisting not only of "statements made by individual Congressmen," SJ Opp. at 17, but of the Committee Report itself, both of which contain a litany of troubling statements regarding Congress's purposes for the law. *See* MSJ at 8-10 & nn.4-6. Where, as here, a law lacks any legitimate explanation – and the best its defenders can do is come up with a series of implausible post hoc rationalizations disconnected from the actual operation of the law – serious equal protection concerns are warranted. *See Romer*, 517 U.S. at 632. Those concerns are only amplified where, as here, the stated reasons reflect animus against a disfavored group.

When all is said and done, the most charitable articulation of the purpose of DOMA is that Congress wanted to enshrine a particular set of family-law preferences in federal law, as a rebuke to States that chose to pursue domestic relations policies with which Congress – for whatever reasons – disagreed. But Congress's mere desire to make its own family law – or to express its views on same-sex couples – cannot function as a legitimate basis for the discrimination that DOMA imposes. *See* MSJ at 36-37. Plaintiffs, and countless other couples like them, are married, and the States, not Congress, get to decide that question. Congress's mere displeasure with that fact is not enough of a reason to discriminate.[11]

---

[11]      With respect to Sections II and III of the Defendants' Opposition to Summary Judgment, *see* SJ Opp. at 18-22, Plaintiffs rely upon their prior memorandum. *See* MSJ at 41-47. Plaintiffs make the following additional points as to Plaintiff Dean Hara's standing to pursue FEHB enrollment. First, OPM's "final decision" on Hara's health insurance claim – the only

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that Plaintiffs' Motion for Summary Judgment be granted.

Respectfully submitted,

/s/  Gary D. Buseck

---

basis for review – relies solely on an FEHB ground for denial. *See* Affidavit of Dean Hara, Ex. B (Doc. 31). *See Todd v. Merit Sys. Prot. Bd.*, 55 F.3d 1574, 1576 n.4 (Fed. Cir. 1995) ("final decision of the board superseded the initial decision of the administrative judge"; court's "warrant is to review final decisions"). OPM's "initial decision" is legally irrelevant and, indeed, in pointing to it, the Defendants only highlight that OPM *withdrew* the "annuitant" issue in response to Hara's arguments in his letter seeking reconsideration. *See* Second Affidavit of Gary D. Buseck, February 16, 2010 ("Second Buseck Aff."), Exs. A (Initial Decision) & B (Letter Seeking Reconsideration). *Cf. Marin TV Servs. Partners, Ltd. v. FCC*, 936 F.2d 1304, 1308-09 (D.C. Cir. 1991) (statement in decision without analysis is insufficient to support broader agency rationale). Second, while an appellee need not cross-appeal to raise alternative arguments to support a decision below, an appellee cannot, without a cross-appeal, undermine facts established below. *See Woodson v. AMF Leisureland Centers, Inc.*, 842 F.2d 699, 702 (3d Cir. 1988); *Morley Const. Co. v. Maryland Cas. Co.*, 300 U.S. 185, 191 (1937). As noted in Plaintiffs' Memorandum in Support of Summary Judgment, the facts on Hara's eligibility for a survivor annuity have already been conclusively determined at the MSPB. *See* MSJ at 46-47. Therefore, whether Hara qualifies as a survivor annuitant is no longer a live issue in the Federal Circuit. Finally, while Defendants assert that Hara cannot seek FEHB coverage until he is "declared" an annuitant, they cite no support for that proposition and OPM itself asserted, in its initial decision, only that "you [Hara] must have been *eligible* to receive a survivor annuity." Second Buseck Aff. Ex. A (emphasis added).

GAY & LESBIAN ADVOCATES & DEFENDERS
Gary D. Buseck, BBO #067540
gbuseck@glad.org
Mary L. Bonauto, BBO #549967
mbonauto@glad.org
Nima R. Eshghi, BBO #633716
neshghi@glad.org
Janson Wu, BBO #609949
jwu@glad.org
Samuel P. Bickett, BBO #676190
sbickett@glad.org
30 Winter Street, Suite 800
Boston, MA 02108
Telephone (617) 426-1350
Facsimile (617) 426-3594
*Attorneys for Plaintiffs*


JENNER & BLOCK LLP
Paul M. Smith (pro hac vice)
psmith@jenner.com
Luke C. Platzer (of counsel)
lplatzer@jenner.com
Daniel I. Weiner (of counsel)
dweiner@jenner.com
Anna M. Baldwin (of counsel)
abaldwin@jenner.com
1099 New York Ave, NW, Suite 900
Washington, DC 20001
Telephone (202) 639-6060
Facsimile (202) 661-4948
*Attorneys for Plaintiffs*

FOLEY HOAG LLP
Claire Laporte, BBO #554979
claporte@foleyhoag.com
Vickie L. Henry, BBO #632367
vhenry@foleyhoag.com
Matthew Miller, BBO #655544
mmiller@foleyhoag.com
Amy Senier, BBO #672912
asenier@foleyhoag.com
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210
Telephone (617) 832-1000
Facsimile (617) 832-7000
*Attorneys for Plaintiffs*

SULLIVAN & WORCESTER LLP
David J. Nagle, BBO # 638385
dnagle@sandw.com
Richard L. Jones, BBO # 631273
rjones@sandw.com
One Post Office Square
Boston, MA 02109
Telephone (617) 338-2873
Facsimile (617) 338-2880
*Attorneys for Plaintiffs Mary Ritchie, Kathleen
Bush, Melba Abreu, Beatrice Hernandez,
Marlin Nabors, Jonathan Knight, Mary Bowe-
Shulman, and Dorene Bowe-Shulman*


<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 16, 2010.

/s/  Gary D. Buseck                              .
Gary D. Buseck

20