1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
2
   * * * * * * * * * * * * * *
3  NANCY GILL, et al           *
            Plaintiffs,        *
4                              *
            vs.                *      CIVIL ACTION
5                              *      No. 09-10309-JLT
   OFFICE OF PERSONNEL         *
6  MANAGEMENT, et al           *
            Defendants.        *
7  * * * * * * * * * * * * * *

8           BEFORE THE HONORABLE JOSEPH L. TAURO
                UNITED STATES DISTRICT JUDGE
9           **SUMMARY JUDGMENT MOTION HEARING**

10 A P P E A R A N C E S

11         GAY & LESBIAN ADVOCATES AND DEFENDERS
           30 Winter Street, Suite 800
12         Boston, Massachusetts 02108
           for the plaintiffs
13         By:  Mary L. Bonauto, Esq.
                Gary D. Buseck, Esq.
14

15

16         FOLEY HOAG LLP
           Seaport World Trade Center West
17         155 Seaport Boulevard
           Boston, Massachusetts 02210
18         for the plaintiffs
           By:  Vickie L. Henry, Esq.
19

20

21                          Courtroom No. 22
                            John J. Moakley Courthouse
22                          1 Courthouse Way
                            Boston, Massachusetts 02210
23                          May 6, 2010
                            10:30 a.m.
24

25

1    **APPEARANCES, CONTINUED**

2

3                    JENNER & BLOCK
                    1099 New York Avenue, NW
                    Washington, D.C. 20001-4412
4                    for the plaintiffs
                    By: Paul M. Smith, Esq.

5

6                    U.S. DEPARTMENT OF JUSTICE
                    P.O. Box 883
7                    Washington, D.C. 20044
                    for the defendants
8                    By: W. Scott Simpson, Senior Trial Counsel

9

10

11

12

13

14

15

16

17

18

19

20

21                    CAROL LYNN SCOTT, CSR, RMR
                        Official Court Reporter
22                    One Courthouse Way, Suite 7204
                    Boston, Massachusetts 02210
23                        (617) 330-1377

24

25

1              <u>P R O C E E D I N G S</u>

2              **THE CLERK:**  All rise for the Honorable Court.

3              **THE COURT:**  Good morning, everybody.

4              **VOICES:**  Good morning.

5              **THE COURT:**  Oh, come on.

6              Good morning.

7              **VOICES:**  Good morning.

8              **THE COURT:**  That is the stuff.

9              **THE CLERK:**  This is Civil Action No. 09-10309,

10   <u>Nancy Gill, et at, versus the Office of Personnel</u>

11   <u>Management</u>.

12              Counsel, please identify yourselves for the record.

13              **MS. BONAUTO:**  My name is Mary Bonauto from Gay &

14   Lesbian Advocates and Defenders, here for the plaintiffs,

15   Your Honor.

16              **THE COURT:**  Okay.

17              **MR. BUSECK:**  Your Honor, Gary Buseck from Gay &

18   Lesbian Advocates & Defenders, for the plaintiffs as well.

19              **THE COURT:**  Okay.

20              **MR. SMITH:**  Paul Smith from Jenner & Block for the

21   plaintiffs.

22              **MS. HENRY:**  Vickie Henry from Foley Hoag for the

23   plaintiffs.

24              **MR. SIMPSON:**  Good morning, Your Honor.  Scott

25   Simpson from the Department of Justice for the defendants.

1          **THE COURT:**  Okay.  So I have Mr. Smith,

2     Mr. Henry -- Ms. Henry.

3          **MS. HENRY:**  Yes.

4          **THE COURT:**  And then we have Mr. Simpson.

5          Okay.  Sit down, please, everybody.

6          I had the idea that the best way to proceed would

7     be to have the plaintiffs go first and then the defendants

8     and then I find out that that is what you wanted.

9          (Laughter.)

10         **THE COURT:**  So I figure how can I go wrong in this

11    case.  I have already won the first major skirmish here.

12         (Laughter.)

13         **THE COURT:**  So we are ready to hear, it is you,

14    Ms. Bonauto?

15         **MS. BONAUTO:**  Yes, Your Honor.

16         **THE COURT:**  Do I pronounce that correctly?

17         **MS. BONAUTO:**  You have, Your Honor.

18         **THE COURT:**  Okay.

19         Now, you can use anywhere you want.  Are you

20    comfortable right there?

21         **MS. BONAUTO:**  Thank you, yes.

22         **THE COURT:**  Okay.  Go ahead.

23         **MS. BONAUTO:**  Good morning, Your Honor.

24         **THE COURT:**  Good morning.

25         **MS. BONAUTO:**  May it please the Court, I am Mary

1    Bonauto and I'm here for the plaintiffs Nancy Gill and 16

2    others, all of whom are in the courtroom today.

3         **THE COURT:**  Okay.

4         **MS. BONAUTO:**  And as you know, with me are

5    co-counsel from Foley Hoag, Jenner & Block and also Sullivan

6    & Worcester in the courtroom.

7         **THE COURT:**  Okay.

8         **MS. BONAUTO:**  Your Honor, as you know, this is a

9    case about a statute, Section 3 of the Defense of Marriage

10   Act which was inserted into the Dictionary Act of the U.S.

11   Code and provides a definition of "marriage" and "spouse."

12        And in so doing, what DOMA does is take the one

13   class of marriages that we have here in the Commonwealth and

14   divide it into two, with one class of marriages receiving

15   all of the protections, marital protections under federal

16   law, and the other class of marriages, those of the

17   plaintiffs and other gay and lesbian people, being utterly

18   disregarded for purposes of federal law and denied all of

19   those same protections.

20        So it is in our view a classic equal protection

21   issue:  Why does DOMA treat identically situated married

22   persons differently?

23        **THE COURT:**  How about the basic question, whether

24   Congress had the power to create this division, this

25   intrusion, if you want to call it that?

1          **MS. BONAUTO:**  That is an important question, Your

2     Honor.  It's one --

3          **THE COURT:**  It is what?

4          **MS. BONAUTO:**  It is an important question.  It is

5     one that is advanced in the Commonwealth's case where they

6     have brought a Tenth Amendment challenge.  We did not

7     actually bring a Tenth Amendment challenge but we do think

8     that it is correct, that the Supreme Court has made it clear

9     that it is states that have the police powers.  That's been

10    the way it's been in this country since our founding.  The

11    federal government doesn't have broad police powers.

12         And even in the Commerce Clause context, the 1995

13    case of U.S. v.Lopez and then the 2000 case of U.S. versus

14    Morrison, even though the court disagreed about the scope of

15    the commerce power, everyone agreed that the one area that

16    was walled off from the commerce power was family law and

17    marriage.  But that is actually not essential to our case.

18         **THE COURT:**  To your case here?

19         **MS. BONAUTO:**  Yes.

20         **THE COURT:**  Go ahead.

21         **MS. BONAUTO:**  Thank you.

22         So more specifically vis-a-vis these plaintiffs,

23    Your Honor, we ask what governmental purpose does it serve

24    to take people who have been paying into Social Security for

25    their entire working lives and deny them the spousal

1    benefit, or in the case of the three widowers, death-related

2    benefits after they have been paying into this insurance

3    program.

4         With respect to the -- the tax plaintiffs, we have,

5    for example, Your Honor, a State Trooper, just promoted to

6    lieutenant over the weekend, Mary Ritchie and her spouse

7    Kathleen Bush who left the workforce to care for their two

8    sons and manage the household, since it is difficult to have

9    two working parents when you're a State Trooper.

10        But she pays anywhere between one and six thousand

11   dollars extra federal income taxes every year because she is

12   treated differently from other married persons.  And the

13   same, of course, is true with respect to the other six tax

14   plaintiffs.

15        **THE COURT:**  So now when you start talking about

16   money, does that sort of indicate that we are not dealing

17   with a constitutional issue, it is federal money that we are

18   talking about here?

19        **MS. BONAUTO:**  Your Honor, that's what the

20   defendants would say, that this is really just a benefits

21   case; but with all respect, it's a case about the

22   Constitution and about equal protection.

23        The Congress can, of course, set terms for its own

24   statutes; but all we ask is that once it has set those

25   terms, that it do so evenhandedly, that it comply with the

1    Constitution, comply with equal protection.  You can't have

2    a definition of "person" where "person" means only Caucasian

3    or only woman or only heterosexual.

4         Your Honor, we also ask what governmental

5    purpose -- sorry.  Is that okay?

6         **THE COURT:**  Okay.  You don't have to get that

7    close.  I think that is what does it.

8         **MS. BONAUTO:**  Thank you.

9         **THE COURT:**  Don't let it disturb you.

10        **MS. BONAUTO:**  Thank you, Your Honor.

11        We also ask what governmental purpose it serves to

12   have the United States as an employer treating some of its

13   married employees, retirees and surviving annuitants, all of

14   which we have in this case, differently from other married

15   persons.

16        So the case of Nancy Gill, she has been paying for

17   a self and family health insurance plan at work for years

18   now at the Post Office but she still can't include her

19   spouse Marcelle on that family plan and only because of

20   DOMA.

21        So, Your Honor, if I may, what I'm going to do

22   first is turn to rational basis and address the rational

23   basis issues and then turn to the three bases for heightened

24   scrutiny.

25        **THE COURT:**  Okay.

1          **MS. BONAUTO:**   Okay.

2          And I think everyone would agree, Your Honor, that

3     Congress acted in 1996 because it saw that marriage for

4     same-sex couples was coming in Hawaii and they felt like

5     they had to do something about it.  And that meant two

6     things.

7          One, make sure other states could resist it, use a

8     belt and suspenders approach to make sure states would not

9     have to recognize marriages of same-sex couples.  And that's

10    Section 2 of DOMA which is actually not an issue in our

11    case.

12         But then, in addition, the federal government

13    wanted to make sure that it would not have to treat married

14    same-sex couples as the married people that they are.

15    According to the controlling House Judiciary Report, the

16    Congress knew full well what would happen if same-sex

17    couples began to marry in Hawaii.  Federal agencies would

18    treat them like other married people.

19         And the Report worries out loud that married

20    same-sex couples will be eligible for the full range of

21    federal marital protections.  In the words of the House

22    Judiciary Committee Chairman Henry Hyde, DOMA allowed

23    Congress to express its, quote, disapprobation for, quote,

24    homosexual conduct.

25         And, further, an explicitly stated purpose of DOMA

1      was to express moral disapproval of homosexuality.  Others

2      added to their voices, some very colorfully, but, among

3      other things, calling homosexuality immoral and depraved.

4            Your Honor, Congress was not at its best.  Calling

5      it morality or call it the status quo, call it maintaining

6      tradition or call it as the Department of Justice does in

7      its most recent brief in the Commonwealth's case, call it

8      changing the purpose of every federal law where marriage is

9      relevant, the bottom line is that the intent of the Congress

10     remains the same.  And that intent was to create a special

11     rule keeping gay people and their families outside the

12     protections of the law, disadvantaging them relative to

13     other married persons.

14           Your Honor, in our view this is acting on bare

15     disapproval of a group of citizens and is most definitely

16     not a legitimate purpose on which a classification can be

17     based.

18           As USDA versus Moreno said some time ago, well

19     before 1996, when striking down a Food Stamp provision that,

20     in fact, had been targeted at trying to disqualify hippie

21     households from getting Food Stamp benefits, "If the

22     constitutional conception of equal protection of the law

23     means anything, it must at the very least mean that a bare

24     desire to harm a politically unpopular group cannot

25     constitute a legitimate interest."

1          And the Supreme Court hasn't hesitated to strike

2    down government attitudes based on mere negative attitudes

3    as we saw in City of Cleburne --

4          **THE COURT:**  How about the status quo argument?

5    Isn't that a legitimate concern of the Congress to preserve

6    the status quo?

7          **MS. BONAUTO:**  Your Honor --

8          **THE COURT:**  Or if it is going -- or if it is going

9    to be upset, the other part of that argument that the

10   defendant seemed to talk about is incrementalization.  Is

11   that a legitimate --

12         **MS. BONAUTO:**  No, Your Honor.

13         **THE COURT:**  All right, go ahead.

14         **MS. BONAUTO:**  Thank you.

15         In the end, if you wanted to sum it up, DOMA

16   upended the status quo because prior to DOMA for 230 years

17   we had the federal government deferring to state

18   determinations of marital status, in part because of that

19   power issue that Your Honor raised, that it is states that

20   determine the core status of who is married and who is not.

21         **THE COURT:**  Your position is that "status quo"

22   means states control the situation, not that it is

23   heterosexual marriage?  That is basically what you are

24   saying as far as "status quo"?

25         **MS. BONAUTO:**  That is part of what we are saying,

1   Your Honor, that for 230 years there was a system in place

2   where for purposes of marital benefits at the federal level

3   and marital protections and marital responsibilities, the

4   federal government deferred to state determinations of

5   marital status.  And it changed the rule only when it looked

6   like same-sex couples might begin to marry in some states.

7          But, further, Your Honor, just in terms of the

8   status quo issue, the defendants say that we have chosen the

9   wrong status quo and that there was actually a choice that

10  the Congress had.  It could choose to continue the

11  heterosexual status quo or it could choose to continue the

12  status quo deferring to state determinations of marital

13  status.  That is a completely fallacious framing.  And I say

14  that because there was no prior definition of "marriage."

15         What happened with DOMA was a brand-newly minted --

16  brand-new newly-minted exclusion solely for the purpose of

17  excluding some people from benefits.  They couldn't continue

18  to have marriage be heterosexual because there was no

19  definition of marriage saying it had to be heterosexual.  It

20  was all depending on whatever the states said.

21         And in that vein, Your Honor, just a related point

22  that they make is that DOMA preserves nationwide consistency

23  in the distribution of benefits.

24         And they also say that without DOMA federal rights

25  would vary from state to state.  And, again, Your Honor, we

1    think this is exactly backwards.  But for DOMA, but for

2    DOMA, state law would have controlled the determination of

3    marital status at the federal level and --

4        **THE COURT:**  It might vary from state to state but

5    that would be the source of power you are talking about?

6        **MS. BONAUTO:**  Well, who's married, states certainly

7    have different eligibility requirements; but all the federal

8    government has ever cared about is that the person is

9    married at the state level.

10       So, for example, we've had in this country very

11   vigorous debates at the state level.  Sometimes they have

12   actually gone to the Congress as well in terms of proposed

13   constitutional amendments about things like interracial

14   marriage, about remarriage after divorce, was that bigamy or

15   polygamy.  We've had arguments about consanguinity

16   limitations in first cousin marriages, whether marriages had

17   to be ceremonial.

18       And the United States has embraced the state

19   inconsistencies, again, caring only if the person is

20   considered married under their state law.

21       So for the first time ever DOMA departed from that.

22   Rather than embrace inconsistencies, as it has historically,

23   for the first time it created a new exclusion.

24       And the defendants say, well, we had to do this

25   because no other change in marriage over the years has

1    had -- would have such an impact on the distribution of

2    benefits, that's a quote, or was such a topic of debate or

3    was so fluid.

4         Well, Your Honor, the only change here, the only

5    change was who was going to marry, not any change in

6    marriage itself.  And, again, Congress had seen these kinds

7    of debates --

8         **THE COURT:**  The financial impact that the

9    defendants seem to be worried about, you say that is not a

10   matter of significance?

11        **MS. BONAUTO:**  No, Your Honor.  The conserving

12   resources justification?

13             **THE COURT:**  Yes.

14        **MS. BONAUTO:**  No.  And I say that because, number

15   one, we know that conserving resources was not an actual

16   concern of the Congress.  I say that because, again, in the

17   House Report they frankly acknowledge that they have not

18   undertaken an exhaustive examination of the benefits let

19   alone the cost of those benefits.  And they rejected a

20   proposed amendment in the committee hearing about having a

21   full Congressional Budget Office study.

22        But then further, Your Honor, even if the 1996

23   Congress believed that it would save some money to deny only

24   married same-sex couples alone, among all married couples,

25   some money, what we know from other case law like Plyler

1    <u>versus Doe</u> is that if you are going to single out a group

2    for cost cutting, you have to explain why you've singled out

3    only that group.

4         Generally denying people benefits saves money but

5    you have to explain why you have chosen just that group.

6    And, again, we're talking about married people, not

7    unmarried people, why just this group of married people is

8    being singled out.

9         The other thing I'd add, Your Honor, is that we've

10   now learned since the enactment of DOMA from the 2004

11   Congressional Budget Office Report that if same-sex couples

12   across the country were able to marry, then there would

13   actually be a modest improvement in the federal fisc to the

14   tune of about a billion dollars a year through 2014.

15        And, again, it just shows that this was, conserving

16   resources was I think asserted but not really in any way a

17   real concern.

18        **THE COURT:**  Okay.

19        **MS. BONAUTO:**  Your Honor, I want to mention, if I

20   may, I want to just go through the, quickly the rest of the

21   1996 rationales even though they have been disavowed by the

22   defendants, only because if Your Honor --

23        **THE COURT:**  Are they bound by those?

24        **MS. BONAUTO:**  Even though they disavowed them?

25        **THE COURT:**  Are they limited to those?  Let me put

1    it that way.

2            **MS. BONAUTO:**  No, they're not limited to those, not

3    on a rational basis review.

4            **THE COURT:**  All right.

5            **MS. BONAUTO:**  Of course, with heightened scrutiny,

6    post hoc justifications cannot be considered by the Court.

7    And I want to get to that issue momentarily.

8            **THE COURT:**  Okay.

9            **MS. BONAUTO:**  But I do think the 1996

10   justifications are relevant on rational basis reviews and I

11   want to be able to go through them just very quickly.

12           **THE COURT:**  Go ahead.

13           **MS. BONAUTO:**  In addition to morality, the

14   explicitly mentioned purpose of morality and how that

15   evidences a bare desire to harm, the actual first stated

16   purpose of DOMA was to defend the institution of traditional

17   marriage.  And as <u>Heller versus Doe</u> says, a rational basis

18   case, rational-basis review still must find some footing in

19   the reality of the subject matter addressed.  Defending

20   traditional marriage is about whether gay people should get

21   married at all.

22           And, of course, that decision was already made by

23   the sovereign empowered to make that decision, the

24   Commonwealth of Massachusetts.

25           So Congress's mere desire to express its family law

1   preferences and defend traditional marriage is not a valid

2   objective.

3            The other thing, Your Honor, is if that interest

4   could be reframed -- and I'm not saying the defendants'

5   reframed it this way -- but if it could be reframed as a

6   desire to continue excluding same-sex couples from benefits

7   because they have been excluded in the past, then that's a

8   tradition of exclusion and a tradition of exclusion simply

9   by itself is not a legislative -- legitimate legislative end

10  either.

11           The other point, Your Honor, is on rational

12  connection.  The defense of traditional marriage doesn't

13  even speak to what DOMA does.  What DOMA does is deny all

14  marital protections and responsibilities and nonpecuniary

15  benefits to a class of people who are already married.

16           And if the notion is that denying same-sex married

17  couples these federal protections will somehow make marriage

18  more valuable or desirable for other people, for

19  heterosexuals, that, again, is implausible because federal

20  marital protections and so on stayed the same.  The only

21  thing that would change with DOMA is that some people would

22  be denied benefits.  So it's hard to imagine plausibly that

23  that provides an incentive for people to marry.

24           Your Honor, if I may, also related to traditional

25  marriage is the rationale, also disavowed by the government

1    for the very good reasons stated in the memorandum, but the

2    purpose of encouraging responsible procreation and child

3    rearing.

4         Now, in 1996, Your Honor, even if the Congress

5    believed that children are better off with a biological

6    mother and a biological father no matter what the parents'

7    relationship was and no matter their parenting capacities

8    and everything else, even if they believed that alone, it

9    was obvious then and it is obvious now that denying

10   protections to married same-sex couples does nothing to help

11   children in different sex families or in any way encourage

12   more heterosexuals to have children in marriage or any of

13   that.  All it does is penalize gay and lesbian families and

14   any children they may be raising.

15        So, Your Honor, I'll just address the two other

16   rationales briefly.  We talked about conserving resources.

17   The final one that was actually advanced, Your Honor, is

18   that DOMA would preserve state sovereignty.  And I think

19   that's one that you can just bat out of the park because

20   Section 3 overrides state determinations of marital status

21   and in that way clearly doesn't respect state sovereignty at

22   all.  And, again, DOMA fails to find any footing in reality.

23        So that leaves us with the status quo arguments.

24   And, again, I'm happy to talk more about those, Your Honor.

25   You mentioned incrementalism so perhaps I should return to

1    that.

2         **THE COURT:**  Go ahead.

3         **MS. BONAUTO:**  Yes.  Thank you.

4         **THE COURT:**  What interest is there -- what

5    interests does the government have in preserving the status

6    quo?

7         **MS. BONAUTO:**  Our point, Your Honor, is that

8    preserving the status quo for the sake of preserving the

9    status quo is not an interest.  The defendant has cited

10   cases and we've responded in our briefs where the status quo

11   comes up as a means to some other purpose but is not a

12   purpose in itself.

13        So there is a, I think an Eleventh Circuit case

14   about park land, a planning process going on about what to

15   do about that park land so to let people live in these

16   stilted structures while we're having our planning process.

17   Well, fine, that says we are doing a planning process.

18   That's the purpose we are trying to serve.  We're not going

19   to upset the apple cart while that's going on.

20        But with DOMA what we have is saying these people

21   are going to be singled out right now and maintain that

22   status quo but for what purpose.  And, Your Honor, that is

23   exactly the right question:  What is the purpose that is

24   served?  We have found none that is served.

25        The defendants in that vein, however, they have

1    conjured some up.  With respect to incrementalism they say

2    it has to be okay for the Congress to proceed on this issue

3    and respond to a new social phenomenon incrementally one

4    step at a time.  And, again, Your Honor, we are talking

5    about marriage which is not a new social phenomenon.  And,

6    again, the issue is who is marrying, not marriage itself.

7         And the response, Your Honor, from the Congress was

8    not incremental.  As you know, it was a wholesale denial of

9    all the protections and responsibilities and so on.  So we

10   think they confuse means and ends and that incrementalism by

11   itself simply cannot be an end.

12        Your Honor, in 1948 the California Supreme Court

13   became the first high court in the country to strike down a

14   ban on interracial marriage.  There have been other

15   attempts.  No court ever did so before.  And if at that

16   point in 1948 or 1949 the Congress had responded and said

17   we're now going to pass a law that says the only marriages

18   we'll respect for federal purposes are marriages of

19   same-race couples, we would all recognize it for exactly

20   what it is.

21        And I will note that at that time in 1948 thirty

22   states had bans or criminal prohibitions on marriage of

23   different race couples.

24        Your Honor, the defendants also say that an end of

25   preserving the status quo is that federal agencies should

1   not have to deal immediately with the changing patchwork of

2   state approaches to same-sex marriage and relatedly that

3   married same-sex couples would create significant and

4   unpredictable affects on federal agencies and programs.

5          Your Honor, we are not talking about a mom and pop

6   operation here.  We are talking about agencies of the

7   federal government that are staffed with incredibly trained,

8   highly skilled people who have had no problem sorting out

9   who is married and who is not even though we have varying

10  state marriage laws today, including common law marriage

11  which is still recognized in 12 states.

12         So we think this one is also, this interest is also

13  entirely implausible.

14         So, Your Honor, that addresses the status quo as

15  far as I understand it, that the defendants have raised.

16         **THE COURT:**  Okay.

17         **MS. BONAUTO:**  May I turn to heightened scrutiny

18  now, Your Honor?

19         **THE COURT:**  Yes.

20         **MS. BONAUTO:**  Thank you.

21         So we, even though we think there is no rational

22  basis for DOMA in 1996 and certainly not now, the first

23  basis --

24         **THE COURT:**  Let me take you back just a little bit.

25         **MS. BONAUTO:**  Sure.

1          **THE COURT:**  This incrementalization -- and I am

2     having trouble with that word -- as a valid method dealing

3     with social problems, is that a legitimate thing?  In other

4     words, to take a bite at a time?  That seems to be the

5     suggestion that the defendants are proffering.

6          **MS. BONAUTO:**  But it's a bite at a time toward what

7     end.  Incrementalism again is not an end.  It is a means to

8     a particular end.  And the response here was not incremental

9     in any way.  It was an across-the-board denial of all, to

10    all 1,138 federal --

11         **THE COURT:**  In other words, there would have to be

12    a desire that there be no same-sex marriage?

13         **MS. BONAUTO:**  Can I have that again, please, Your

14    Honor?

15         **THE COURT:**  Well, what I am trying to see is what

16    is the legislative purpose.  The legislative purpose taken

17    to its logical conclusion would be an absolute ban on

18    same-sex marriage.

19         **MS. BONAUTO:**  That could be, Your Honor.  The

20    department hasn't -- the defendants haven't stated that but

21    that could be.

22         **THE COURT:**  Okay.  Go ahead.

23         **MS. BONAUTO:**  But, again, Your Honor, I would say

24    with respect to that, that the Congress has no interest in

25    having any kind of nationally uniform family law or marriage

1    law or discouraging any particular type of marriage.

2         **THE COURT:**  But if they decide now is the hour, you

3    are saying it is too late?  In other words, after 200 years

4    of the states doing it, if the Congress said now we want to

5    make it a federal -- we want to make marriage subject to

6    federal jurisdiction and federal supervision, you are saying

7    it is too late for them to do that, that there was a time

8    bar because of the 200 years that it has been taken care of

9    by the states?  Is that your position?

10        **MS. BONAUTO:**  No, there is two issues, Your Honor.

11   One is the power issue which we've begun to address and it's

12   raised in the Commonwealth's case.

13        But the other issue, if after 230 years where the

14   Congress has not displayed any interest in overriding state

15   determinations of who is married, on federalism we think the

16   important, one of the important points in rational basis is

17   that when -- and Romer said this and Romer cites other cases

18   saying this -- when you have an unusual enactment that is

19   unprecedented, you better look at it carefully.  And that's

20   what we think is happening here.

21        The other thing, Your Honor, where the federal

22   government has completely deferred to the states on this

23   issue, and, again, we think for very good power reasons,

24   that means there is no particular federal interest in having

25   any definition of "marriage."  People may have politically

1    hoped one thing or another but that -- perhaps along the

2    lines of what Your Honor is speculating about -- but that is

3    not an interest that is legitimate for the Congress, not in

4    this area.

5          **THE COURT:**  Okay.  Go ahead.

6          **MS. BONAUTO:**  Okay.

7          Actually, Your Honor, picking up on federalism, the

8    defendants have not disputed that it is within the state's

9    core power to make these declarations of status on marriage,

10   annulment, divorce, so on and so forth.  And they concede

11   that prior to DOMA the marital status of individuals under

12   federal law depended on a person's marital status under

13   state law.

14         We think a very important case to direct Your

15   Honor's attention to is the Northwest Austin Municipal Water

16   District case about the Voting Rights Act.  It was issued by

17   the Supreme Court last term.  Because what that case said is

18   when you have a federal law that trenches on an area of

19   traditional state authority such as electoral systems in

20   that case, or a federal law that creates differences among

21   states despite their equal sovereignty, then the measure

22   that's doing the intruding or creating those differences has

23   to be, quote, sufficiently related to the problem the law

24   targets.  And that is a hallmark of heightened scrutiny.

25         DOMA, of course, does both of these things.  It

1    leverages the reach of the federal government to make its

2    own family law at the expense of the states traditional

3    authority over domestic relations; and, of course, it

4    validates the laws of some states while overriding and

5    disrespecting the laws of others.

6            So, Your Honor, where close scrutiny of Section 5

7    of the Voting Rights Act was warranted even where the Voting

8    Rights Act is tethered explicitly -- is tethered to the

9    Fifteenth Amendment, and there have been years of

10   congressional findings on the problem of black

11   disenfranchisement, then clearly close scrutiny has to be

12   applied to DOMA as well which is tethered to no particular

13   congressional power and where DOMA, in fact, creates rather

14   than solves problems.

15           Now, the defendants will say, quickly, that, well,

16   DOMA doesn't displace state laws about who can marry and the

17   plaintiffs are married.  And, of course, that is true.  But

18   it also fails to capture the enormity of what DOMA is and

19   what it means for the first time in our nation's history to

20   have a federal definition of marriage, let alone one

21   targeted at just a minority group.  Because prior to DOMA

22   you were married by your state, you were married for all

23   purposes.  And federal --

24           **THE COURT:**  Let me ask you this:

25           What is your position, that there is no rational

1    basis for this or that it is subject to heightened scrutiny

2    and it fails?  Or is there a third suggestion that you are

3    making?

4          **MS. BONAUTO:**  Your Honor, we believe we are right

5    on all of our claims.  There is no rational basis, not in

6    1996, not now, and that heightened scrutiny is actually the

7    proper standard to be applying to this case.

8          **THE COURT:**  And not necessary.

9          **MS. BONAUTO:**  And not necessary, Your Honor, if

10   this Court were to rule on rational basis.

11         But let's say, for example, just optimistically

12   speaking that this Court ruled in favor of the plaintiffs on

13   rational basis but the Appellate Court decided that actually

14   heightened scrutiny issues should have been addressed, then

15   we would be back in front of Your Honor and we would

16   encourage Your Honor to rule on all the bases asserted.

17         **THE COURT:**  Suppose I agree with you on rational

18   basis but not on heightened scrutiny.

19         **MS. BONAUTO:**  Like I said, I think we're going to

20   be in the First Circuit, Your Honor.

21         **THE COURT:**  Okay.

22         **MS. BONAUTO:**  But I just want to go back to the

23   impact of DOMA, Your Honor, even though states, in fact,

24   like Massachusetts are marrying people because when you have

25   a federal definition of "marriage," it obviously involves

1   the federal government making determinations of who is

2   married and who is not and disrespects the state's

3   historical exclusivity to make that determination.  And it

4   also advances a whole competing national definition that

5   undermines the states that normally would have established

6   the full meaning and contours of marriage.

7           I also want to address another argument the

8   defendants make on federalism.  And they say, well, there

9   are other challenges to other federal laws that bring up

10  federalism concerns.  And in those cases there is no

11  heightened scrutiny applied.

12          Every single one of those cases is distinguishable,

13  Your Honor, for the reasons cited in our briefs but I want

14  to give you just one example, if I may.

15          There have been challenges in this circuit to the

16  Child Support Recovery Act.  And it is true, heightened

17  scrutiny is not applied to those.  But those cases, again,

18  are very, very different from DOMA.  So if you take United

19  States versus Lewko, decided by the First Circuit, they were

20  asked to revisit a prior ruling upholding the Child Support

21  Recovery Act following the Supreme Court's decision in U.S.

22  versus Morrison.

23          The First Circuit upheld the Child Support Recovery

24  Act and also the Deadbeat Parents Punishment Act.  Both are

25  targeted at interstate enforcement of state-created child

1    support obligations against a commerce clause challenge.

2          The defendants argued that those statutes somehow

3    encroached on family law and domestic relations because they

4    involve state court judgments.  But the First Circuit

5    rightly ruled that child support is a thing in commerce and

6    that those statutes -- and this is the key -- those statutes

7    did not have the purpose or effect of creating, quote,

8    national uniform family law.

9          But what is DOMA but national uniform family law

10   defining plaintiffs' marriages out of existence for purposes

11   of all federal laws and programs.

12         Moreover, Your Honor, the Lewko court noted that

13   those federal statutes at issue protected the integrity of

14   state court judgments while enforcing them in other states

15   as, again, as the Congress may empower someone to do,

16   whereas DOMA, of course, disrespects sovereign states'

17   marital status determinations.

18         So, Your Honor, I want to turn to sexual

19   orientation, heightened scrutiny, the second basis for

20   reviewing DOMA more closely.  And as you know, the parties'

21   briefing has focused on the First Circuit decision in Cook

22   versus Gates where the First Circuit applied rational basis

23   to a law excluding gay and lesbian persons from the

24   military.

25         The court noted in its opinion that homosexuals are

1    not a suspect class.  That's a quote.  And the defendants

2    say this language bars this Court from examining the legal

3    question that plaintiffs ask here.

4         We think they reach too far.  The First Circuit

5    Panel explicitly limited itself to the question whether the

6    Romer case and the Lawrence versus Texas case mandated the

7    application of heightened scrutiny and the court said no.

8         The court did not consider whether sexual

9    orientation is a suspect classification under the doctrinal

10   factors, did not engage in such analysis, nor was there any

11   record before the court on which the court could have done

12   so.

13        We have provided, as Your Honor knows, four expert

14   affidavits that go to the doctrinal factors on heightened

15   scrutiny and the defendants have not rebutted those

16   affidavits or their conclusions in any way.

17        Moreover, Your Honor, in Cook what we know is that

18   language was dicta and we know it was dicta because the

19   court applied heightened scrutiny to the due process claim

20   and the plaintiffs still lost.  So applying heightened

21   scrutiny in the equal protection context would have made no

22   difference.

23        So if Your Honor engages in this inquiry, as you

24   know, there is no rigid test for determining whether or not

25   a classification is suspect.  It tends to focus on two key

1    factors:  Is there a history of discrimination?  That's

2    something that no court who has ever reached this issue has

3    disputed.

4            And, secondly, is the characteristic one that is

5    unrelated to the ability to perform or to contribute in

6    society?

7            And on that factor, Your Honor, as evidenced by the

8    very plaintiffs in this case, we are dealing with teachers,

9    a State Trooper, government workers, attorneys, nurses,

10   chief financial officer, all kinds of folks who are clearly

11   contributing to society who have successfully formed

12   families and some of whom are also parents.

13           So we think those two, those are the two key

14   criteria and they have been met here.

15           Sometimes, Your Honor, courts look to the issue of

16   is the group a minority.  Yes, being gay or lesbian is a

17   minority.  And also relative -- or relative lack of

18   political power.

19           With respect to that issue, Your Honor, despite

20   recent progress in some areas or hoped for progress, it is

21   still the case that gay men and lesbians face significant

22   obstacles to achieving protection in the political process.

23   There is still no federal law that makes it impermissible to

24   discriminate based on sexual orientation in jobs, in

25   housing, in public accommodations and education.

1          The Federal Hate Crimes Law did pass last year but

2     only as an amendment to a Defense Appropriation Bill because

3     it didn't have the votes to survive on its own.   There are

4     numerous state marriage bans.   There is DOMA itself.   These

5     are among the many things that could be cited as emblematic

6     for the lack of political power of gay men and lesbians.

7          The fourth criteria that some courts mentioned is

8     is there an obvious immutable or distinguishing

9     characteristic -- that comes from Bowen versus Gilliard --

10    that would define the group.   And, Your Honor, we know that

11    religion, we know that alienage are considered suspect

12    classes and those are, I think sexual orientation is at

13    least essential to people's identity and as distinguishing

14    as what a person's religion is or what their alienage is.

15         Moreover, sexual orientation is something that is

16    extremely resistant to change, often set very, very early,

17    and people deny experiencing that they have any particular

18    choice over the matter.

19         So I would be happy to answer questions about this

20    but we have provided affidavits to the Court to assist the

21    Court in making this determination since it is a matter of

22    constitutional fact.

23         The final piece, Your Honor, is our claim for

24    heightened scrutiny based on DOMA's infringement on the

25    plaintiffs' right to family integrity.   And the claim here,

1    Your Honor, is that all these plaintiffs, like other people,

2    have a fundamental right to family integrity that is

3    burdened by DOMA's selective imposition only on them as

4    married same-sex couples.

5          And very notably, the <u>Lawrence versus Texas</u> case

6    confirmed that the right of the same-sex couple to join in

7    their relationship is a protected liberty interest.  And the

8    defendants acknowledge again in their brief recently filed

9    in the Commonwealth's case that <u>Lawrence</u> and <u>Cook</u> both stand

10   for the proposition that heightened scrutiny applies when

11   there's a governmental intrusion on the liberty interest in

12   forming a family.

13         One last doctrinal piece.  We know from <u>Roberts</u>

14   <u>versus U.S. Jaycees</u> that the reason why family relationships

15   are protected in the constitutional matter is because family

16   relationships permit the ability to define one's identity

17   that is a central part of liberty.

18         So where all of these fundamental and protected

19   liberty interests around families are at stake, Congress

20   should have been very careful about saying which families

21   count and which families don't.

22         But instead what DOMA does is come in and negate

23   their marital status, a core part of their identity as a

24   people and as families, and it does so for all federal

25   purposes.

1          Also what was once a whole marital status has now

2     been sundered into two where we have a state marital status

3     and a federal marital status, which is zero, and taking away

4     the full meaning of their marriage, saying that they are not

5     married at the federal level and advertising that to the

6     nation, that there is something suspect about these

7     marriages takes away one of the most important things about

8     being married:  The clarity, the dignity and the security of

9     what happens when you can say to somebody, I am married.

10          And the defendants acknowledge that there is a

11    right to family integrity, Your Honor, but they say the

12    plaintiffs aren't sufficiently burdened to invoke that right

13    because it doesn't physically cast married couples of the

14    same sex asunder, citing some cases for that.

15          But there is two points, Your Honor.  The cases are

16    not that limited.  And there is no doubt here that DOMA is,

17    in fact, treating some married people, this class of married

18    people differently from all other married people in the

19    Commonwealth.  And that in itself triggers heightened

20    scrutiny.

21          And, second, as to burden, you know, I mentioned

22    some of the burden, Your Honor, but think about this.  These

23    plaintiffs are not only denied federal protections but they

24    are conscripted into the process of denying their own

25    marriages.  So when they complete federal income tax returns

1    every year, as they are required to do, they have to check

2    off "single" or "head of household" but they cannot check

3    off "married" under the pains and penalties of perjury.

4         DOMA also affects how they live their lives.  So if

5    you take, for example, the plaintiffs Nancy Gill and

6    Marcelle Letourneau, married in '04.  They thought that

7    finally they would have health insurance coverage and that

8    Marcelle would be able to stay home and be a stay-at-home

9    mom for their middle- and high-school aged children.  Only

10   because of DOMA that child rearing plan has not come to

11   fruition.

12        So, Your Honor, in conclusion I want to say Justice

13   Kennedy began his opinion in Romer versus Evans by quoting

14   Justice Harlan's dissent in Plessy versus Ferguson:

15        "The Constitution neither knows nor tolerates

16   classes among citizens."

17        We think those two cases guide this Court today.

18   Once all of the conceivable rationales for DOMA are

19   examined, it is clear that they either restate what DOMA

20   does without explaining it, or the interests are not really

21   interests of the federal government, or they're a bare

22   dislike and a desire to disadvantage, or the interests have

23   no rational connection to DOMA's across-the-board denial of

24   all protections and responsibilities.

25        So what remains, Your Honor, and what cannot be

1    purged is that Congress's desire to deny otherwise available

2    protections only to gay people and make these people and

3    their marriages unequal to everyone else.

4            Although the U.S. has historically deferred to

5    marital status, the Congress changed its rules for all the

6    wrong reasons only because there was gay people involved.

7            We are a society based on the rule of law.  And

8    going back to Romer, Justice Kennedy understood Justice

9    Harlan's admonition to, quote, state a commitment to the

10   law's neutrality where the rights of persons are at stake.

11           DOMA is a rare federal statute that represents the

12   antithesis of neutral law making and cannot be justified

13   under any level of review.

14           The Constitution applies to gay men and lesbians

15   and married ones too.

16           The plaintiffs request, Your Honor, that you

17   declare DOMA unconstitutional as applied to them in the

18   areas of Social Security, federal employee and retiree

19   benefits and federal income tax so they may proceed with

20   their benefit applications without regard to DOMA, and they

21   receive federal income tax refunds denied based on their

22   inability to file as married filing jointly.

23           Thank you, Your Honor.

24           Actually I want to ask one housekeeping matter,

25   Your Honor, if I may?

1          We have a second amended complaint in the works,

2     many of the plaintiff couples fold in the 2008 tax year.

3     The defendants have that complaint and the IRS is currently

4     in -- the IRS is in the process of verifying the

5     allegations.  And the defendants expect that process to be

6     completed within two weeks before the -- Your Honor's

7     hearing on the Commonwealth's case.  And assuming everything

8     is verified, we would be filing that amended complaint by

9     consent.

10         **THE COURT:**  With agreement?

11         **MS. BONAUTO:**  With agreement, yes, Your Honor.

12         **THE COURT:**  Okay.  That would be helpful.  Good.

13         **MS. BONAUTO:**  Thank you, Your Honor.

14         **THE COURT:**  Thank you.

15     Defense.

16         **MR. SIMPSON:**  Thank you, Your Honor.  I appreciate

17     the Court hearing us today.

18         **THE COURT:**  Mr. Simpson?

19         **MR. SIMPSON:**  Yes, Mr. Simpson.

20         **THE COURT:**  Okay.  Go ahead.

21         **MR. SIMPSON:**  I guess I should say beforehand I

22     apologize for the quality of my voice.  I have been

23     struggling with some allergy issues.  I hope I don't have a

24     coughing fit while I'm up here.

25         **THE COURT:**  I have the same problem.  I hope we

 1    don't cough on each other so.

 2         (Laughter.)

 3         **MR. SIMPSON:**  Your Honor, we submit that the gist

 4    of this case is whether the federal government can control

 5    the meaning of the terms used in its own statutes.

 6         Plaintiffs seek to require the United States to

 7    follow the expanded meaning of those two words, "marriage"

 8    and "spouse" recently adopted by five states and the

 9    District of Columbia.

10         The defendants agree that who can marry is a

11    question of state law, that each state must decide for

12    itself.  Indeed, the very fact that some states have now

13    decided to permit same-sex marriage is we think an essential

14    element of plaintiffs' claims.  If that were not true, we

15    would not actually be here.

16         But what the words "marriage" and "spouse" mean for

17    purposes of federal law is a question of federal -- is a

18    question for the federal government, especially when it

19    involves the expenditure of federal funds and the

20    application of the U.S. Tax Code.

21         **THE COURT:**  When did that begin?  When did it

22    become a federal matter, dealing with marriage?

23         **MR. SIMPSON:**  Well, I would say from, to some

24    extent, Your Honor, it has been a federal matter since the

25    history of the United States.

1          **THE COURT:**  Specifically.  I mean, point to an

2     instance.  Where is your precedent for your assertion that

3     it is a federal matter, pre DOMA?

4          **MR. SIMPSON:**  Your Honor, the federal government,

5     it is true, has until 1996 simply followed the state's

6     definition of "marriage."  However --

7          **THE COURT:**  There is no federal tradition here.

8          **MR. SIMPSON:**  Federal, I'm sorry?

9          **THE COURT:**  There is no federal tradition involved

10    here of the government looking out for its own statutes and

11    interpreting its own statutes?  There is no tradition of

12    that?

13         **MR. SIMPSON:**  Oh, there absolutely is --

14         **THE COURT:**  In the marriage field.

15         **MR. SIMPSON:**  In the marriage field, correct,

16    that's correct, Your Honor.

17         1996, DOMA is the first time it is true that

18    Congress has enacted a law defining what "marriage" means

19    for federal purposes.

20         **THE COURT:**  Okay.  Go ahead.

21         **MR. SIMPSON:**  Now, before I get further into my

22    argument, I should repeat something that was said in our

23    briefs, which is that as a matter of policy this

24    Administration does not support the Defense of Marriage Act

25    and it wants to have it repealed.  However, that does not

1    affect the constitutionality of the statute.

2           Congress could have believed in 1996 that DOMA was

3    rationally related to legitimate governmental interests.

4           I'd like to explain first why we believe DOMA

5    satisfies rational basis review and then, like Ms. Bonauto,

6    I'll address the requests for heightened scrutiny on their

7    part.

8           I'd like to first make a few comments about what

9    rational basis review is.  Under rational basis review the

10   court -- and I'm quoting the Supreme Court decision in

11   Heller versus Doe.  Under this type of review the court can

12   rely on the court's, the Supreme Court says, rational

13   speculation.

14          We submit that the things that the plaintiffs have

15   focused on in their argument regarding material in the

16   Committee Report on DOMA are irrelevant here.  In fact, the

17   plaintiffs' own opening brief -- this is docket No. 28 at

18   page 34 -- said, Because defendant's do not rely on them,

19   that is, on the statements in the Committee Report, because

20   the defendants do not rely on them to defend the statute,

21   they're not properly before the Court.

22          We agree with that.  And we submit that the

23   argument regarding the statements in the Committee Report

24   are irrelevant here.

25          Your Honor, the rationality of DOMA we think is

1    tied up in the historical context.  Congress passed DOMA, as

2    we know, in 1996, as states were beginning to consider

3    whether to expand the definition of "marriage."

4         Congress could reasonably have foreseen at that

5    time that some states would decide to permit same-sex

6    marriage, that some states would decide not to permit it.

7    And the Congress could also have foreseen that the status of

8    the issue in the states would remain unsettled, fluid for

9    some time.  And that, of course, has happened.

10         Understanding the words "marriage" and "spouse" as

11   encompassing same-sex marriage and same-sex spouses

12   represents a, obviously a significant change in how those

13   words were understood throughout the United Sates before

14   1996.  Many, we acknowledge many federal--

15        **THE COURT:**  Well, why did it become a federal

16   interest though?  That is what I can't understand from your

17   argument so far.

18        **MR. SIMPSON:**  Yes, Your Honor.  If I could explain

19   that.

20        **THE COURT:**  Go ahead.

21        **MR. SIMPSON:**  Congress --

22        **THE COURT:**  Why is it any different than age?

23   Let's say that -- I am not sure what the statistics are.

24   Let's say 20 states limit marriage to people who are at

25   least 21 years old and the rest of them don't, I mean, if

```
 1    that is a valid hypothesis.  Why is this any different than

 2    that in terms of your interest in trying to have

 3    consistency?

 4         MR. SIMPSON:  I think it primarily, as I'll explain

 5    a little bit more in a moment, Your Honor, it's primarily a

 6    matter of what Congress saw as the -- as a trajectory of

 7    this issue in the states.

 8         And, again, Congress foresaw these things we submit

 9    and these things have happened.  The states have addressed

10    this issue fairly rapidly.  The changes within the states on

11    this issue have occurred rapidly.  Some states have decided

12    to permit same-sex marriage and then decided not to.

13         Some states, when they decide to permit same-sex

14    marriage, for example, by court decision, that decision does

15    not become effective for a while.  It's a lot for the

16    federal agencies to keep track of and a lot of changing in a

17    fairly brief period of time on a very -- on an issue that

18    changes marriage as we said very significantly.

19         THE COURT:  You are making a serious assertion that

20    the matter is so complex that it would be a burden on the

21    operation of federal government; is that what you are

22    saying?

23         MR. SIMPSON:  What we're saying, Your Honor, is

24    that Congress could reasonably have believed that it would

25    be a challenge for the federal agencies to keep track of the
```

1    changes as they happened within the states.

2          **THE COURT:**  But here we only have -- all this time

3    has passed and you only have, what, six or seven states to

4    deal with.

5          **MR. SIMPSON:**  Well, right now there are five

6    states.

7          **THE COURT:**  Two went back.

8          **MR. SIMPSON:**  Correct.  Right now there are five

9    states that permit same-sex marriage plus the District of

10   Columbia.  There was one state, Maine I believe --

11         **THE COURT:**  Maine.

12         **MR. SIMPSON:**  -- that was about to permit same-sex

13   marriage and then basically changed its mind pursuant to its

14   citizens' vote.

15         Of course, California once permitted it and now

16   doesn't.

17         And even in those states, in all the states we

18   submit that the question is not necessarily settled.  That

19   it may be brought to a ballot again in California, I believe

20   there is an attempt to do that.

21         Again, it is an unsettled issue and Congress could

22   have foreseen that in those -- in that unsettled

23   circumstance, they -- the best approach for the federal

24   government was to freeze the federal status quo, in other

25   words, to freeze the understanding of "marriage" as it

1    existed in all 50 states in 1996, in 1996 as this whole --

2    as these changes --

3            **THE COURT:**  The status quo really was the

4    circumstance that the state governments that provided the

5    answer.  It isn't the heterosexual versus homosexual issue.

6            **MR. SIMPSON:**  Actually, Your Honor --

7            **THE COURT:**  It is the status quo; isn't it?

8            **MR. SIMPSON:**  There are two different ways to look

9    at status quo.

10           **THE COURT:**  Well, maybe that is what we ought to

11   do, try to find out what you feel is, in quotes, the "status

12   quo" that we are litigating here.

13           **MR. SIMPSON:**  Correct, Your Honor.

14           When we say "status quo," plaintiffs respond, as

15   the Court has said, that the status quo was the states

16   decide.

17           But in that, in -- when I say "status quo," I am

18   trying to say before the phrase "status quo," "federal

19   status quo," because before 1996 the federal status quo was,

20   you know, a couple comes to you or someone seeking benefits.

21   From the federal standpoint it was only heterosexual

22   marriage that they had to look at.  Those are the only kinds

23   of marriage that were coming from the states to the federal

24   government.

25           So that was, from the federal government standpoint

```
 1    that was the status quo.  And so what we are saying is that
 2    that is the status quo that Congress established.  That's
 3    the status quo that Congress preserved in the Defense of
 4    Marriage Act as of 1996.
 5         THE COURT:  In other words, you are not saying that
 6    the status quo includes the power of the states to decide
 7    the issues on a state-by-state basis, whatever their
 8    decision is, whether it is going to be homosexual or
 9    heterosexual?
10         MR. SIMPSON:  Again, before -- I suppose one could
11    say that before 1996 there were two status quos.  There was
12    the status quo, as the Court said, of following whatever the
13    states said was marriage.  And there was the federal status
14    quo of the fact that all of those marriages that were coming
15    from the states were opposite-sex marriages.
16         THE COURT:  That was a circumstance though.
17         MR. SIMPSON:  I'm sorry?
18         THE COURT:  That was a circumstance.  That
19    wasn't -- there was no law to the contrary at that time,
20    prior to DOMA.
21         MR. SIMPSON:  Correct, there was no law; but as far
22    as I know, there was no federal -- there was no written
23    federal statute that said we will follow state law.
24         I assume there were federal, there were federal
25    regulations I assume to that effect but I don't believe
```

```
 1    there was a federal statute that said we will follow the

 2    states' decisions.

 3              So, again, from --

 4         THE COURT:  It has never been a matter of

 5    jurisprudence in -- never been any cases that have -- I

 6    don't want to give you a pop quiz on that subject.  I don't

 7    know the answer myself.

 8              (Laughter.)

 9         THE COURT:  But it strikes me as being almost

10    incredible that the issue had not litigated in some manner

11    where someone opined that this is the state's role, not --

12         MR. SIMPSON:  Your Honor, I'm sure you can find

13    that in the case law, particularly where --

14         THE COURT:  Well, let me -- I am interrupting you.

15    Forgive me for doing this.

16              If it isn't so, how come you -- both sides seem to

17    agree that up until DOMA it was a state matter?  And that

18    was beyond dispute.  That was your position; wasn't it?

19         MR. SIMPSON:  Correct, Your Honor.  The federal

20    government generally followed state determinations as to who

21    was married before 1996.

22         THE COURT:  So that must have been written

23    someplace.

24         MR. SIMPSON:  As I said, it was presumably I would

25    assume written in federal regulations.
```

1      And normally -- the Court's question is partly were

2   there any cases to that effect.  I know that there were

3   cases --

4      **THE COURT:**  I just mean authority for the

5   proposition, that is what I am -- if everybody is saying it

6   is a state matter, who said so?  Who decided it?

7      **MR. SIMPSON:**  I would think there would be, there

8   were -- and, again, I'm assuming, most of -- I have looked

9   at many state court decisions where a marriage comes to the

10  state court and the person who has been married was married

11  in another state that has a different law, for example, age

12  of consent or whether first cousins can marry, comes to

13  another state and that state court has to decide is that

14  marriage going to be valid.

15      I would not be surprised to find federal cases to

16  that effect where they have conflicting laws regarding

17  marriage.  And there are probably decision -- there are

18  probably statements in federal decisions saying we follow

19  the federal -- I'm sorry -- the state determinations

20  regarding who is married.

21      But, again, as this -- as Congress saw this, these

22  changes approaching in 1996 where this very fundamental

23  change in who could marry was going to be happening in the

24  states, Congress could reasonably have decided this is a

25  very fundamental change, there are going to be lots of

 1    changes coming from the states.  And, again, Congress could

 2    have assumed some states would go, would permit same-sex

 3    marriage, some states would not.  It would be in flux for a

 4    while.

 5          Congress could reasonably have said we need to

 6    freeze the current understanding of the current application

 7    of marriage for federal purposes as what it was at that

 8    time -- I'm sorry -- which was heterosexual marriage and

 9    wait to see how this evolution comes out in the states.

10          As I said, Your Honor, in absence of that --

11          **THE COURT:**  But in doing so they created a federal

12    marital status.

13          **MR. SIMPSON:**  In a sense, Your Honor --

14          (Whereupon, the fire alarm sounded.)

15          (Whereupon, the Court and the Clerk conferred.)

16          **THE COURT:**  All right.  I think that --

17          (Whereupon, the Court and the Court Security

18          Officer conferred.)

19          **THE COURT:**  I am sure that everything is fine but

20    we also don't have any word that this is a test.  So what I

21    am going to do is to recess court now and let's hope for no

22    more than fifteen minutes and we will start again if we are

23    back in the building at quarter of twelve.  Okay.

24          So you won't miss anything if you are here by

25    quarter of twelve.

 1

 2                    (Recess at 11:30 a.m.)

 3

 4          **THE COURT:**  Okay, Mr. Simpson, now you can go.

 5          **MR. SIMPSON:**  Thank you, Your Honor.

 6          If I could just summarize a little bit where we

 7   were going --

 8          **THE COURT:**  Go ahead.

 9          **MR. SIMPSON:**  -- on the rational basis review.

10          We suggest, Your Honor, that under these

11   circumstances Congress could have foreseen that these

12   developments in the states would have significant and

13   unpredictable effects on the federal agencies and federal

14   programs, especially while the question of same-sex marriage

15   was still unsettled in the states.

16          I think I have said a little bit already what we

17   believe Congress could have foreseen as the impacts on

18   federal agencies, just a little bit more on that.

19          Obviously the application of federal laws would

20   have differed from state to state.  Even within some states

21   over time the application of federal laws would have

22   differed as the states struggled with the question of

23   same-sex marriage.

24          Without congressional action, as I may have said

25   before, Congress could have realized that federal agencies

1    would have to keep track of each state's status in relation

2    to same-sex marriage and how that status was changing over

3    time, sometimes from one decision and then flipping back to

4    the earlier decision.

5         Your Honor, plaintiffs' counsel said something

6    about whether preserving a status quo can be a governmental

7    interest.  We suggest that it can.  We quote a decision on

8    page fifteen of our, I believe it was our opening brief,

9    which is docket No. 55.  And the parenthetical that we quote

10   there says that, "The temporary preservation of the status

11   quo to preserve options and a long-term planning process,"

12   which is what was going on there, "is a legitimate

13   governmental interest."

14        **THE COURT:**  That is your incrementalization

15   argument sort of; isn't it?

16        **MR. SIMPSON:**  Well, Your Honor, I was going to talk

17   a little bit about that.  I would not characterize

18   incrementalism as one of the interests we're relying on.  I

19   believe the paragraph on incrementalism comes at the end of

20   the argument in our opening brief.

21        We're not saying that incrementalism is an interest

22   that Congress could have relied on but, rather, we are

23   pointing out that courts have said that Congress is

24   justified that legislatures, that legislatures in general

25   are justified in approaching social issues one step at a

1      them.

2           **THE COURT:**  See, now, then you get to the status

3      quo which I understand; but the question is is the status

4      quo you are talking about the states running things or is it

5      a heterosexual marriage requirement?

6           **MR. SIMPSON:**  Again, the status quo from the

7      standpoint of the federal government is what the status quo

8      was before 1996, which is, for federal purposes, at that

9      time marriage was heterosexual marriage and --

10          **THE COURT:**  Because the state said so.

11          **MR. SIMPSON:**  True, because the state said so; but,

12     again, as the federal government saw, as Congress saw that

13     that was changing, Congress decided to keep that as a

14     federal status quo pursuant to DOMA.

15          Now, where the incrementalism comes in --

16          **THE COURT:**  On both sides of the argument.

17          **MR. SIMPSON:**  I wouldn't say that, Your Honor.

18          **THE COURT:**  All right.

19          **MR. SIMPSON:**  Again, the interests we are relying

20     on is that Congress could have stepped back and said, okay,

21     this is all changing in the states.  They're going to be

22     working on this question for a while.  It's going to be

23     unsettled for a while and so Congress could have said let's

24     step back and from a federal standpoint keep things the way

25     they are for now until as -- obviously Congress could decide

1  at some point to provide federal benefits to same-sex

2  spouses and same-sex couples.

3     And, in fact, in Congress right now there are bills

4  pending to provide certain federal benefits to the domestic

5  partners of federal employees.  So things, things could

6  change from the federal standpoint even as, as I said,

7  Congress was seeing that things were changing from the state

8  standpoint.

9     And so where the incrementalism comes in is that,

10  again, Congress could change that.  Congress could at some

11  point provide federal benefits.  And so where that ties in,

12  that ties into the argument to the fact that the Federal

13  Courts will allow legislatures to do that, to approach

14  social issues one step at a time instead of just changing

15  immediately for every one.

16     As the Supreme Court has said, Your Honor, the

17  states can serve as laboratories in our federal systems.

18  DOMA does leave each state free to experiment in the area of

19  same-sex marriage but we submit that that experimentation

20  should not compel, should not dictate how the federal

21  government applies federal laws.

22     My intent now, Your Honor, is to move on to the

23  level of review.

24     **THE COURT:**  Go ahead.

25     **MR. SIMPSON:**  Plaintiffs make I think -- I think I

1    am characterizing correctly that plaintiffs make three

2    arguments for heightened scrutiny here.

3         First they argue that DOMA intrudes into an area of

4    family law reserved to the states and for that reason should

5    be subject to heightened scrutiny.  We submit, in our view,

6    Your Honor, the plaintiffs here are asking the Court to

7    break new ground.

8         We don't believe there is any precedent for

9    applying any sort of heightened scrutiny to this kind of

10   claim.  Obviously there have been many times claims that

11   Congress is intruding into the areas of state concern.  But

12   what the courts ask when they're faced with that kind of

13   claim is they simply ask is what Congress has done here

14   within one of Congress's enumerated powers.

15        And we submit that the matters that are addressed

16   by DOMA, the meanings of terms used in federal statutes, the

17   expenditure of federal funds for federal programs, the

18   application of the Tax Code, we submit that those things are

19   within the enumerated powers of Congress.

20        And DOMA does not address who can marry or other

21   matters of family law that are reserved to the states.

22        Plaintiffs' second argument for heightened scrutiny

23   is that DOMA burdens the integrity of their families by --

24   and here, in finishing this sentence I have to step back a

25   little bit because I think in arguing this morning

1   plaintiffs' counsel said it a little bit different than it

2   is in their briefs.

3          In their briefs they talk about burdening the

4   integrity of their families by depriving their relationships

5   of, they used the term "social recognition," "respect" and a

6   few other terms.  This morning counsel has talked about

7   dignity and a feeling of security.

8          All of those things, Your Honor, although there is

9   a fundamental right to the integrity of the family unit, it

10  encompasses things more concrete than social recognition,

11  respect, dignity, a feeling of security --

12          **THE COURT:**  What is "it"?

13          **MR. SIMPSON:**  I'm sorry?

14          **THE COURT:**  What is "it"?

15          **MR. SIMPSON:**  The right to family integrity

16  recognized under the Constitution.

17          If you look at the case law on that right, it

18  encompasses things like the right of the family to remain

19  together, the right of parents to the care, custody and

20  control of children, the right, the right of familial

21  privacy.

22          Now, although we certainly admit that things like

23  social recognition, respect, dignity, a feeling of security,

24  those are important things.  We submit that there is no

25  precedent for making them constitutional rights and

```
 1      certainly not the fundamental rights.

 2              Also, again, we submit that DOMA does not affect

 3      any aspect of that recognized right to the integrity of the

 4      family unit.  It doesn't affect plaintiffs' marital

 5      status --

 6          THE COURT:  What is your position?  Do you

 7      recognize that there is a fundamental constitutionally

 8      protected right to the integrity of marriage as a broad

 9      proposition?  Is that --

10          MR. SIMPSON:  There is a fundamental -- there is a

11      recognized fundamental right to the integrity of the family

12      unit that encompasses certain things.

13          THE COURT:  Including marriage.

14          MR. SIMPSON:  I can't --

15          THE COURT:  It starts with the marriage; doesn't

16      it?

17          MR. SIMPSON:  I'm sorry?

18          THE COURT:  Is the basis for that right a system of

19      marriage that is approved by the states?

20          MR. SIMPSON:  Not that I have seen, Your Honor.

21      The cases that I have seen again talk about the right of the

22      family to remain together, the parental right to control

23      what happens to their children, the right of familial

24      privacy.

25              So, again, there is such a right; but what we are
```

1    saying is it doesn't encompass the less concrete things that

2    parent -- that plaintiffs are talking about here, the

3    dignity, the feeling of security.  I don't know of anything

4    in the case law that extends that right of familial

5    integrity to that kind of thing.

6           And in a sense, Your Honor, we would submit that

7    DOMA doesn't even affect directly the kind of dignity and

8    respect that the plaintiffs are talking about.  They can

9    still hold themselves out as married in social settings.

10   Only when they're applying, when you're looking at applying

11   federal law does DOMA come into play.

12          And, third, finally, Your Honor, plaintiffs argue

13   for heightened scrutiny because DOMA discriminates on the

14   basis of sexual orientation, which they say is a suspect

15   classification.

16          Obviously part of the dispute between the parties

17   here is how to read the decision of the First Circuit in

18   Cook versus Gates.  We submit that simply reading that

19   decision shows that the plaintiffs' argument that there's a

20   suspect classification here needs to be rejected.

21          We submit that the First Circuit in Cook squarely

22   addressed a contention that homosexuality is a suspect

23   classification requiring heightened scrutiny and squarely

24   rejected it.  And this Court would be bound by that

25   decision.

1          If I could read just a few sentences from that Cook

2    decision.  This is at top of page 61.  The court said,

3    "Under equal protection jurisprudence, a governmental

4    classification aimed at a suspect class is subject to

5    heightened judicial scrutiny.  Classifications that target

6    nonsuspect classes are subject only to rational basis

7    review.  The plaintiffs contend," the court said, "that the

8    district court erred by applying rational basis review."

9          Then the court went on to describe the plaintiff's

10   arguments.

11         Now, the court there, it is true, focused on Romer,

12   the Supreme Court's decision in Romer and Lawrence but that

13   is because that's what the plaintiffs were focusing on.  The

14   court said what it said and in a concluding offhand analysis

15   the court unequivocally said sexual orientation is, quote,

16   not a suspect class.

17         But in getting to that point, naturally the court

18   looked at the arguments that the plaintiffs were making and

19   they were focusing their arguments on Romer versus Lawrence

20   (sic) but that doesn't take away from the fact that the

21   First Circuit said again that sexual orientation is not a

22   suspect class.

23         And we submit that this is the whole -- this is our

24   response to the plaintiffs' motion for summary judgment,

25   because the Court of Appeals held that homosexuality is not

1    a suspect classification, plaintiffs are foreclosed from

2    trying to show that it is in relation to their motion for

3    summary judgment.

4          We submit it doesn't matter that the Court

5    didn't -- the court in Cook didn't get into the factors such

6    as whether the class has experienced a history of

7    discrimination.  The Court of Appeals in Cook apparently

8    found it unnecessary to get into all those factors.

9          And in our reply we cite several decisions, both

10   from the First Circuit and from this court, where the court

11   rejected arguments for a new suspect classification without

12   analyzing any of those factors.

13         If I could quote a sentence from plaintiffs' reply,

14   because I am going to say that we just don't see how they

15   can make this statement.  In their reply they say, "In no

16   case decided by" -- I'm sorry -- "cited by defendants for

17   support did the court actually resolve a claim for

18   heightened scrutiny in this manner."  That is, without

19   alluding to the factors.

20         Again, we submit that that is simply untrue.  If I

21   could quote just, I'm going to restrict this just to two of

22   the -- I believe we cited five or so decisions to this

23   effect, Your Honor, for the proposition that when the courts

24   are faced with new arguments for new suspect

25   classifications, they often reject them without analyzing

```
 1    the factors.
 2            We just quote the two, there are two decisions from
 3    the First Circuit that we cited for that proposition and I
 4    believe three in this court and let me just quote, if I
 5    could, the two First Circuit decisions.
 6            One of them was Beauchamp versus Murphy where the
 7    court said, "The classification here is between prison
 8    escapees and other fugitives and is far from any previously
 9    deemed suspect."
10            That was the extent of the court's analysis.
11            Then two sentences later the court said, "Since
12    there is no suspect classification here involved, nor any
13    deprivation of fundamental rights, the ordinary equal
14    protection test is extremely deferential."
15            And, again, so the court there didn't get into the
16    factors that plaintiffs are asking the court to analyze.
17            And in Rodriguez, another First Circuit case,
18    Rodriguez versus Secretary of Health, Education and Welfare,
19    the court said, "The challenged statutory provision creates
20    two relevant classifications among children born after a
21    parent becomes eligible for Social Security benefits."
22            And then a few sentences later the court said,
23    "Neither of these distinctions involves any inherently
24    suspect classification."
25            Again, no analysis of the factors there.
```

1          And I could quote, I won't go into them, but three

2     decisions from this court, from this district to the same

3     effect.

4          As these -- excuse me, Your Honor -- as these cases

5     illustrate --

6          **THE COURT:**  Do you want some water?

7          **MR. SIMPSON:**  Thank you, Your Honor.

8          (Pause in proceedings.)

9          **MR. SIMPSON:**  As these cases illustrate, Your

10    Honor, in holding that a previously unrecognized purported

11    suspect classification does not qualify as such, the courts

12    most often simply observe the fact that there is no

13    precedent to establish to say that that classification is

14    suspect.

15         So, again, the First Circuit found unnecessary in

16    Cook to analyze these factors and this court we submit is

17    bound to follow the First Circuit's decision in Cook that

18    homosexuality is not a suspect classification for purposes

19    of constitutional review.

20         Your Honor, that is our argument on the

21    constitutional arguments and the constitutional issues.

22         There are two other issues here.  There is an

23    argument by the plaintiffs, statutory argument regarding the

24    Federal Employees Health Benefits Act and there is an issue

25    regarding plaintiff Dean Hara's standing.  I notice that

 1    plaintiffs' counsel did not get into those.

 2         THE COURT:  What is the position of -- let's see if

 3    we can clear that up.

 4         Does the plaintiff have a position with respect

 5    to -- there you are.  I am sorry.  I was looking for you

 6    behind him.

 7         The dismissed OPM as a defendant, there is an issue

 8    as to whether there is standing to pursue a claim for

 9    Federal Employees Health Benefits because that should be in

10    the Federal Circuit.

11         MS. BONAUTO:  Yes, we do have a position, Your

12    Honor.

13         THE COURT:  What is it?  I mean, the Federal

14    Circuit has put a stay on it.

15         MS. BONAUTO:  Yes.  Did you want to hear from me at

16    this point, Your Honor?

17         THE COURT:  You brought it up.  Do you mind --

18         MR. SIMPSON:  I could argue it or we could let the

19    plaintiffs go first.  Again, I think there are two issues.

20         The one the Court just referred to is a standing

21    issue regarding the division between, jurisdiction between

22    this court and the Federal Circuit and the other one is a

23    statutory -- is an issue of statutory construction.

24         THE COURT:  Well, go ahead with your presentation.

25         MR. SIMPSON:  Okay.  Certainly, Your Honor,

1    certainly.

2         The first issue, again, is an issue of statutory

3    construction.  And we submit that this is relating to the

4    interpretation of a provision in the Federal Employees

5    Health Benefits Act.

6         And we submit that plaintiffs' claim boils down to

7    this:  Do the broad legislative goals of a statute, in this

8    case the FEHB, the Federal Employees Health Benefits Act, do

9    the broad legislative goals as construed by the plaintiffs

10   override the plain language of the statute?  That's the way

11   we see it.

12        Plaintiffs seek coverage for their same-sex spouses

13   under self and family enrollment in the FEHB.  Pursuant to

14   OPM's regulations, an enrollment for self and family covers

15   all "family members" who are eligible.  And the statute says

16   that "member of family" means the spouse of an employee or

17   annuitant or an unmarried dependent child.

18        And, of course, DOMA defines "spouse" as meaning a

19   husband or wife of the opposite sex.

20        Now, again, aside, this is aside from the

21   constitutional issues, plaintiffs I think don't, I think

22   don't have a quarrel with what I just said about what the

23   regulations and the statutes say.  What they're relying on

24   is what they call the broad goals of the FEHB and the fact

25   that the word "includes" appears in the legislative history

1    of the FEHB.

2          Your Honor, I like to avoid using the word

3    "obviously" in legal argument but I think it's merited here.

4    Obviously one's understanding of the legislative -- the

5    goals of the statute legislatively and the fact that the

6    verb "includes" appears in the legislative history of the

7    FEHB, that cannot override what the statute clearly says.

8          Plaintiffs don't actually say anything in their

9    final brief in their reply about this claim, that may

10   indicate something about how they feel about it.  They don't

11   say anything about it besides just resting on their prior

12   memorandum.

13         To quote a phrase from the First Circuit, Your

14   Honor, the court said, "Legislative history does not trump

15   an ambiguous statutory text."  And that's our position on

16   the statutory interpretation claim.

17         To address the standing issue, as the Court has

18   said, it involves plaintiff Dean Hara's standing to seek

19   enrollment in the FEHB in this action.  And as I said, this

20   claim involves the division of labor between the U.S.

21   District Courts and the Federal Circuit.

22         Mr. Hara complains to this court that he has been

23   denied enrollment in the FEHB as a survivor annuitant.  One

24   of the eligibilities for enrollment in the FEHB as a

25   survivor annuitant is to be -- as a surviving spouse is to

1    be a federal annuitant.  And to become a federal annuitant,

2    one makes application to the Office of Personnel Management.

3           And Congress has established one route to seek

4    review of a decision by OPM denying a federal annuity and

5    that is through petition to the Merits System Protection

6    Board and then judicial review before the Federal Circuit.

7    And that is the exclusive avenue.

8           Mr. Hara has sought an annuity from OPM and it was

9    denied.  He petitioned for review by the MSPB and the Board

10   concluded, among other things, that Mr. Hara was not

11   eligible for a survivor annuity because of DOMA.

12          He then sought judicial review in the Federal

13   Circuit and that petition is now pending but there has still

14   not been a determination by the Federal Circuit which is the

15   only court that can make the determination.  There has still

16   not been any determination that Mr. Hara is eligible for an

17   annuity.

18          So for this reason, Your Honor, we suggest that a

19   decision by this Court regarding DOMA would not redress

20   Mr. Hara's inability to enroll in the FEHB because there

21   would still be the issue of is he a surviver annuitant.  And

22   that is something that the Federal Circuit has to declare.

23          Also if this Court were to enter a judgment that

24   Mr. Hara is entitled to enrollment in the FEHB, that would

25   impliedly determine his underlying status as a federal

1    annuitant and we believe that would thus violate the Federal

2    Circuit's exclusive jurisdiction to determine that status as

3    a federal annuitant.

4          Plaintiffs make essentially two arguments in

5    response to this in their briefs.  First that OPM

6    purportedly abandoned administratively its position that

7    Mr. Hara cannot be enrolled in the FEHB because he's not an

8    annuitant.  OPM respectfully disagrees with that

9    interpretation of its reconsideration decision.  And we

10   submit that OPM should be the best judge of what its own

11   reconsideration decision means.

12         Besides, the decision quotes the regulations to the

13   effect that an employee's FEHB enrollment terminates at

14   death unless the employee leaves a family member who is,

15   "entitled to continue enrollment as a survivor annuitant."

16         Thus, the reason I read that, obviously, is that to

17   that effect, to that extent, the OPM's decision did refer to

18   the requirement to be an annuitant.

19         And, lastly, plaintiffs' second argument on this is

20   that OPM did not appeal from the MSPB's decision regarding

21   Mr. Hara's entitlement to an annuity.  And they say that,

22   thus, OPM can no longer raise the annuitant issue before the

23   Federal Circuit.

24         But our response to that is that OPM does not have

25   to appeal to assert that issue as an alternative ground for

1    the affirmance of the MSPB's decision that rejected his

2    request for an annuity.

3              In any event, Your Honor, it strike us that both of

4    these arguments that they're using on this claim are really

5    issues that should be presented to the Federal Circuit

6    because they go to what OPM should be able to argue or not

7    in the Federal Circuit.

8              Your Honor, to go back to something I started at

9    the beginning, and to conclude, I will say again that this

10   Presidential Administration disagrees with DOMA as a matter

11   of policy.  It would like to see it repealed.  But that does

12   not affect the statute's constitutionality.

13             We believe it is constitutional, that it is

14   rationally related to legitimate governmental interests and

15   we urge this Court so to hold.

16             **THE COURT:**  Okay.  Thank you.

17             **MR. SIMPSON:**  Thank you.

18             **THE COURT:**  Do you want to follow up on that?

19             **MS. BONAUTO:**  May I, Your Honor?

20             **THE COURT:**  Yes, go ahead.  Just a couple of

21   minutes.

22             **MS. BONAUTO:**  Yes.

23             (Pause in proceedings.)

24             **MS. BONAUTO:**  Thank you, Your Honor.

25             Turning first to the statutory construction

1   argument.  If I may, we have made an argument in our motion

2   for summary judgment that the FEHB statute can be construed

3   to provide benefits.

4        And, Your Honor, the issue may be obvious to

5   Mr. Simpson but it wasn't obvious to Chief Judge Kozinski in

6   the Ninth Circuit who made a ruling in a case called In Re:

7   Golinski where he was dealing with a Ninth Circuit staff

8   attorney who had married in California and sought health and

9   other benefits for her spouse.

10       As the administrator, or whatever it's called in

11  that case, he ruled that the statute was susceptible to a

12  different construction and that the term in 8901(5) which

13  Mr. Simpson referred to was meant essentially to be a floor

14  and not a ceiling so that a spouse had to be covered, a

15  child under age 22 had to be covered, but that there was no

16  reason the statute couldn't also cover other individuals.

17       And that's why we put in our briefing that the

18  purpose, the very purpose of the program is to provide

19  protections and health insurance to a member of an

20  employee's immediate family.

21       So you still have a situation, as I mentioned

22  earlier, where Nancy Gill has been with the Post Office for

23  over 20 years.  She has been married since 2004.  She still

24  can't provide health insurance to her immediate family

25  despite the intent of what the statutes were.

1          And, Your Honor, I have a copy of that decision if

2     that would be of good assistance to the Court.

3          **THE COURT:**  Just give us the cite.

4          **MS. BONAUTO:**  Very good.

5          With respect to the issues with respect to

6     Mr. Hara's standing, I do want to point out that Mr. Hara

7     has also brought a Social Security claim so there is no

8     reason he should be dismissed from the case entirely.  In

9     fact, we think he should not be dismissed from the case at

10    all.

11         The issue that is pending, the only issue that is

12    pending really about -- let me start again.

13         With respect to health insurance and with respect

14    to the survivor annuity, the only remaining issue is the

15    constitutionality of DOMA.  This Court has clear

16    jurisdiction over the Federal Employee Health Benefits

17    Statute.

18         Now, it is true that in order to avail himself of

19    insurance under that statute Mr. Hara first has to be an

20    eligible annuitant under the survivor benefits.  We submit,

21    Your Honor, that that issue has, in fact, been resolved by

22    the Federal Circuit.  In fact, the only issue pending before

23    the Federal Circuit is the constitutionality of DOMA and it

24    has stayed its hand in deference to this Court's

25    proceedings.

1          And I say all this, Your Honor, because what

2     happened at the MSPB is that Chief Judge Boulden of that

3     court determined that there was no requirement that former

4     Representative Studds make an election because under DOMA he

5     wasn't married so he had no election to make.  He had failed

6     to elect.  There was simply nothing that he could do.  He

7     couldn't elect.  He couldn't elect the reduced annuity that

8     would have provided a survivor benefit to his spouse Dean

9     Hara.

10         And, further, Judge Boulden ruled that if it was an

11    election requirement, then Representative Studds was deemed

12    to have made it because the evidence of intent, both from

13    live witnesses and from recorded statements of

14    Representative Studds, the evidence was overwhelming that it

15    was his intent to provide not only the annuity but health

16    insurance.

17         So, Your Honor, what happened with respect to

18    health insurance in this case is that Mr. Hara made a

19    request for health insurance.  OPM denied it and they denied

20    it on two grounds:  The annuity ground and the failure to

21    elect under the FEHB statute.

22         Mr. Hara wrote back and said here's a copy of the

23    MSPB decision.  As you can see, Judge Boulden found that

24    there was no duty to elect the survivor annuity; there

25    should be no duty to elect here either.  DOMA bars, barred

1    my former spouse from being able to elect anything and Judge

2    Boulden found that my former spouse wanted to provide all

3    these benefits to me.

4         At that point OPM issued a reconsidered decision.

5    And in that reconsidered decision it stated the grounds.

6    It's true it quoted a reg saying here's the applicable law

7    but they say, "We have no record or documentation of

8    Mr. Studds making an open season enrollment decision to

9    change his self only election to self and family election at

10   any time during open enrollment."

11        It actually says a little bit more than that.

12        "Therefore, because Mr. Studds was not enrolled in

13   the FEHBP Family Plan at the time of his death, you are not

14   eligible to enroll for health benefits coverage under his

15   health plan as a survivor annuitant."

16        Your Honor, the OPM did withdraw the annuitant

17   basis for denying Mr. Hara the health benefits.  They have

18   withdrawn it.  The only thing the Court can rely on is what

19   the agency has said in its decision as a grounds.  And

20   that's what we have here.  We think they have withdrawn the

21   annuity and then, in any event, the MSPB has already

22   conclusively determined that the election issues have been

23   satisfied.

24        So that all that remains before this Court is the

25   constitutionality of DOMA.

 1              Does that clarify it, Your Honor?

 2          **THE COURT:**  I think so.

 3          **MS. BONAUTO:**  Okay.  Does Your Honor want to hear

 4     anything in response to Mr. Simpson's argument?

 5          **THE COURT:**  Well, I don't want you to reargue the

 6     case.

 7          **MS. BONAUTO:**  No, definitely not.

 8          **THE COURT:**  You can have two, two minutes or so, if

 9     you think that --

10          **MS. BONAUTO:**  That's fine, Your Honor.

11          **THE COURT:**  Okay.

12          **MS. BONAUTO:**  Let me just say with respect to the

13     issue, one of the issues that you asked Mr. Simpson about,

14     where is the authority stating that it is states that

15     determine marital status and the federal government shall

16     rely on that.

17              In our briefing, in the summary judgment briefing,

18     document 28, page 13, there are ample quotes from the

19     Supreme Court about how this whole issue of family law and

20     domestic relations belongs to the law of the states and not

21     of the United States.

22              Secondly, you asked about statutes that direct

23     agencies to look to state law.  Among others, Your Honor, is

24     the Social Security Act itself which Section 416(h), a

25     section called "Determination of Family Status" particularly

1    states that in determining whether or not somebody is a

2    husband, wife, widow or widower, you look to what the courts

3    of the state would say about whether that couple was validly

4    married.  And there is no doubt what the courts of

5    Massachusetts would say.

6            Your Honor, with respect to the issue of it being

7    too burdensome to treat marriages of same-sex couples

8    equally because of changes and fluidity, I would just say

9    that we are on summary judgment and we have seen no evidence

10   from the government on this point.

11           Moreover, Your Honor, as this is a common sense

12   matter, DOMA makes it more burdensome for agencies to

13   administer the law because all they used to ask is are you

14   married under state law or not.  Now they have to ask a

15   second question:  Are you married under state law and what

16   are your genders?

17           So there is no basis at all to conclude that it's

18   easier now for agencies with DOMA.  And we would submit it

19   was -- it is an entirely implausible reason.

20           I will leave it at that, Your Honor.  Thank you

21   very much.

22           **THE COURT:**  Do you want the last word?

23           **MR. SIMPSON:**  Could I just have a couple of

24   minutes, please?

25           **THE COURT:**  Go ahead.

1              **MR. SIMPSON:**  Just three points, if I could.

2          On Dean Hara's standing, this isn't a question,

3    Your Honor, of whether an issue has been resolved.  It is a

4    question of authority, jurisdiction to declare status.  And

5    we submit that it is only the Federal Circuit that has the

6    authority to declare that Mr. Hara has the status as a

7    federal annuitant.

8          Moving to the second point, Ms. Bonauto quoted a

9    provision in the Social Security Act.  I think it's pretty

10   obvious that DOMA is a later enacted statute.  DOMA

11   obviously would have to have been seen -- be seen as having

12   impliedly overruled that provision to that effect.

13         And one final point, Your Honor.  Plaintiffs have

14   said that we haven't submitted evidence.  We -- they have

15   moved on a motion for summary judgment.  We have submitted a

16   motion to dismiss.  And if I could quote one sentence from

17   the Supreme Court's decision in Heller versus Doe -- this is

18   describing what rational basis review is.

19         It said that in that case the government moreover,

20   "Moreover has no obligation to produce evidence to sustain

21   the rationality of a statutory classification."

22         Thank you, Your Honor.

23         **THE COURT:**  Okay.  That is it?

24         Let me say this case has been very well presented

25   by both sides, very professionally done.  The briefing and

1     the oral arguments have been particularly helpful.  And I

2     will do the best I can with it and you will hear from me,

3     okay.

4             Thank you very much.  Very, very fine presentation.

5             Anything else?

6             Zita, is that it?

7             **THE CLERK:**  That is it.

8             **THE COURT:**  Okay.  Bye bye everybody.

9             **THE CLERK:**  All rise for the Honorable Court.

10            (WHEREUPON, the proceedings were recessed at 12:55

11            p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


      I, Carol Lynn Scott, Official Court Reporter for

the United States District Court for the District of

Massachusetts, do hereby certify that the foregoing pages

are a true and accurate transcription of my shorthand notes

taken in the aforementioned matter to the best of my skill

and ability.



      /S/CAROL LYNN SCOTT


_____

      CAROL LYNN SCOTT
     Official Court Reporter
   John J. Moakley Courthouse
  1 Courthouse Way, Suite 7204
   Boston, Massachusetts 02210
      (617) 330-1377


**DATE:** May 18, 2010