UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NANCY GILL & MARCELLE LETOURNEAU, et al., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 09-10309-JLT |
| | * | |
| OFFICE OF PERSONNEL MANAGEMENT, et al., | * | |
| | * | |
| | * | |
| Defendants. | * | |
| | * | |

MEMORANDUM

July 8, 2010

TAURO, J.

I.      Introduction

This action presents a challenge to the constitutionality of Section 3 of the Defense of

Marriage Act[1] as applied to Plaintiffs, who are seven same-sex couples married in Massachusetts

and three survivors of same-sex spouses, also married in Massachusetts.[2]  Specifically, Plaintiffs

contend that, due to the operation of Section 3 of the Defense of Marriage Act, they have been

denied certain federal marriage-based benefits that are available to similarly-situated heterosexual

---

[1] 1 U.S.C. § 7.

[2] Defendants in this action are the Office of Personnel Management; the United States Postal Service; John E. Potter, in his official capacity as the Postmaster General of the United States of America; Michael J. Astrue, in his official capacity as the Commissioner of the Social Security Administration; Eric H. Holder, Jr., in his individual capacity as the United States Attorney General; and the United States of America.  Hereinafter, this court collectively refers to the Defendants as "the government."

couples, in violation of the equal protection principles embodied in the Due Process Clause of the Fifth Amendment.[3]  Because this court agrees, <u>Defendants' Motion to Dismiss</u> [#20] is DENIED and <u>Plaintiffs' Motion for Summary Judgment</u> [#25] is ALLOWED, except with regard to Plaintiff Dean Hara's claim for enrollment in the Federal Employees Health Benefits Plan, as he lacks standing to pursue that claim in this court.

II.    <u>Background</u>[4]

      A.    <u>The Defense of Marriage Act</u>

In 1996, Congress enacted, and President Clinton signed into law, the Defense of Marriage Act ("DOMA").[5]  At issue in this case is Section 3 of DOMA, which defines the terms "marriage" and "spouse," for purposes of federal law, to include only the union of one man and one woman.  In particular, it provides that:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or wife.[6]

> In large part, the enactment of DOMA can be understood as a direct legislative response

---

    [3]Though the Fifth Amendment to the United States Constitution does not contain an Equal Protection Clause, as the Fourteenth Amendment does, the Fifth Amendment's Due Process Clause includes an Equal Protection component.  <u>See</u> <u>Bolling v. Sharpe</u>, 347 U.S. 497, 499 (1954).

    [4]In the companion case of <u>Commonwealth of Mass. v. Dep't of Health and Human Servs., et al.</u>, No. 09-cv-11156-JLT (D.Mass. July 8, 2010) (Tauro, J.) this court holds that the Defense of Marriage Act is additionally rendered unconstitutional by operation of the Tenth Amendment and the Spending Clause.

    [5]Pub. L. No. 104-199, 110 Stat. 2419 (1996).

    [6]1 U.S.C. § 7.

to <u>Baehr v. Lewin</u>,[7] a 1993 decision issued by the Hawaii Supreme Court, which indicated that same-sex couples might be entitled to marry under the state's constitution.[8]  That decision raised the possibility, for the first time, that same-sex couples could begin to obtain state-sanctioned marriage licenses.[9]

The House Judiciary Committee's Report on DOMA (the "House Report")  referenced the <u>Baehr</u> decision as the beginning of an "orchestrated legal assault being waged against traditional heterosexual marriage," and expressed concern that this development "threaten[ed] to have very real consequences . . . on federal law."[10]  Specifically, the Report warned that "a redefinition of marriage in Hawaii to include homosexual couples could make such couples eligible for a whole range of federal rights and benefits."[11]

And so, in response to the Hawaii Supreme Court's decision, Congress sought a means to both "preserve[] each State's ability to decide" what should constitute a marriage under its own laws and to "lay[] down clear rules" regarding what constitutes a marriage for purposes of federal law.[12]

---

[7]852 P.2d 44 (Haw. 1993).

[8]<u>See</u> <u>id</u>. at 59-67.

[9]Notably, the <u>Baehr</u> decision did not carry the day in Hawaii.  Rather, Hawaii ultimately amended its constitution to allow the state legislature to limit marriage to opposite-sex couples.  <u>See</u> HAW. CONST. art. I, § 23. However, five other states and the District of Columbia now extend full marriage rights to same-sex couples.  These five states are Iowa, New Hampshire, Connecticut, Vermont, and Massachusetts, where Plaintiffs reside.

[10]Aff. of Gary D. Buseck, Ex. D, H.R. Rep. No. 104-664 at 2-3 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2906-07 ("H. Rep.") [hereinafter "House Report"].

[11]<u>Id.</u> at 10.

[12]<u>Id.</u> at 2.

3

In enacting Section 2 of DOMA,[13] Congress permitted the states to decline to give effect to the laws of other states respecting same-sex marriage.  In so doing, Congress relied on its "express grant of authority," under the second sentence of the Constitution's Full Faith and Credit Clause, "to prescribe the effect that public acts, records, and proceedings from one State shall have in sister States."[14] With regard to Section 3 of DOMA, the House Report explained that the statute codifies the definition of marriage set forth in "the standard law dictionary," for purposes of federal law.[15]

The House Report acknowledged that federalism constrained Congress' power, and that "[t]he determination of who may marry in the United States is uniquely a function of state law."[16] Nonetheless, it asserted that Congress was not "supportive of (or even indifferent to) the notion of same-sex 'marriage,'"[17] and, therefore, embraced DOMA as a step toward furthering Congress's interests in "defend[ing] the institution of traditional heterosexual marriage."[18]

The House Report further justified the enactment of DOMA as a means to "encourag[e] responsible procreation and child-rearing," conserve scarce resources,[19] and reflect Congress'

---

[13]Section 2 of DOMA provides that "[n]o State...shall be required to give effect to any public act, record, or judicial proceeding of any other State...respecting a relationship between persons of the same sex that is treated as a marriage under the laws of such other State."

[14]Id. at 25.

[15]Id. at 29. (citing BLACK'S LAW DICTIONARY 972 (6th ed. 1990)).

[16]Id. at 3.

[17]Id. at 12.

[18]Id.

[19]Id. at 13, 18.

"moral disapproval of homosexuality, and a moral conviction that heterosexuality better comports

with traditional (especially Judeo-Christian) morality."[20]  In one unambiguous expression of these

objectives, Representative Henry Hyde, then-Chairman of the House Judiciary Committee, stated

that "[m]ost people do not approve of homosexual conduct . . . and they express their

disapprobation through the law."[21]

In the floor debate, members of Congress repeatedly voiced their disapproval of

homosexuality, calling it "immoral," "depraved," "unnatural," "based on perversion" and "an

attack upon God's principles."[22] They argued that marriage by gays and lesbians would "demean"

and "trivialize" heterosexual marriage[23] and might indeed be "the final blow to the American

family."[24]

Although DOMA drastically amended the eligibility criteria for a vast number of different

federal benefits, rights, and privileges that depend upon marital status, the relevant committees did

---

[20]Id. at 16 (footnote omitted).

[21]142 CONG. REC. H7480 (daily ed. July 12, 1996).

[22]142 CONG. REC. H7444 (daily ed. July 11, 1996) (statement of Rep. Coburn); 142 CONG. REC. H7486 (daily ed. July 12, 1996) (statement of Rep. Buyer); Id. at H7494 (statement of Rep. Smith).

[23]Id. at H7494 (statement of Rep. Smith); see also 142 CONG. REC. S10, 110 (daily ed. Sept. 10, 1996) (statement of Sen. Helms) ("[Those opposed to DOMA] are demanding that homosexuality be considered as just another lifestyle–these are the people who seek to force their agenda upon the vast majority of Americans who reject the homosexual lifestyle... Homosexuals and lesbians boast that they are close to realizing their goal–legitimizing their behavior....  At the heart of this debate is the moral and spiritual survival of this Nation."); 142 CONG. REC. H7275 (daily ed. July 11, 1996) (statement of Rep. Barr) (stating that marriage is "under direct assault by the homosexual extremists all across this country").

[24]Id. at H7276 (statement of Rep. Largent); see also 142 CONG. REC. H7495 (daily ed. July 12, 1996) (statement of Rep. Lipinski) ("Allowing for gay marriages would be the final straw, it would devalue the love between a man and a woman and weaken us as a Nation.").

not engage in a meaningful examination of the scope or effect of the law. For example, Congress did not hear testimony from agency heads regarding how DOMA would affect federal programs. Nor was there testimony from historians, economists, or specialists in family or child welfare. Instead, the House Report simply observed that the terms "marriage" and "spouse" appeared hundreds of times in various federal laws and regulations, and that those terms were defined, prior to DOMA, only by reference to each state's marital status determinations.[25]

In January 1997, the General Accounting Office issued a report clarifying the scope of DOMA's effect.  It concluded that DOMA implicated at least 1,049 federal laws, including those related to entitlement programs, such as Social Security, health benefits and taxation, which are at issue in this action.[26]  A follow-up study conducted in 2004 found that 1,138 federal laws tied benefits, protections, rights, or responsibilities to marital status.[27]

B.      The Federal Programs Implicated in This Action

Prior to filing this action, each Plaintiff, or his or her spouse, made at least one request to the appropriate federal agency or authority for treatment as a married couple, spouse, or widower with respect to particular federal benefits available to married individuals.  But each request was denied.   In denying Plaintiffs access to these benefits, the government agencies responsible for administering the relevant programs all invoked DOMA's mandate that the federal government recognize only those marriages between one man and one woman.

---

[25]House Report at 10-11.

[26]Aff. of Gary D. Buseck, Ex. A, Report of the U.S. General Accounting Office, Office of General Counsel, January 31, 1997 (GAO/OGC-97-16).

[27]U.S. Gov. Accountability Office, GAO-04-353R Defense of Marriage Act (2004), *available at* http://www.gao.gov/new.items/d04353r.pdf.

1.      Health Benefits Based on Federal Employment

Plaintiffs' allegations in this case encompass three federal health benefits programs: the Federal Employees Health Benefits Program (the "FEHB"), the Federal Employees Dental and Vision Insurance Program (the "FEDVIP"), and the federal Flexible Spending Arrangement program.

Plaintiff Nancy Gill, an employee of the United States Postal Service, seeks to add her spouse, Marcelle Letourneau, as a beneficiary under Ms. Gill's existing self and family enrollment in the FEHB, to add Ms. Letourneau to FEDVIP, and to use her flexible spending account for Ms. Letourneau's medical expenses.

Plaintiff Martin Koski, a former employee of the Social Security Administration, seeks to change his "self only" enrollment in the FEHB to "self and family" enrollment in order to provide coverage for his spouse, James Fitzgerald.  And Plaintiff Dean Hara seeks enrollment in the FEHB as the survivor of his spouse, former Representative Gerry Studds.

A.      Federal Employees Health Benefits Program

The FEHB is a comprehensive program of health insurance for federal civilian employees,[28] annuitants, former spouses of employees and annuitants, and their family members.[29] The program was created by the Federal Employees Health Benefits Act, which established (1) the eligibility requirements for enrollment, (2) the types of plans and benefits to be provided, and (3) the qualifications that private insurance carriers must meet in order to offer coverage under

---

[28]"Employee" is defined as including a Member of Congress. 5 U.S.C. § 8901(1)(B).

[29]5 U.S.C. § 8905.

7

the program.[30]

The Office of Personnel Management ("OPM") administers the FEHB and is empowered to negotiate contracts with potential carriers, as well as to set the premiums for each plan.[31]  OPM also prescribes regulations necessary to carry out the program, including those setting forth "the time at which and the manner and conditions under which an employee is eligible to enroll,"[32] as well as "the beginning and ending dates of coverage of employees, annuitants, members of their families, and former spouses."[33] Both the government and the enrollees contribute to the payment of insurance premiums associated with FEHB coverage.[34]

An enrollee in the FEHB chooses the carrier and plan in which to enroll, and decides whether to enroll for individual, i.e. "self only," coverage or for "self and family" coverage.[35] Under OPM's regulations, "[a]n enrollment for self and family includes all family members who are eligible to be covered by the enrollment."[36] For the purposes of the FEHB statute, a "member of family" is defined as either "the spouse of an employee or annuitant [or] an unmarried dependent child under 22 years of age...."[37]  An employee enrolled in the FEHB for "self only" coverage may change to "self and family" coverage by submitting documentation to the

---

[30]Id. §§ 8901-8914.

[31]Id. §§ 8902, 8903, 8906.

[32]Id. § 8913.

[33]Id.

[34]Id. § 8906.

[35]Id. §§ 8905, 8906.

[36]5 C.F.R. § 890.302(a)(1).

[37]Id. § 8901(5).

employing office during an annual "open season," or within sixty days after a change in family status, "including a change in marital status."[38]

An "annuitant" eligible for coverage under the FEHB is, generally speaking, either an employee who retires on a federal annuity, or "a member of a family who receives an immediate annuity as the survivor of an employee...or of a retired employee...."[39]  To be covered under the FEHB, anyone who is not a current federal employee, or the family member of a current employee, must be eligible for a federal annuity, either as a former employee or as the survivor of an employee or former employee.  When a federal employee or annuitant dies under "self and family" enrollment in FEHB, the enrollment is "transferred automatically to his or her eligible survivor annuitants."[40]

> B.      Federal Employees Dental and Vision Insurance Program ("FEDVIP")

The Federal Employees Dental and Vision Insurance Program provides enhanced dental and vision coverage to federal civilian employees, annuitants, and their family members, in order to supplement health insurance coverage provided by the FEHB.[41]  The program was created by the Federal Employee Dental and Vision Benefits Enhancement Act of 2004,[42] and, as with the FEHB generally, FEDVIP is administered by OPM, which contracts with qualified companies and

---

[38]See 5 U.S.C. § 8905(f); 5 C.F.R. § 890.301(f), (g).

[39]See 5 U.S.C. § 8901(3)(B).

[40]5 C.F.R. § 890.303(c).

[41]5 U.S.C. §§ 8951, 8952, 8981, 8982.

[42]Id. §§ 8951, 8954, 8981, 8984.

9

sets the premiums associated with coverage.[43] OPM is also authorized to "prescribe regulations to carry out" this program.[44]

Persons enrolled in FEDVIP pay the full amount of the premiums,[45] choose the plan in which to enroll, and decide whether to enroll for "self only," "self plus one," or "self and family" coverage.[46] Under the associated regulations, an enrollment for "self and family "covers the enrolled employee or annuitant and all eligible family members."[47] An employee enrolled in FEDVIP for "self only" coverage may change to "self and family" coverage during an annual "open season" or within 60 days after a "qualifying life event," including marriage or "acquiring an eligible child."[48] The terms "annuitant" and "member of family" are defined in the same manner for the purposes of the FEDVIP as they are for the FEHB more generally.[49]

C.       Flexible Spending Arrangement Program[50]

A Flexible Spending Arrangement ("FSA") allows federal employees to set aside a portion of their earnings for certain types of out-of-pocket health care expenses.  The money withheld in

---

[43]Id. §§ 8952(a), 8953, 8982(a), 8983.

[44]Id. §§ 8962(a), 8992(a).

[45]Id. §§ 8958(a), 8988(a).

[46]Id. §§ 8956(a), 8986(a); see 5 C.F.R. § 894.201(b).

[47]Id. § 894.201(c).

[48]Id. 894.509(a), (b).

[49]See 5 U.S.C. §§ 8951(2), 8991(2).

[50]Plaintiffs' First Amended and Supplemental Complaint refers to the "Federal Flexible Spending Account Program".  Compl. ¶ 401. Although OPM and the Internal Revenue Service have occasionally used that term, the term now used by both agencies is "Flexible Spending Arrangement." The term "HCFSA" used by the plaintiffs means "health care flexible spending arrangement."  Id. ¶¶ 401, 410-12.

an FSA is not subject to income taxes.[51] OPM established the federal Flexible Spending

Arrangement program in 2003.[52]  This program does not apply, however, to "[c]ertain executive

branch agencies with independent compensation authority," such as the United States Postal

Service, which established its own flexible benefits plan prior to the creation of the FSA.[53]

2.     <u>Social Security Benefits</u>

The Social Security Act ("Act") provides, among other things, Retirement

and Survivors' Benefits to eligible persons. The Act is administered by the Social Security

Administration, which is headed by the Commissioner of Social Security.[54] The Commissioner has

the authority to "make rules and regulations and to establish procedures, not inconsistent with the

[pertinent] provisions of [the Social Security Act], which are necessary or appropriate to carry

out such provisions."[55]

A number of the plaintiffs in this action seek certain Social Security Benefits under the

Act, based on marriage to a same-sex spouse.  Specifically, Jo Ann Whitehead seeks Retirement

Insurance Benefits based on the earnings record of her spouse, Bette Jo Green.  Three of the

Plaintiffs, Dean Hara, Randell Lewis-Kendell, and Herbert Burtis, seek Lump-Sum Death Benefits

based on their marriages to same-sex spouses who are now deceased.  And Plaintiff Herbert

---

[51]26 U.S.C. § 125.

[52]<u>See</u> 71 Fed. Reg. 66,827 (Nov. 17, 2006).

[53]<u>Id.</u>; <u>see</u> 68 Fed. Reg. 56,525 (Oct. 1, 2003).  Because Plaintiff Gill works for the United State Postal Service, her claim with regard to her FSA is asserted only against the Postal Service and not against OPM.

[54]42 U.S.C. §§ 901, 902.

[55]<u>Id.</u> § 405(a); <u>see</u> <u>id.</u> § 902(a)(5).

11

Burtis seeks Widower's Insurance Benefits.

### A.    Retirement Benefits

The amount of Social Security Retirement Benefits to which a person is entitled depends on an individual's lifetime earnings in employment or self-employment.[56] In addition to seeking Social Security Retirement Benefits based on one's own earnings, an individual may claim benefits based on the earnings of a spouse, if the claimant "is not entitled to old-age . . . insurance benefits [on his or her own account], or is entitled to old-age . . . insurance benefits based on a primary insurance amount which is less than one-half of the primary insurance amount of [his or her spouse]."[57]

### B.    Social Security Survivor Benefits

The Act also provides certain benefits to the surviving spouse of a deceased wage earner. This action implicates two such types of Survivor Benefits, the Lump-Sum Death Benefit and the Widower's Insurance Benefit.[58]

### i.    Lump-Sum Death Benefit

The Lump-Sum Death Benefit is available to the surviving widow or widower of an individual who had adequate lifetime earnings from employment or self-employment.[59] The amount of the benefit is the lesser of $255 or an amount determined based on a formula involving

---

[56]Id. §§ 402, 413(a), 414, 415.

[57]Id. § 402(b), (c).

[58]The Social Security Act also provides for a Widow's Insurance Benefit, see 42 U.S.C. § 402(e), but only the Widower's Insurance Benefit is implicated here because the only plaintiff who seeks such benefits herein is Herbert Burtis, a male.

[59]Id. §§ 402(I), 413(a), 414(a), (b).

the individual's lifetime earnings.[60]

### ii.     Widower's Insurance Benefit

The Widower's Insurance Benefit is available to the surviving husband of an individual

who had adequate lifetime earnings from employment or self-employment.[61] The claimant, with a

few limited exceptions, must not have "married" since the death of the individual, must have

attained the age set forth in the statute, and must be either (1) ineligible for old-age insurance

benefits on his own account or (2) entitled to old-age insurance benefits "each of which is less

than the primary insurance amount" of his deceased spouse.[62]

### 3.     Filing Status Under the Internal Revenue Code

Lastly, a number of Plaintiffs in this case seek the ability to file federal income taxes jointly

with their spouses.  The amount of income tax imposed on an individual under the Internal

Revenue Code depends in part on the taxpayer's "filing status."  In accordance with the income

tax scheme utilized by the federal government, a "married individual . . . who makes a single [tax]

return jointly with his spouse" is generally subject to a lower tax than an "unmarried individual" or

a "head of household."[63] "[I]f an individual has filed a separate return for a taxable year for which

a joint return could have been made by him and his spouse," the couple may file a joint return

---

[60]Id. §§ 402(I), 415(a).

[61]Id. §§ 402(f), 413(a), 414(a), (b).

[62]Id. § 402(f)(1); see id. § 402(f)(3).

[63]26 U.S.C. § 1(a), (b), (c); see id. § 6013(a) ("A husband and wife may make a single
return jointly of income taxes . . . even though one of the spouses has neither gross income nor
deductions [subject to certain exceptions].").

within three years after the filing of the original returns.[64] Should the amended return call for a

lower tax due than the original return, the taxpayer may also file an administrative request for a

refund of the difference.[65]

III.    Discussion

    A.    Summary Judgment

    Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment shall be granted

where there is no genuine issue as to any material fact and the moving party is entitled to

judgment as a matter of law.[66]  In granting a summary judgment motion, the court "must

scrutinize the record in the light most favorable to the summary judgment loser and draw all

reasonable inferences therefrom to that party's behoof."[67]  Because the Parties do not dispute the

material facts relevant to the questions raised by this action, it is appropriate for this court to

dispose of the issues as a matter of law.[68]

    B.    Plaintiff Dean Hara's Standing to Pursue his Claim for Health Benefits

    As a preliminary matter, this court addresses the government's assertion that Plaintiff

Dean Hara lacks standing to pursue his claim for enrollment in the FEHB, as a survivor annuitant,

in this court.

---

[64] Id. § 6013(b)(1), (2).

[65] Id. § 6511(a); see 26 C.F.R. § 301.6402-2(a)(1).

[66] Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008).

[67] Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005).

[68] This court notes that Defendants' Motion to Dismiss [#20] is also currently pending.
Because there are no material facts in dispute and Defendants' Motion to Dismiss turns on the
same purely legal question as the pending Motion for Summary Judgment, this court finds it
appropriate, as a matter of judicial economy, to address the two motions simultaneously.

"The irreducible constitutional minimum of standing contains three requirements. First and foremost, there must be alleged (and ultimately proven) an injury in fact.... Second, there must be causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability–a likelihood that the requested relief will redress the alleged injury."[69] Where the plaintiff lacks standing to pursue his claim, the court, in turn, lacks subject matter jurisdiction over the dispute.[70] At issue here is the question of redressability.

A surviving spouse can enroll in the FEHB program only if he or she is declared eligible to receive a survivor annuity under federal retirement laws.[71] Such eligibility is a matter determined initially by OPM,[72] subject to review by the Merit Systems Review Board, and finally subject to the *exclusive* judicial review of the United States Court of Appeals for the Federal Circuit.[73]

Prior to this action, Mr. Hara sought to enroll in the FEHB as a survivor annuitant based on his deceased spouse's federal employment. OPM found Mr. Hara ineligible for a survivor annuity both on initial review and on reconsideration. Mr. Hara appealed that decision to the Merit Systems Review Board, which affirmed OPM's denial. And currently, Mr. Hara's appeal of

---

[69]Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998) (internal citations omitted).

[70]FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990).

[71]5 U.S.C. § 8905(b).

[72]5 U.S.C. § 8347(b).

[73]See 5 U.S.C. § 7703(b)(1); 28 U.S.C. § 1295(a)(9); see also Lindahl v. OPM, 470 U.S. 768, 775, 791-99 (1985).

15

the Merit Systems Review Board's decision is pending before the Federal Circuit.[74]

Accordingly, the government asserts that a ruling in this court cannot redress Mr. Hara's inability

to enroll in the FEHB as an annuitant, because the Federal Circuit has yet to resolve his appeal of

the Merit Systems Review Board's decision, which affirmed OPM's finding adverse to Mr. Hara.

And so the government maintains that, if Mr. Hara has not been declared eligible for a survivor

annuity, he will remain ineligible for FEHB enrollment, regardless of the outcome of this

proceeding.  This court agrees.

Plaintiffs arguments to the contrary are unavailing.  First, Plaintiffs argue that, in basing its

decision on reconsideration explicitly on the finding that Mr. Hara's spouse failed to elect self and

family FEHB coverage prior to his death, OPM effectively conceded Mr. Hara's status as an

annuitant for purposes of appeal to the Federal Circuit.  But, regardless of the grounds upon

which OPM rested its decision, the fact remains that Mr. Hara applied for an annuity, and the

agency which has authority over such matters denied his claim.

Because the Federal Circuit has not held differently, this court must accept OPM's

determination, affirmed by the Merit Systems Review Board, that Mr. Hara is ineligible to receive

a survivor annuity pursuant to the FEHB statute.  And if he is ineligible to receive a survivor

annuity, then he cannot enroll in the FEHB program, notwithstanding this court's finding that

Section 3 of DOMA as applied to Plaintiffs violates principles of equal protection.

Second, Plaintiffs argue that, because OPM did not file a cross-appeal to the Federal

Circuit, it is estopped from raising the issue of whether Mr. Hara is an "annuitant" on appeal and,

therefore, Mr. Hara's eligibility for a survivor annuity turns solely on the constitutionality of

---

[74]The appeal, however, has been stayed pending the outcome of this action.

DOMA.  This argument stems from the fact that, unlike OPM, the Merit Systems Review Board deemed Mr. Hara's spouse to have made the requisite "self and family" benefits election prior to his death, based on unrebutted evidence of his intent.

The Merit Systems Review Board affirmed OPM's decision that Mr. Hara is ineligible for a survivor annuity only because DOMA precluded federal recognition of Mr. Hara's same-sex marriage.  Plaintiffs therefore contend that, as a matter of judicial economy, it makes sense for this court to render a decision on Mr. Hara's claim, because the pending appeal in the Federal Circuit ultimately turns on the precise legal question at issue here, the constitutionality of DOMA.

Though this court is empathetic to Plaintiffs' argument, identity of issues does not confer standing.  The question of standing is one of jurisdiction, not one of efficiency.[75]  So if this court cannot redress Mr. Hara's injury, it is without *power* to hear his claim.  Based on this court's reading of the Merit Systems Review Board's decision, Plaintiffs are correct that Mr. Hara will be rendered eligible for a survivor annuity if the question of DOMA's constitutionality is resolved in his favor.  But that question, as it pertains to Mr. Hara, must be answered by the Federal Circuit.  Accordingly, a decision by this court cannot redress Mr. Hara's injury and, therefore, this court is without power to hear his claim.

C.    The FEHB Statute

In the alternative to the constitutional claims analyzed below, Plaintiffs assert that, notwithstanding DOMA, the FEHB statute confers on OPM the discretion to extend health benefits to same-sex spouses.  In support of this argument, Plaintiffs contend that the terms "family members" and "members of family" as used in the FEHB statute set a floor, but not a

---

[75]See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-03 (1998) (internal citations omitted).

ceiling, to coverage eligibility. Plaintiffs assert, therefore, that OPM may, in its discretion, consider same-sex spouses to be eligible "family members" for purposes of distributing health benefits. To arrive at this interpretation of the FEHB statute, Plaintiffs rely on associated regulations which state that an "enrollment for self and family *includes* all family members who are eligible to be covered by the enrollment."[76]

A basic tenet of statutory construction teaches that "where the plain language of a statute is clear, it governs."[77] Under the circumstances presented here, this basic tenet readily resolves the issue of interpretation before this court. The FEHB statute unambiguously proclaims that "'member of family' *means* the spouse of an employee or annuitant [or] an unmarried dependent child under 22 years of age."[78] And "[w]here, as here, Congress defines what a particular term 'means,' that definition controls to the exclusion of any meaning that is not explicitly stated in the definition."[79]

In other words, through the plain language of the FEHB statute, Congress has clearly limited coverage of family members to spouses and unmarried dependent children under 22 years of age. And DOMA, with similar clarity, defines the word "spouse," for purposes of determining the meaning of *any* Act of Congress, as "a person of the opposite sex who is a husband or wife."[80] In the face of such strikingly unambiguous statutory language to the contrary, this court cannot

---

[76] 5 C.F.R. § 890.302(a)(1) (emphasis added).

[77] One Nat'l Bank v. Antonellis, 80 F.3d 606, 615 (1st Cir. 1996).

[78] 5 U.S.C. § 8901(5) (emphasis added).

[79] United States v. Roberson, 459 F.3d 39, 53 (1st Cir. 2006).

[80] 1 U.S.C. § 7.

plausibly interpret the FEHB statute to confer on OPM the discretion to provide health benefits to same-sex couples, notwithstanding DOMA.[81]

Having reached this conclusion, the analysis turns to the central question raised by Plaintiffs' Complaint, namely whether Section 3 of DOMA as applied to Plaintiffs[82] violates constitutional principles of equal protection.

> D.    Equal Protection of the Laws

"[T]he Constitution 'neither knows nor tolerates classes among citizens.'"[83] It is with this fundamental principle in mind that equal protection jurisprudence takes on "governmental classifications that 'affect some groups of citizens differently than others.'"[84] And it is because of this "commitment to the law's neutrality where the rights of persons are at stake"[85] that legislative provisions which arbitrarily or irrationally create discrete classes cannot withstand constitutional

---

[81]Accord In re Brad Levenson, 560 F.3d 1145, 1150 (9th Cir. 2009) (Reinhardt, J.); but see, In re Karen Golinski, 587 F.3d 956, 963 (9th cir. 2009) (Kozinski, C.J.). This court also takes note of Plaintiffs' argument that the FEHB statute should not be read to exclude same-sex couples as a matter of constitutional avoidance.  The doctrine of constitutional avoidance counsels that "between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative." United States v. Dwinells, 508 F.3d 63, 70 (1st Cir. 2007).  Because this court has concluded that there is but one plausible construction of the FEHB statute, the doctrine of constitutional avoidance has no place in the analysis.

[82]In the remainder of this Memorandum, this court uses the term "DOMA" as a shorthand for "Section 3 of DOMA as applied to Plaintiffs."

[83]Romer v. Evans, 517 U.S. 620, 623 (1996) (quoting Plessy v. Ferguson, 163 U.S. 537, 559 (1896) (Harlan, J. dissenting)).

[84]Engquist v. Or. Dep't of Agric., 553 U.S. 591, ___, 128 S. Ct. 2146, 2152 (2008) (quoting McGowan v. Maryland, 366 U.S. 420, 425 (1961)).

[85]Romer, 517 U.S. at 623.

scrutiny.[86]

To say that all citizens are entitled to equal protection of the laws is "essentially a direction [to the government] that all persons similarly situated should be treated alike."[87]  But courts remain cognizant of the fact that "the promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons."[88]  And so, in an attempt to reconcile the promise of equal protection with the reality of lawmaking, courts apply strict scrutiny, the most searching of constitutional inquiries, only to those laws that burden a fundamental right or target a suspect class.[89]  A law that does neither will be upheld if it merely survives the rational basis inquiry–if it bears a rational relationship to a legitimate government interest.[90]

Plaintiffs present three arguments as to why this court should apply strict scrutiny in its review of DOMA, namely that:

•   DOMA marks a stark and anomalous departure from the respect and recognition that the federal government has historically afforded to state marital status determinations;

---

[86]Id.

[87]City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)).

[88]Romer, 517 U.S. at 631 (citing Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 271-72 (1979); F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)).

[89]Id.

[90]Id. (citing Heller v. Doe, 509 U.S. 312, 319-320 (1993)).  This constitutional standard of review is alternately referred to as the rational relationship test or the rational basis inquiry.

- • DOMA burdens Plaintiffs' fundamental right to maintain the integrity of their existing family relationships, and;

- • The law should consider homosexuals, the class of persons targeted by DOMA, to be a suspect class.

This court need not address these arguments, however, because DOMA fails to pass constitutional muster even under the highly deferential rational basis test. As set forth in detail below, this court is convinced that "there exists no fairly conceivable set of facts that could ground a rational relationship"[91] between DOMA and a legitimate government objective. DOMA, therefore, violates core constitutional principles of equal protection.

      1.    The Rational Basis Inquiry

This analysis must begin with recognition of the fact that rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."[92] A "classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity...[and] courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends."[93] Indeed, a court applying rational basis review may go so far as to hypothesize about potential motivations of the legislature, in order to find a legitimate government interest sufficient to justify the challenged provision.[94]

---

[91]Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir. 2005) (internal citation omitted).

[92]Heller v. Doe, 509 U.S. 312, 319-20 (1993) (internal citations omitted).

[93]Id. (internal citations omitted).

[94]Shaw v. Oregon Public Employees' Retirement Bd., 887 F.2d 947, 948-49 (9th Cir. 1989) (internal quotation omitted).

Nonetheless, "the standard by which legislation such as [DOMA] must be judged is not a toothless one."[95]  "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [courts] insist on knowing the relation between the classification adopted and the object to be attained."[96]  In other words, a challenged law can only survive this constitutional inquiry if it is "narrow enough in scope and grounded in a sufficient factual context for [the court] to ascertain some relation between the classification and the purpose it serve[s]."[97]  Courts thereby "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."[98]

Importantly, the objective served by the law must be not only a proper arena for government action, but also properly cognizable by the governmental body responsible for the law in question.[99]  And the classification created in furtherance of this objective "must find some footing in the realities of the subject addressed by the legislation."[100]  That is to say, the constitution will not tolerate government reliance "on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."[101]  As such, a law

---

[95]Matthews v. de Castro, 429 U.S. 181, 185 (1976) (internal quotation omitted).

[96]Romer, 517 U.S. at 633.

[97]Id.

[98]Id. (citing Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 181 (1980) (Stevens, J., concurring) ("If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect.").

[99]Bd. Of Trs. Of the Univ. of Ala. v. Garrett, 531 U.S. 356, 366 (2001) (quoting City of Cleburne, 473 U.S. at 441).

[100]Heller v. Doe, 509 U.S. 312, 321 (1993).

[101]City of Cleburne, 473 U.S. at 447.

must fail rational basis review where the "purported justifications...[make] no sense in light of how the [government] treated other groups similarly situated in relevant respects."[102]

       2.   <u>Congress' Asserted Objectives</u>

The House Report identifies four interests which Congress sought to advance through the enactment of DOMA: (1) encouraging responsible procreation and child-bearing, (2) defending and nurturing the institution of traditional heterosexual marriage, (3) defending traditional notions of morality, and (4) preserving scarce resources.[103]  For purposes of this litigation, the government has disavowed Congress's stated justifications for the statute and, therefore, they are addressed below only briefly.

But the fact that the government has distanced itself from Congress' previously asserted reasons for DOMA does not render them utterly irrelevant to the equal protection analysis.  As this court noted above, even in the context of a deferential rational basis inquiry, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."[104]

This court can readily dispose of the notion that denying federal recognition to same-sex marriages might encourage responsible procreation, because the government concedes that this objective bears no rational relationship to the operation of DOMA.[105]  Since the enactment of DOMA, a consensus has developed among the medical, psychological, and social welfare

---

[102]<u>Garrett</u>, 531 U.S. at 366 n.4 (citing <u>City of Cleburne</u>, 473 U.S. at 447-450).

[103]House Report at 12-18.

[104]<u>City of Cleburne</u>, 473 U.S. at 446.

[105]<u>See</u> Def.'s Mem. Supp. Mot. Dismiss, 19 n. 10.

communities that children raised by gay and lesbian parents are just as likely to be well-adjusted as those raised by heterosexual parents.[106]  But even if Congress believed at the time of DOMA's passage that children had the best chance at success if raised jointly by their biological mothers and fathers, a desire to encourage heterosexual couples to procreate and rear their own children more responsibly would not provide a rational basis for denying federal recognition to same-sex marriages.  Such denial does nothing to promote stability in heterosexual parenting.  Rather, it "prevent[s] children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure,"[107] when afforded equal recognition under federal law.

Moreover, an interest in encouraging responsible procreation plainly cannot provide a rational basis upon which to exclude same-sex marriages from federal recognition because, as Justice Scalia pointed out in his dissent to Lawrence v. Texas, the ability to procreate is not now, nor has it ever been, a precondition to marriage in any state in the country.[108]  Indeed, "the sterile

---

[106]Def.'s Mem. Supp. Mot. Dismiss, 19 n. 10 (citing American Academy of Pediatrics, Committee on Psychosocial Aspects of Child and Family Health, *Coparent or second-parent adoption by same-sex parents*, 109 PEDIATRICS 339 (2002), *available at* http://aappolicy.aappublications.org/cgi/content/full/pediatrics; American Psychological Association, *Policy Statement on Lesbian and Gay Parents*, http://www.apa.org/about/governance/council/policy/parenting.aspx; American Academy of Child & Adolescent Psychiatry, *Gay, Lesbian, Bisexual, or Transgender Parents Policy Statement* http://www.aacap.org/cs/root/policy_statements/gay_lesbian_transgender_and_bisexual_parents_ policy_statement; American Medical Association, *AMA Policy Regarding Sexual Orientation*, http://www.ama-assn.org/ama/pub/about-ama/our-people/member-groups-sections/glbt-advisory-committee/ama-policy-regarding-sexual-orientation.shtml; Child Welfare League of America,*Position Statement on Parenting of Children by Lesbian, Gay, and Bisexual Adults*, http://www.cwla.org/programs/culture/glbtqposition.htm).

[107]Goodridge v. Dep't of Public Health, 440 Mass. 309, 335 (2003).

[108]See Lawrence v. Texas, 539 U.S. 558, 605 (2003) (Scalia, J., dissenting).

and the elderly" have never been denied the right to marry by any of the fifty states.[109] And the federal government has never considered denying recognition to marriage based on an ability or inability to procreate.

Similarly, Congress' asserted interest in defending and nurturing heterosexual marriage is not "grounded in sufficient factual context [for this court] to ascertain some relation" between it and the classification DOMA effects.[110] To begin with, this court notes that DOMA cannot possibly encourage Plaintiffs to marry members of the opposite sex because Plaintiffs are *already* married to members of the same sex.  But more generally, this court cannot discern a means by which the federal government's denial of benefits to same-sex spouses might encourage homosexual people to marry members of the opposite sex.[111]  And denying marriage-based benefits to same-sex spouses certainly bears no reasonable relation to any interest the government might have in making heterosexual marriages more secure.

What remains, therefore, is the possibility that Congress sought to deny recognition to same-sex marriages in order to make heterosexual marriage appear more valuable or desirable. But to the extent that this was the goal, Congress has achieved it "*only* by punishing same-sex couples who exercise their rights under state law."[112]  And this the Constitution does not permit. "For if the constitutional conception of 'equal protection of the laws' means anything, it must at

---

[109]Id.

[110]Romer, 517 U.S. at 632-33.

[111]Accord In re Brad Levenson, 560 F.3d 1145, 1150 (9th Cir. Jud. Council 2009) (Reinhardt, J.).

[112]Id.

the very least mean"[113] that the Constitution will not abide such "a bare congressional desire to harm a politically unpopular group."[114]

Neither does the Constitution allow Congress to sustain DOMA by reference to the objective of defending traditional notions of morality.  As the Supreme Court made abundantly clear in <u>Lawrence v. Texas</u> and <u>Romer v. Evans</u>, "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law...."[115]

And finally, Congress attempted to justify DOMA by asserting its interest in the preservation of scarce government resources.  While this court recognizes that conserving the public fisc can be a legitimate government interest,[116] "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources."[117] This court can discern no principled reason to cut government expenditures at the particular expense of

---

[113]<u>United States Dep't of Agric. v. Moreno</u>, 413 U.S. 528, 534 (1973).

[114]<u>Moreno</u>, 413 U.S. at 534 (1973); <u>see also</u>, <u>Lawrence</u> 539 U.S. at 571, 578 (suggesting that the government cannot justify discrimination against same-sex couples based on traditional notions of morality alone).

[115]<u>Lawrence</u>, 539 U.S. at 577 (quoting <u>Bowers v. Hardwick</u>, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting)).

[116]This court notes that, though Congress paid lip service to the preservation of resources as a rationale for DOMA, such financial considerations did not actually motivate the law.  In fact, the House rejected a proposed amendment to DOMA that would have required a budgetary analysis of DOMA's impact prior to passage.  <u>See</u> 142 CONG. REC. H7503-05 (daily ed. July 12, 1996).  Furthermore, the Congressional Budget Office concluded in 2004 that federal recognition of same-sex marriages by all fifty states would actually result in a net *increase* in federal revenue. <u>See</u> Buseck Aff., Ex. C at 1, Cong. Budget Office, The Potential Budgetary Impact of Recognizing Same-Sex Marriages.

[117]<u>Plyler v. Doe</u>, 457 U.S. 202, 227 (1982) (quoting <u>Graham v. Richardson</u>, 403 U.S. 365, 374-75 (1971)).

Plaintiffs, apart from Congress' desire to express its disapprobation of same-sex marriage.  And "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable [by the government]" are decidedly impermissible bases upon which to ground a legislative classification.[118]

### 3.    Objectives Now Proffered for Purposes of Litigation

Because the rationales asserted by Congress in support of the enactment of DOMA are either improper or without relation to DOMA's operation, this court next turns to the potential justifications for DOMA that the government now proffers for the purposes of this litigation.

In essence, the government argues that the Constitution permitted Congress to enact DOMA as a means to preserve the "status quo," pending the resolution of a socially contentious debate taking place in the states over whether to sanction same-sex marriage.  Had Congress not done so, the argument continues, the definitions of "marriage" and "spouse" under federal law would have changed along with each alteration in the status of same-sex marriage in any given state because, prior to DOMA, federal law simply incorporated each state's marital status determinations.  And, therefore, Congress could reasonably have concluded that DOMA was necessary to ensure consistency in the distribution of federal marriage-based benefits.

In addition, the government asserts that DOMA exhibits the type of incremental response to a new social problem which Congress may constitutionally employ in the face of a changing socio-political landscape.

---

[118]City of Cleburne, 473 U.S. at 448.

For the reasons set forth below, this court finds that, as with Congress' prior asserted rationales, the government's current justifications for DOMA fail to ground a rational relationship between the classification employed and a legitimate governmental objective.

To begin, the government claims that the Constitution permitted Congress to wait for the heated debate over same-sex marriage in the states to come to some resolution before formulating an enduring policy at the national level.  But this assertion merely begs the more pertinent question: whether the federal government had any proper role to play in formulating such policy in the first instance.

There can be no dispute that the subject of domestic relations is the exclusive province of the states.[119]  And the powers to establish eligibility requirements for marriage, as well as to issue determinations of martial status, lie at the very core of such domestic relations law.[120]  The government therefore concedes, as it must, that Congress does not have the authority to place restrictions on the states' power to issue marriage licenses.  And indeed, as the government aptly points out, DOMA refrains from directly doing so.  Nonetheless, the government's argument assumes that Congress has some interest in a uniform definition of marriage for purposes of determining federal rights, benefits, and privileges.  There is  no such interest.[121]  "The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be

---

[119]See, e.g., Elk Grove United Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting In re Burrus, 136 U.S. 586, 593 (1890)); Commonwealth of Mass. v. Dep't of Health and Human Servs., et al., No. 09-cv-11156-JLT (D.Mass. July 8, 2010) (Tauro, J.).

[120]See Ankenbrandt v. Richards, 504 U.S. 689, 716 (1992) (Blackmun, J., concurring).

[121]See, generally, Commonwealth of Mass. v. Dep't of Health and Human Servs., et al., No. 09-cv-11156-JLT (D.Mass. July 8, 2010) (Tauro, J.).

determined by state, rather than federal law.  This is especially true where a statute deals with a familiar relationship [because] there is no federal law of domestic relations."[122]

This conclusion is further bolstered by an examination of the federal government's historical treatment of state marital status determinations.[123]  Marital eligibility for heterosexual couples has varied from state to state throughout the course of history.  Indeed, pursuant to the sovereign power over family law granted to the states by virtue of the federalist system, as well as the states' well-established right to "experiment[] and exercis[e] their own judgment in an area to which States lay claim by right of history and expertise,"[124] individual states have changed their marital eligibility requirements in myriad ways over time.[125]  And yet the federal government has fully embraced these variations and inconsistencies in state marriage laws by recognizing as valid for federal purposes any heterosexual marriage which has been declared valid pursuant to state law.[126]

---

[122]DeSylva v. Ballentine, 351 U.S. 570, 580 (1956) (internal citation omitted).

[123]This court addresses the federal government's historical treatment of state marital status determinations at length in the companion case of Commonwealth of Mass. v. Dep't of Health and Human Servs., et al., No. 09-cv-11156-JLT (D.Mass. July 8, 2010) (Tauro, J.).

[124]United States v. Lopez, 514 U.S. 549, 580-83 (1995) (Kennedy, J., concurring).

[125]See, e.g., Michael Grossberg, *Guarding the Altar: Physiological Restrictions and the Rise of State Intervention in Matrimony*, 26 Amer. J. of Legal Hist. 197, 197-200 (1982).

[126]See, e.g., Dunn v.Comm'r of Internal Revenue, 70 T.C. 361, 366 (1978) ("recognizing that whether an individual is 'married' is, for purposes of the tax laws, to be determined by the law of the State of the marital domicile"); 5 C.F.R. § 843.102 (defining "spouse" for purposes of federal employee benefits by reference to State law); 42 U.S.C. § 416(h)(1)(A)(i) (defining an "applicant" for purposes of Social Security survivor and death benefits as "the wife, husband, widow or widower" of an insured person "if the courts of the State" of the deceased's domicile "would find such an applicant and such insured individual were validly married"); 20 C.F.R. § 404.345 (Social Security) ("If you and the insured were validly married under State law at the time you apply for . . . benefits, the relationship requirement will be met."); 38 U.S.C. § 103(c) (Veterans' benefits); 20 C.F.R. § 10.415 (Workers' Compensation); 45 C.F.R. § 237.50(b)(3)

By way of one pointed example, so-called miscegenation statutes began to fall, state by state, beginning in 1948.  But no fewer than sixteen states maintained such laws as of 1967 when the Supreme Court finally declared that prohibitions on interracial marriage violated the core constitutional guarantees of equal protection and due process.[127]  Nevertheless, throughout the evolution of the stateside debate over interracial marriage, the federal government saw fit to rely on state marital status determinations when they were relevant to federal law.

The government suggests that the issue of same-sex marriage is qualitatively different than any historical state-by-state debate as to who should be allowed to marry because, though other such issues have indeed arisen in the past, "none had become a topic of great debate in numerous states with such fluidity."[128]  This court, however, cannot lend credence to the government's unsupported assertion in this regard, particularly in light of the lengthy and contentious state-by-state debate that took place over the propriety of interracial marriage not so very long ago.[129]

Importantly, the passage of DOMA marks the *first* time that the federal government has ever attempted to legislatively mandate a uniform federal definition of marriage–or any other core concept of domestic relations, for that matter.  This is so, notwithstanding the occurrence of other

---

(Public Assistance); 29 C.F.R. §§ 825.122 and 825.800 (Family Medical Leave Act); 20 C.F.R. §§ 219.30 and 222.11 (Railroad Retirement Board); 38 C.F.R. § 3.1(j) (Veterans' Pension and Compensation). Indeed, the only federal statute other than DOMA, of which this court is aware, that denies federal recognition to *any* state-sanctioned marriages is another provision that targets same-sex couples, regarding burial in veterans' cemeteries, enacted in 1975. See 38 U.S.C. § 101(31).

[127]See Loving v. Virginia, 388 U.S. 1, 6 n.5, 12 (1967).

[128]Def.'s Reply Mem., 14.

[129]See NANCY COTT, PUBLIC VOWS 163 (2000).

similarly politically-charged, protracted, and fluid debates at the state level as to who should be permitted to marry.[130]

Though not dispositive of a statute's constitutionality in and of itself, "a longstanding history of related federal action . . . can nonetheless be 'helpful in reviewing the substance of a congressional statutory scheme,' and, in particular, the reasonableness of the relation between the new statute and pre-existing federal interests."[131]   And the *absence* of precedent for the legislative classification at issue here is equally instructive, for "'discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the [C]onstitution[]....'"[132]

The government is certainly correct in its assertion that the scope of a federal program is generally determined with reference to federal law.  But the historically entrenched practice of incorporating state law determinations of marital status where they are relevant to federal law

---

[130]Congress has contemplated regulating the marital relationship a number of times in the past, but always by way of proposed constitutional amendments, rather than legislation.  And none of these proposed constitutional amendments have ever succeeded in garnering enough support to come to a vote in either the House or the Senate.  See Edward Stein, *Past and Present Proposed Amendments to the United States Constitution Regarding Marriage*, 82 WASH. U. L. Q. 611, 614-15 (2004).  It is worthy of note that Congress' resort to constitutional amendment when it has previously considered wading into the area of domestic relations appears to be a tacit acknowledgment that, indeed, regulation of familial relationships lies beyond the bounds of its legislative powers.  See id at 620 (internal citations omitted) ("Advocates for nationwide changes to marriage laws typically consider amending the Constitution in part because of the widely-accepted view that, in the United States, for the most part, family law is state law.... Although the process of passing a law is much easier than amending the Constitution, a law may still be found unconstitutional.  Advocates of federal marriage laws are worried that such laws would be in tension with the thesis that family law is state law and for this reason would be found unconstitutional. Reaching marriage laws by amending the Constitution sidesteps this tension.").

[131]United States v. Comstock, 176 L. Ed. 2d 878, 892 (2010) (internal citations omitted).

[132]Romer, 517 U.S. at 633 (quoting Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 37-38 (1928)).

reflects a long-recognized reality of the federalist system under which this country operates. The states alone have the authority to set forth eligibility requirements as to familial relationships and the federal government cannot, therefore, have a legitimate interest in disregarding those family status determinations properly made by the states.[133]

Moreover, in order to give any meaning to the government's notion of preserving the status quo, one must first identify, with some precision, the relevant status quo to be preserved. The government has claimed that Congress could have had an interest in adhering to federal policy regarding the recognition of marriages as it existed in 1996. And this may very well be true. But even assuming that Congress could have had such an interest, the government's assertion that pursuit of this interest provides a justification for DOMA relies on a conspicuous misconception of what the status quo was *at the federal level* in 1996.

The states alone are empowered to determine who is eligible to marry and, as of 1996, no state had extended such eligibility to same-sex couples. In 1996, therefore, it was indeed the status quo *at the state level* to restrict the definition of marriage to the union of one man and one woman. But, the status quo *at the federal level* was to recognize, for federal purposes, any marriage declared valid according to state law. Thus, Congress' enactment of a provision denying federal recognition to a particular category of valid state-sanctioned marriages was, in fact, a significant *departure* from the status quo at the federal level.

Furthermore, this court seriously questions whether it may even consider preservation of the status quo to be an "interest" independent of some legitimate governmental objective that preservation of the status quo might help to achieve. Staying the course is not an end in and of

---

[133]See, generally, Commonwealth of Mass. v. Dep't of Health and Human Servs., et al., No. 09-cv-11156-JLT (D.Mass. July 8, 2010).

itself, but rather a means to an end.  Even assuming for the sake of argument that DOMA

succeeded in preserving the federal status quo, which this court has concluded that it did not, such

assumption does nothing more than describe what DOMA does.  It does not provide a

justification for doing it.  This court does not doubt that Congress occasionally encounters social

problems best dealt with by preserving the status quo or adjusting national policy incrementally.[134]

But to assume that such a congressional response  is appropriate requires a predicate assumption

that there indeed exists a "problem" with which Congress must grapple.[135]

The only "problem" that the government suggests DOMA might address is that of state-

to-state inconsistencies in the distribution of federal marriage-based benefits.  But the

classification that DOMA effects does not bear any rational relationship to this asserted interest in

---

[134]The government asserts, without explaining, that DOMA exhibits legislative
incrementalism.  As Plaintiffs aptly point out, it is unclear how this is so.  DOMA, by its language,
permanently and sweepingly excludes same-sex married couples from recognition for all federal
purposes.

[135]Indeed, the cases cited by the government support this court's interpretation of the
incrementalist approach as a means by which to achieve a legitimate government objective and not
an objective in and of itself.  See, e.g., Medeiros v. Vincent, 431 F.3d 25, 31-32 (1st Cir. 2005)
(upholding regulation of lobster fishing method, notwithstanding differential treatment of other
fishing methods, to ameliorate problem of overfishing); Butler v. Apfel, 144 F.3d 622, 625 (9th
Cir. 1998) (upholding denial of Social Security benefits to incarcerated felons to conserve welfare
resources, notwithstanding different treatment of other institutionalized groups because these
groups are different in relevant respects); Massachusetts v. EPA, 549 U.S. 497, 524 (2007)
(noting that a massive problem, such as global change, is not generally resolved at once but rather
with "reform" moving one step at a time, addressing what seems "most acute to the legislative
mind"); SEC v. Chenery Corp., 332 U.S. 194, 202 (1947) (addressing need for regulatory
flexibility to address "specialized problems which arise"); Nat'l Parks Conserv. Ass'n. v. Norton,
324 F.3d 1229, 1245 (11th Cir. 2003) (preserving status quo by allowing leaseholders of stilted
structures on national park land to continue to live in structures to extend their leases for a limited
period of time served legitimate interest in ensuring that structures were maintained pending
development of planning process); Teigen v. Renfrow, 511 F.3d 1072, 1084-85 (10th Cir. 2007)
(preserving status quo by not promoting employees involved in active litigation against
government employer served government's legitimate interest in avoiding courses of action that
might negatively impact its prospects of success in the litigation).

consistency.  Decidedly, DOMA does not provide for nationwide consistency in the distribution of federal benefits among married couples.  Rather it denies to same-sex married couples the federal marriage-based benefits that similarly situated heterosexual couples enjoy.

And even within the narrower class of heterosexual married couples, this court cannot apprehend any rational relationship between DOMA and the goal of nationwide consistency.  As noted above, eligibility requirements for heterosexual marriage vary by state, but the federal government nonetheless recognizes any heterosexual marriage, which a couple has validly entered pursuant to the laws of the state that issued the license.  For example, a thirteen year-old female and a fourteen year-old male, who have the consent of their parents, can obtain a valid marriage license in the state of New Hampshire.[136]  Though this court knows of no other state in the country that would sanction such a marriage, the federal government recognizes it as valid simply because New Hampshire has declared it to be so.

More importantly, however, the pursuit of consistency in the distribution of federal marriage-based benefits can only constitute a legitimate government objective if there exists a relevant characteristic by which to distinguish those who are entitled to receive benefits from those who are not.[137]  And, notably, there is a readily discernible and eminently relevant characteristic on which to base such a distinction: *marital status*.  Congress, by premising eligibility for these benefits on marriage in the first instance, has already made the determination that married people make up a class of similarly-situated individuals, different in relevant respects

---

[136]RSA 457:4-5.

[137]City of Cleburne, 473 U.S. at 439 (explaining that equal protection of the laws is "essentially a direction [to the government] that all persons similarly situated should be treated alike") (internal citation omitted).

from the class of non-married people.  Cast in this light, the claim that the federal government

may also have an interest in treating all same-sex couples alike, whether married or unmarried,

plainly cannot withstand constitutional scrutiny.[138]

Similarly unavailing is the government's related assertion that "Congress could reasonably

have concluded that federal agencies should not have to deal immediately with [the administrative

burden presented by] a changing patchwork of state approaches to same-sex marriage"[139] in

distributing federal marriage-based benefits.  Federal agencies are not burdened with the

administrative task of implementing changing state marriage laws–that is a job for the states

themselves.  Rather, federal agencies merely distribute federal marriage-based benefits to those

couples that have already obtained state-sanctioned marriage licenses.  That task does not become

more administratively complex simply because some of those couples are of the same sex.  Nor

does it become more complex simply because some of the couples applying for marriage-based

benefits were previously ineligible to marry.  Every heterosexual couple that obtains a marriage

license was at some point ineligible to marry due to the varied age restrictions placed on marriage

by each state.  Yet the federal administrative system finds itself adequately equipped to

accommodate their changed status.

In fact, as Plaintiffs suggest, DOMA seems to inject complexity into an otherwise

straightforward administrative task by sundering the class of state-sanctioned marriages into two,

those that are valid for federal purposes and those that are not.  As such, this court finds the

---

[138]See Garrett, 531 U.S. at 366 n.4 (finding that a law failed rational basis review where
the "purported justifications...made no sense in light of how the [government] treated other
groups similarly situated").

[139]Def.'s Mem. Opp. Summ. Judg., 16.

suggestion of potential administrative burden in distributing marriage-based benefits to be an utterly unpersuasive excuse for the classification created by DOMA.

Lastly, even if DOMA succeeded in creating consistency in the distribution of federal marriage-based benefits, which this court has concluded that it does not, DOMA's comprehensive sweep across the entire body of federal law is so far removed from that discrete goal that this court finds it impossible to credit the proffered justification of consistency as the motivating force for the statute's enactment.[140]

The federal definitions of "marriage" and "spouse," as set forth by DOMA, are incorporated into at least 1,138 different federal laws, many of which implicate rights and privileges far beyond the realm of pecuniary benefits.[141] For example, persons who are considered married for purposes of federal law enjoy the right to sponsor their non-citizen spouses for naturalization,[142] as well as to obtain conditional permanent residency for those spouses pending naturalization.[143]  Similarly, the Family and Medical Leave Act ("FMLA") entitles federal employees, who are considered married for federal purposes, to twelve weeks of unpaid leave in order to care for a spouse who has a serious health condition or because of any qualifying exigency arising out of the fact that a spouse is on active military duty.[144]  But because DOMA

---

[140]See Romer, 517 U.S. at 635 (rejecting proffered rationale for state constitutional amendment because "[t]he breadth of the Amendment is so far removed from these particular justifications that we find it impossible to credit them.").

[141]See U.S. Gov. Accountability Office, GAO-04-353R Defense of Marriage Act (2004), *available at* http://www.gao.gov/new.items/d04353r.pdf.

[142]8 U.S.C. § 1430.

[143]8 U.S.C.§ 1186b(2)(A).

[144]See 5 U.S.C. § 6382.

dictates that the word "spouse", as used in the above-referenced immigration and FMLA

provisions, refers only to a husband or wife of the opposite sex, these significant non-pecuniary

federal rights are denied to same-sex married couples.

It strains credulity to suggest that Congress might have created such a sweeping status-

based enactment, touching every single federal provision that includes the word marriage or

spouse, simply in order to further the discrete goal of consistency in the distribution of federal

marriage-based pecuniary benefits.  For though the government is correct that the rational basis

inquiry leaves room for a less than perfect fit between the means Congress employs and the ends

Congress seeks to achieve,[145] this deferential constitutional test nonetheless demands some

*reasonable* relation between the classification in question and the purpose it purportedly serves.

In sum, this court is soundly convinced, based on the foregoing analysis, that the

government's proffered rationales, past and current, are without "footing in the realities of the

subject addressed by [DOMA]."[146]  And "when the proffered rationales for a law are clearly and

manifestly implausible, a reviewing court may infer that animus is the only explicable basis.

[Because] animus alone cannot constitute a legitimate government interest,"[147] this court finds

that DOMA lacks a rational basis to support it.

This court simply "cannot say that [DOMA] is directed to any identifiable legitimate

purpose or discrete objective. It is a status-based enactment divorced from any factual context

---

[145]See Heller, 509 U.S. at 319-20 (internal citations omitted).

[146]Id. at 321.

[147]Lofton v. Sec'y of the Dep't of Children & Family Servs., 377 F.3d 1275, 1280 (11th
Cir. 2004) (Birch, J., specially concurring in the denial of rehearing en banc) (interpreting the
mandate of Romer v. Evans).

from which [this court] could discern a relationship to legitimate [government] interests."[148] Indeed, Congress undertook this classification for the one purpose that lies entirely outside of legislative bounds, to disadvantage a group of which it disapproves.  And such a classification, the Constitution clearly will not permit.

In the wake of DOMA, it is only sexual orientation that differentiates a married couple entitled to federal marriage-based benefits from one not so entitled.  And this court can conceive of no way in which such a difference might be relevant to the provision of the benefits at issue. By premising eligibility for these benefits on marital status in the first instance, the federal government signals to this court that the relevant distinction to be drawn is between married individuals and unmarried individuals.  To further divide the class of married individuals into those with spouses of the same sex and those with spouses of the opposite sex is to create a distinction without meaning.  And where, as here, "there is no reason to believe that the disadvantaged class is different, in *relevant* respects" from a similarly situated class, this court may conclude that it is only irrational prejudice that motivates the challenged classification.[149]  As irrational prejudice plainly *never* constitutes a legitimate government interest, this court must hold that Section 3 of DOMA as applied to Plaintiffs violates the equal protection principles embodied in the Fifth Amendment to the United States Constitution.

IV.    Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss [#20] is DENIED and Plaintiffs' Motion for Summary Judgment [#25] is ALLOWED, except with regard to Plaintiff

---

[148]Romer, 517 U.S. at 635.

[149]Lofton, 377 F.3d at 1280 (Birch, J., specially concurring in the denial of rehearing en banc) (interpreting the mandate of City of Cleburne v. Cleburne Living Center) (emphasis added).

Dean Hara's claim for enrollment in the Federal Employees Health Benefits Plan, as he lacks standing to pursue that claim in this court.

AN ORDER HAS ISSUED.

 /s/ Joseph L. Tauro          
United States District Judge